UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LEROY PEOPLES,

                                        Plaintiff,

v.                                                                      9:20-CV-00242
                                                                        (MAD/TWD)

RICHARD HOYT, JOHN SHEA,
JAMES PIROZZOLO, and
MICHAEL RUSSO,

                                        Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

LEROY PEOPLES
*Plaintiff, pro se*
235959
Broome County Correctional Facility
P.O. Box 2047
Binghamton, NY 13902

LETITIA JAMES                                          LAUREN ROSE EVERSLEY, ESQ.
Attorney General of the State of New York    Assistant Attorney General
*Attorney for Defendants Hoyt, Shea, and Pirozzolo*
The Capitol
Albany, NY 12224

MICHAEL RUSSO
*Defendant, pro se*
116 Emory Drive
Jamestown, NY 14701

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

This matter has been referred for a Report-Recommendation, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(c).  Plaintiff Leroy Peoples commenced this action against

Defendants Richard Hoyt, John Shea, James Pirozzolo, and Michael Russo asserting claims pursuant to 42 U.S.C. §1983 for violations of his Fourth and Fourteenth Amendment rights while a parolee on post-release supervision by the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 1.) The Honorable Mae A. D'Agostino, United States District Judge, reviewed the complaint in accordance with 28 U.S.C. §§ 1915(e) and 1915A, and directed Defendants to respond to Plaintiff's Fourteenth Amendment due process claims challenging (1) the imposition of GPS monitoring as a special condition to Plaintiff's post-release supervision and (2) the requirement that Plaintiff pay to attend mandated sex offender programming conducted by Russo. (Dkt. No. 5 at 4-6, 8.[1]) Defendants Hoyt, Shea, and Pirozzolo answered the complaint through counsel, Defendant Russo answered the complaint *pro se*, and discovery ensued. (Dkt. Nos. 30, 34, 35, 40.)

Currently before the Court is a motion for summary judgment filed by Defendants Hoyt, Shea, and Pirozzolo, in which Defendant Russo joins. (Dkt. No. 59; *see also* Dkt. Nos. 58, 67, 69.) Plaintiff opposed the motion and Defendants Hoyt, Shea, and Pirozzolo replied. (Dkt. Nos. 65, 66.) For the following reasons, the undersigned recommends granting Defendants' motion and dismissing Plaintiff's complaint in its entirety. (Dkt. No. 59.)

## I.    LEGAL STANDARD

Summary judgment is warranted if the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing Fed. R. Civ. P. 56(a)). A fact

---

[1] Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

is "material" if it "might affect the outcome of the suit under the governing law[,]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute of a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of pointing the court to the materials that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 273 (2nd Cir. 2006). In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original; citation omitted). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). At bottom, summary judgment tasks the court with assessing the assembled

evidence and determining whether a reasonable factfinder could find in the nonmovant's favor. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

## II. DEFICIENCIES IN PLAINTIFF'S OPPOSITION SUBMISSION

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' motion for summary judgment, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under Local Rule 56.1(b).[2] (*See* Dkt. No. 65 at 4-8.) "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'" *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

---

[2] Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts. Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 56.1(b).

Here, as pointed out by Defendants, much of Plaintiff's response provides inconsequential background information as to why Plaintiff "disputes" the facts set forth in Defendants' statement of material facts, *i.e.*, his belief that he was not convicted of a sexually motivated felony and that recreational marijuana is currently legal in New York State. (*See, e.g.*, Dkt. No. 65 at 1-8; Dkt. No. 66 at 3.) Where, as in this case, a party has failed to respond to the movant's Statement of Material Facts in the manner required under Local Rule 56.1(b), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[3] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Nevertheless, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record. *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (noting that special solicitude afforded to *pro se* litigants suggests that courts should review record when *pro se* plaintiff fails to appropriately respond to defendants' properly supported statement of material facts).

---

[3] Plaintiff was provided with the requisite notice of the consequences of his failure to properly respond to the motion. (Dkt. No. 60.)

### III.    FACTS

At all times relevant to the claims in this action, Plaintiff was a parolee in custody of DOCCS.  (Dkt. No. 59-2 at ¶ 1.)  On June 6, 2019, Plaintiff was released to parole supervision as a Level 3 Sex Offender after serving a maximum term of incarceration for convictions of two counts of rape in the first degree, stemming from two separate incidents.  *Id.* at ¶¶ 5,[4] 8, 10.  Plaintiff was assigned Hoyt as his parole officer, and was required to report to the Binghamton Area office every Thursday to meet with Hoyt for a weekly check-in.  *Id.* at ¶ 10.  Although Shea worked alongside Hoyt and interacted with Plaintiff on occasion, Shea was not Plaintiff's assigned parole officer.  *Id.* at ¶ 11.

As relevant here, Plaintiff's conditions of release included refraining from marijuana use, imposition of a curfew, and participation in sex offender treatment programming.  *Id.* at ¶ 12.[5]  On or about June 13, 2019, Plaintiff failed to comply with the substance abuse condition by consuming marijuana without the written permission of his parole officer after testing positive for THC use.  *Id.* at ¶ 13.[6]  In response to the positive test, Plaintiff was directed to participate in drug abuse treatment.  *Id.* at ¶ 14.

---

[4] The first rape for which Plaintiff was convicted occurred on or about March 7, 1998, and the second instance was on or about April 7, 2003.  (Dkt. No. 59-2 at ¶ 7.)  As Plaintiff was fifteen when he committed the first rape, he was sentenced as a juvenile offender.  However, he was charged as an adult for the second rape.  *Id.* at ¶ 7 n.1.

[5] While Plaintiff disputes this paragraph, he does not do so in the manner required under L.R. 56.1(b).  (*See* Dkt. No. 65 at 5 ("Plaintiff disputes paragraph '12' because materials cited by defendants do not establish the absence of a genuine dispute of fact.  Recreation marijuana is legal in NYS, and under 'The less is more Community Supervision Reform Act,' Plaintiff cannot be incarcerated for missing sex offender programming or being late for curfew.  (See, 2021 NY Senate Bill S2244A/2021 NY Assembly Bill A5576A.)").)

[6] Plaintiff disputes this paragraph because "recreation marijuana is legal in NYS."  (Dkt. No. 65 at 5.)

On June 25, 2019, Plaintiff was approximately two hours late for his curfew. *Id.* at ¶¶ 16-20. As a result, Hoyt recommended to Pirozzolo, Acting Bureau Chief of the Binghamton Area Office and Senior Parole Officer, that based on Plaintiff's crime history and history of parole violations,[7] Plaintiff be placed on GPS monitoring. *Id.* at ¶ 21. Pirozzolo conferred with his supervisor, non-party Jeffrey Jones, Assistant Regional Director for the Western Region of DOCCS, who approved the implementation of the condition. *Id.* at ¶ 22. On June 27, 2019, Hoyt and Pirozzolo issued Plaintiff the special condition imposing GPS monitoring, which Plaintiff signed. *Id.* at ¶ 23. Plaintiff alleges Hoyt and Pirozzolo did not have the authority to impose the new condition. (Dkt. No. 1 at 4-5.)

From approximately June 11 through July 30, 2019, Plaintiff participated in the weekly sex offender programming conducted by Russo, a private practitioner, in Broome County in conjunction with DOCCS re-entry services. (Dkt. No. 1 at 6; Dkt. No. 59-2 at ¶¶ 29, 30.)

On August 6, 2019, Plaintiff removed his GPS device. (Dkt. No. 59-3 at 37-38; Dkt. No. 59-4 at ¶ 15.) It was determined Plaintiff had left his approved residence at 4:54 a.m. that morning. (Dkt. No. 59-4 at ¶ 15.) Hoyt attempted to contact Plaintiff and visited his residence, his mother's residence, and his wife's residence, but he was not located. *Id.* Hoyt also conducted a visit to Plaintiff's sex offender treatment program class. *Id.* Russo informed Hoyt that Plaintiff failed to show up for class. (Dkt. No. 59-2 at ¶ 25.) At 1:30 p.m., an absconder warrant was issued for Plaintiff's arrest, and he was taken into custody later that day. *Id.* at ¶ 28.[8]

---

[7] Plaintiff has a history of parole violations, including failing to report to his parole officer, changing his residence without notifying his parole officer, and raping the second victim while on parole for the March 7, 1998, rape conviction. *Id.* at ¶ 8.

[8] Plaintiff's Fourth Amendment false arrest claim asserted against Shea was dismissed on initial review. (Dkt. No. 5 at 6-8.)

Plaintiff claims he failed to attend the sex offender treatment program on August 6, 2019, because Russo and Hoyt "demanded" Plaintiff "start making $5 dollar-payments every Tuesday to Defendant Russo or [else] Plaintiff would be expelled from sex offender training for refus[ing] to participate." (Dkt. No. 1 at 8.) He further claims that although he was required to pay for the sex offender programming, Hoyt denied Plaintiff permission to accept an offer of employment until after he completed the program. *Id.*

In his submissions to the Court, Russo explains that "[t]he New York state rate is set at $50/person/session for parolees that are mandated for sex offender treatment. New York State pays a portion of this counseling fee for all parolees depending on their income status. The balance is expected to be paid by the parolee." (Dkt. No. 69 at 1.)

Neither Hoyt nor Pirozzolo had control over the payment structure for the sex offender treatment program. (Dkt. No. 59-2 at ¶ 31.) Hoyt never asked for and/or accepted payment from Plaintiff with respect to the sex offender program. *Id.* at ¶ 32. Plaintiff did not speak with Pirozzolo concerning the payment for treatment of services. *Id.* at ¶ 33. Plaintiff did not miss any treatment classes for failing to pay and was not removed from the program for failing to pay at any time. *Id.* at ¶ 34. The parties agree Shea had no personal involvement with respect to the GPS condition or payment for sex offender treatment programming. *Id.* at ¶ 35.

## IV.    DISCUSSION

### A.    Personal Involvement of Shea

Defendants argue the complaint should be dismissed as against Shea for lack of his personal involvement in any of the alleged constitutional violations. (Dkt. No. 59-1 at 7-8.) In response to the summary judgment motion, Plaintiff has requested that Shea be dismissed from this action. (Dkt. No. 65 at 9.) Considering Plaintiff's request for a voluntary dismissal, and in

the absence of any factual allegations alleging Shea's personal involvement in the underlying causes of action, the Court recommends granting summary judgment to Shea on this ground.

### B.      GPS Monitoring

The Court liberally construed the complaint as alleging Fourteenth Amendment due process claims against Defendants regarding the imposition of GPS monitoring as a special condition to Plaintiff's post-release supervision.  (Dkt. No. 5 at 5-6.)  Defendants seek summary judgment and argue the challenged special condition relating to GPS monitoring is constitutional, reasonably related to Plaintiff's past conduct, and was tailored to serve legitimate state interests.  (Dkt. No. 59-1 at 9-13.)  In his opposition submission, Plaintiff states he "waives" all claims against Shea and Pirozzolo and maintains his claims "only" against Hoyt and Russo regarding the payment of funds to participate in the sex offender treatment program conducted by Russo.  (Dkt. No. 65 at 9.)  Considering Plaintiff's request for a voluntary dismissal, and for the reasons set forth in Defendants' memorandum of law (Dkt. No. 59-1 at 9-13), the Court recommends that summary judgment be granted to Defendants on this ground.

### C.      Requirement to Pay for the Sex Offender Treatment Program

As indicated above, Plaintiff foregoes all claims except for his Fourteenth Amendment due process claims against Hoyt and Russo involving the alleged requirement that Plaintiff pay for the mandated sex offender treatment program conducted by Russo.  Considering Plaintiff's request for a voluntary dismissal of all claims against Shea and Pirozzolo and in the absence of any facts establishing Shea's and Pirozzolo's personal involvement in this underlying cause of action, (Dkt. No. 59-1 at 14-15), the Court recommends that summary judgment be granted to Shea and Pirozzolo on this ground.

Turning to the merits, the Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV. A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

Here, Defendants argue that Plaintiff fails to demonstrate that such allegations amount to a constitutional violation as he does not set forth an implicated liberty interest and fails to allege that he suffered any injury from failing to pay. (Dkt. No. 59-1 at 13-15.) This Court agrees.

The special condition provided Plaintiff "will enter, attend, cooperate, participate, and complete sex offender treatment, and will not leave this program without prior knowledge of and permission of [his] Parole Officer." (Dkt. No. 59-4 at 13.) As set forth above, Plaintiff claims he failed to attend the program on August 6, 2019, because Russo and Hoyt demanded that Plaintiff pay $5.00 to Russo. (Dkt. No. 1 at 8.) The record belies Plaintiff's claim.

Plaintiff attended the weekly sex offender treatment programming conducted by Russo in Broome County from approximately June 11, 2019, through July 30, 2019. (Dkt. No. 1 at 8; *see also* Dkt. No. 59-3 at 50-51 (indicating that that he likely attended classes for a month or two before his re-incarceration on August 6, 2019).) Plaintiff testified that he paid Russo on two such occasions when he "had the money." (Dkt. No. 59-3 at 56.) Notably, Plaintiff did not pay on the remaining occasions and was still permitted to attend the program without penalty, despite his claim that Hoyt told him that he would be removed from the program if he failed to pay. *Id.* at 56-57.

In his declaration, Hoyt states that as a parole officer, he had no control over whether Plaintiff was required to pay for such services. (Dkt. No. 59-4 at ¶¶ 16, 17.) Hoyt avers he never

requested or received money from Plaintiff to attend the programming. *Id.* at ¶ 18. Nor was he present during the programming. *Id.* Similarly, Plaintiff testified that he never spoke with Hoyt regarding his ability to pay for the sex offender treatment program, stating, "No, I never had that conversation with him." (Dkt. No. 59-3 at 59-60.) Plaintiff testified that the only conversation he had with Hoyt concerning the payment for treatment services was questioning whether he had to pay to attend, and Hoyt responded that he was "under the impression that he did." *Id.* at 51-52. Hoyt does not recall conversing with Plaintiff regarding program payment, but if he did, he would have told Plaintiff to speak with Russo or DOCCS re-entry services. (Dkt. No. 59-4 at ¶¶ 19-20.[9]) Russo submits that he "never told Plaintiff he would be denied services for not having the money" to pay for class. (Dkt. No. 69 at 1.)

In short, the record demonstrates Plaintiff was never denied treatment services for failure to pay the $5.00 fee at issue. *Id.*

Additionally, the Court agrees with Defendants that Plaintiff fails to establish any hardship associated with the requirement to pay for the sex offender treatment program. (Dkt.

---

[9] To the extent Plaintiff claims Hoyt "allowed this financial hardship" to continue by not communicating with DOCCS re-entry services about Plaintiff's alleged "financial plight", (Dkt. No. 65 at 9-10), such statement is contradictory to Plaintiff's deposition testimony, wherein he stated that he never spoke to Hoyt concerning his inability to pay for treatment. (*See* Dkt. No. 59-3 at 59.) Plaintiff's self-serving statements, presented for the first time in his opposition to the motion for summary judgment, are unsupported by the record and do not create a material issue of fact for a jury. *See, e.g.*, *Peoples v. Leon*, No. 9:18-CV-1349 (LEK/ML), 2021 WL 1582173, at *10 (N.D.N.Y. Jan. 4, 2021) (citing *Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725 (2d Cir. 2003) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony."))); *Fox v. Harris*, No. 6:15-CV-0616 (LEK/ATB), 2017 WL 1319835, at *2 (N.D.N.Y. Apr. 7, 2017) (holding that the plaintiff "cannot escape summary judgment via 'self-serving statements . . . made in his opposition that contradict his sworn deposition testimony.'") (citation omitted), *report-recommendation adopted*, 2021 WL 977222 (N.D.N.Y. Mar. 16, 2021).

No. 59-1 at 15; Dkt. No. 69 at 1.)  As indicated, Plaintiff likely attended six to eight classes from June 11 through July 31, 2019, and although he only paid on two occasions, Plaintiff was still permitted to attend the program without penalty despite his claims that Hoyt and Russo told Plaintiff that he would be removed from the program if he failed to pay.  The record evidence demonstrates Plaintiff did not miss programming on August 6, 2019, because "he couldn't pay" but rather because of "other issues" including that Plaintiff removed his GPS monitor.  (Dkt. No. 59-3 at 56-57.)

Lastly, to the extent Plaintiff contests the designation that he was "convicted of a sexually motivated felony," and his alleged improper designation under Article 10 of the Menth Hygiene Law, (*see* Dkt. No. 65 at 10), such designations are not at issue in this case.  Because of Plaintiff's two rape convictions, he was released as a Level 3 Sex Offender.  (Dkt. No. 59-2 at ¶ 8.)  "Mandatory sex offender programming for an individual convicted of a sex offense does not rise to the level of a substantive due process violation."  *Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *9 (W.D.N.Y. Nov. 6, 2019) (citing *Miller v. Annucci*, 9:19-CV-0030, 2019 WL 2370295, at *13 (N.D.N.Y. June 5, 2019); *Blake v. Fischer*, No. 09-CV-266, 2010 WL 2522198, at *13 (N.D.N.Y. Mar. 5, 2010)); *see also Mercer v. Sullivan*, No. 18-CV-1148, 2018 WL 6787159, at *5 (N.D.N.Y. Dec. 26, 2018) ("[The] [p]laintiff was convicted of a sex offense, thus, [the] [p]laintiff does not have a liberty interest in being free from participation in a sex offender treatment program." (citation omitted)), *reconsideration denied*, 2019 WL 569074 (N.D.N.Y. Feb. 12, 2019).

In sum, Plaintiff's conclusory and often contradictory allegations fail to demonstrate that there is a material dispute of fact that would necessitate a trial in this matter.  Accordingly, for

the reasons given above, the Court recommends granting summary judgment to Hoyt and Russo on this ground.[10]

## V.    PLAINTIFF'S ADDRESS

Local Rule 10.1(c)(2) states that "all attorneys of record and *pro se* litigants must immediately notify the court of any change of address," and requires parties to file the notice of change with the Clerk and serve all other parties to the action.  L.R. 10.1(c)(2).  In turn, Local Rule 41.2(b) provides that "failure to notify the Court of a change of address in accordance with Rule 10.1(c)(2) may result in the dismissal of any pending action."  L.R. 41.2(b).

Here, Plaintiff was placed on notice by the Court of his duty to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address and that his failure to do so may result in the dismissal of this action.  (Dkt. No. 5 at 9-10.)  Plaintiff demonstrated that he understood this requirement and its importance when he updated his address with the Court on four occasions.  (*See* Dkt. Nos. 18, 21, 29, 45.)  However, on May 9, 2022, a mailed copy of the 05/02/2022 Text Order (Dkt. No. 67) that was sent to Plaintiff at his address on file was returned as undeliverable.  (Dkt. No. 68.)  The envelope was marked "return to sender – not in custody."  *Id.*  The Clerk's Office confirmed Plaintiff was released from the Broome County Correctional Facility on April 29, 2022.

Plaintiff must file a change of address in writing within fourteen (14) days, and he must continue to submit any address changes to the Court as long as this action is pending.[11]  "Failure

---

[10] Considering this recommendation, the Court does not reach Defendants' qualified immunity argument.  (*See* Dkt. No. at 15-17.)

[11] In an extraordinary display of special solicitude to Plaintiff as a *pro se* litigant, the Clerk is directed to mail a one-time courtesy copy of this Order and Report-Recommendation along with a copy of the docket and a notice of change of address to Plaintiff at the address identified by Defendant Russo in Dkt. No. 69.

to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of any pending action."  L.R. 41.2(b).

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the undersigned recommends granting summary judgment to Defendants Shea, Hoyt, Pirozzolo, and Russo and dismissing Plaintiff's complaint in its entirety.

**WHEREFORE**, it is hereby

**RECOMMENDED** that the motion for summary judgment filed by Defendants Shea, Hoyt, Pirozzolo (Dkt. No. 59), and in which Defendant Russo has joined (*see* Dkt. Nos. 58, 67, 69) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED** that Plaintiff must file a **CHANGE OF ADDRESS** within fourteen (14) days of the date of the foregoing report, and he must continue to submit any address changes to the Court as long as this action is pending; failure to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of this action; and it is further

**ORDERED** that the Clerk provide a copy of this Order and Report-Recommendation to the parties in accordance with the Local Rules of Practice, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk provide a one-time courtesy copy of this Order and Report-Recommendation, along with a copy of the docket and a notice of change of address to Plaintiff at the Del Motel, Room 8, 609 Upper Court Street, Binghamton, NY 13904.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  June 3, 2022
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[12] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Supplemented by Cao-Bossa v. New York State Dep't of Labor, N.D.N.Y., November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,
v.
NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of New York, Counsel for Defendant, 300 South State Street, Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE COWAN, ESQ., Assistant Attorney General.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this employment discrimination action filed by Weili Cao-Bossa ("Plaintiff") against the New York State Department of Labor ("Defendant"), are the following two motions: (1) Defendant's motion for summary judgment; and (2) Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt. Nos. 58, 70.) For the reasons set forth below, Defendant's motion for summary judgment is granted, and its motion to strike Plaintiff's sur-reply is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint**
Generally, in her Second Amended Complaint, Plaintiff claims that Defendant discriminated against her based on her national origin and age in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second Am. Compl.].) In support of her claims, Plaintiff alleges that Defendant discriminated against her by (a) refusing to hire her for a position for which she interviewed in March 2016, and (b) terminating her employment in another position after six months. (Id.) More specifically, Plaintiff, who is Chinese and was 45 years old at the time of her termination, alleges that she received unfairly poor performance reviews based on a few sporadic mistakes that resulted in her termination, but that other American and/or younger employees did not receive similar negative performance reviews and were not terminated. (Id.)

**B. Undisputed Material Facts on Defendant's Motion for Summary Judgment**
Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule 7.1[a][3]), a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. Local R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. Local R. 56.1(b).

In this case, Plaintiff entirely failed to provide any response to Defendant's Statement of Material Facts, much less one that complies with Local Rule 56.1. Where a party has failed to respond to the movant's statement of material facts in the manner required under Local Rule 56.1, the facts in the movant's statement will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2)

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 17 of 115
Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)
2021 WL 3674745

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). [1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

[1]    Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

**\*2** Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

 *3  22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

 *4  45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

*5 66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

g. On March 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

*6 i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

*7  92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

*8 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

### C. Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (Id. at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (Id.) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (Id.)

**\*9** Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (Id. at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it was is not sufficient to sustain her claim. (Id.)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (Id. at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

2021 WL 3674745

show that her age was the but-for cause of her termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

### 4. Plaintiff's Sur-Reply

**\*10** Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

### 5. Defendant's Letter-Motion to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[2]      As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[3]

[3]  Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.).[4] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules.[5]

[4]  *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[5]  *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

**\*11**  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*,

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[6] – even where the non-movant was proceeding *pro se*.[7]

[6]  Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports their denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]  *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[8]  *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

**\*12**  Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

## B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

2021 WL 3674745

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

### C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

**\*16** Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiate multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at \*1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

2021 WL 3674745

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

*18  Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.]; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the

evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Slip Copy, 2021 WL 3674745

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 33 of 115

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)
2019 WL 5784940

2019 WL 5784940
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Angel MALDONADO, 03-R-2519, Plaintiff,
v.
Susanna MATTINGLY Parole Officer, Defendant.

11-CV-1091Sr
|
Signed 11/06/2019

**Attorneys and Law Firms**

Angel Maldonado, Ocala, FL, pro se.

Ryan Lane Belka, NYS Attorney General's Office, Buffalo, NY, for Defendant.

## DECISION AND ORDER

Hon. H. Kenneth Schroeder Jr., Judge

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment. Dkt. #15.

Plaintiff's third amended complaint, prepared *pro se*, pursuant to 42 U.S.C. § 1983, alleges that the imposition of sex offender conditions by Parole Officer Susanna Mattingly during his release on parole from February 24, 2010 through March 16, 2010 and September of 2010 through May of 2011 constitute a violation of the *ex post facto* clause of the United States Constitution;[1] a violation of plaintiff's constitutional right to substantive and procedural due process; and a violation of plaintiff's right to free association. Dkt. #52. Plaintiff seeks monetary damages. Dkt. #52, p.19.

[1]      This claim was dismissed with prejudice by Order entered September 24, 2012. Dkt. #5.

Currently before the Court is defendant Susanna Mattingly's motion for summary judgment (Dkt. #78), and plaintiff's motion for summary judgment. Dkt. #80. For the following reasons, defendant's motion is granted in part and plaintiff's motion is denied.

## FACTS

Plaintiff pled guilty to a misdemeanor charge of sexual misconduct pursuant to N.Y. Penal Law § 130.20(2), in satisfaction of a charge of rape, third degree, and was sentenced to three years of probation. Dkt. #25, p.16. Plaintiff's probation was discharged on March 16, 1999. Dkt. #1, ¶ 8. Plaintiff asserts that the charges arose from his consensual sexual relationship with a girlfriend when he was 22 and she was 16. Dkt. #80, pp.15 & 23.

In 2002, the New York State Legislature amended New York's Penal Law to include a conviction under Penal Law § 130.20 within the definition of a sex offense for purposes of New York's Sex Offender Registration Act. *2002 Sess. Law News of N.Y. Ch. 11* (S. 6263-A) (McKinney's).

On April 25, 2003, following his guilty plea to a scheme to defraud, first degree; three counts of grand larceny, third degree; attempted petit larceny; tampering with physical evidence; compounding a crime; coercion, second degree; bribing a witness; tampering with a witness, fourth degree; three counts of criminal impersonation, second degree; harassment, second degree; and three counts of aggravated harassment in the second degree, in satisfaction of Indictment No. 2340/99 and bail jumping, second degree, in satisfaction of Indictment No. 891/01, plaintiff was sentenced to an aggregate indeterminate term of imprisonment of 5 to 15 years. Dkt. #80-1, p.3. Plaintiff had portrayed himself on the internet as a police detective with the New York City Police Department to meet women from whom he obtained significant amounts of money. Dkt. #45, p.8. Plaintiff was released from custody in May of 2009.

By letter dated October 22, 2009, Dominic A. Dispenza, LCSW-R, completed a sexual offender evaluation and risk assessment of plaintiff and determined that plaintiff

displayed symptoms of an antisocial personality disorder. He was deceitful, took no responsibility for his behaviors, showed no remorse, and completely lacked empathy. Furthermore, he has demonstrated impulsivity, aggressiveness, and a reckless disregard for the safety of others and himself.

**\*2** 2. Mr. Maldonado claimed that he does not have a sex offense problem and denied the possibility of relapse. He denied he committed a sexual offense and claimed to this evaluator that he had married his victim in Puerto Rico

prior to his conviction and she had their child when she was 17 years old. Mr. Maldonado is reported to have told his probation officer that he did not marry this victim until after he had been convicted of his offense against her.

\* \* \*

4. Mr. Maldonado demonstrated that he is not amenable to sexual offender treatment. He displayed evasiveness, a superficial manner, hostility, and a lack of cooperation during this evaluation. Furthermore, he was previously expelled from another sex offender treatment program and appears to have tried to hide that fact during this evaluation.

Dkt. #25, p.27.

Plaintiff violated parole in November of 2009. Dkt. #80, p.4, ¶ 4. A Violation of Release Report charged plaintiff with 7 violations of the terms and conditions of his release, including failure to complete sex offender treatment, lying to his parole officer about sex offender treatment, lying to his parole officer about employment, failing to provide his cell phone number to his parole officer and lying to his parole officer about his cell phone number. 11-CV-717 at Dkt. #36-1, p.197. [2] On November 24, 2009, plaintiff pled guilty to the charges of failing to provide his parole officer with his cell phone number and lying to his parole officer and was sentenced to time served plus three months. 11-CV-717 at Dkt. #36-1, p.198.

[2]     In this action, plaintiff alleged that PO Mattingly, *inter alia*, delayed his re-release to parole without affording him due process. 11-CV-717. The Court of Appeals for the Second Circuit affirmed district court's determination that it was reasonable and permissible for the New York State Division of Parole to require approval of his residence as a special condition of release. *Maldonado v. Evans*, 654 Fed. App'x 505 (2d Cir. 2016).

Parole Officer ("PO"), Susanna Mattingly recommended plaintiff for Discretionary Sex Offender ("DSO"), status on February 11, 2010. Dkt. 78-4 & Dkt. #78-5, ¶ 16. P.O. Mattingly made this recommendation based upon plaintiff's past criminal conviction for sexual misconduct with a minor. Dkt. #78-4, ¶ 20.

On February 11, 2010, an unidentified individual, on behalf of Phillip Overfield, the Area Supervisor for the Niagara Falls Areas Office of the New York State Department of Corrections and Community Supervision ("NYSDOCCS"),

signed a Designation Regarding Discretionary Sex Offender Status form advising that,

> Based on case review, [Angel Maldonado] was determined to be a discretionary sex offender. Please take necessary steps to ensure that the case remains in intensive sex offender supervisory status until maximum expiration or other discharge from supervision and set the "Supervised as a Sex Offender" indicator to: "*yes, discretionary.*"

Dkt. #78-5, ¶ 17 & Dkt. #80-1, p.7.

Supervisor Overfield declares that a "DSO is a parolee who is not on parole for a sex crime, but whose criminal history includes a prior sex offense conviction or the commission of a crime which had a sexual component." 78-4, ¶ 8. He further declares that a DSO designation "is not a public designation and does not involve registering with the State Sex Offender Registry," but otherwise subjects a parolee "to the same conditions of parole as a convicted sex offender." Dkt. #78-5, ¶¶ 10 & 12.

**\*3** Plaintiff objects to the following conditions of parole, commonly referred to as sex offender conditions, which were imposed upon his release from prison on February 24, 2010:

4. I will enter, attend, participate in, cooperate with and successfully complete the Sex Offender counseling program at Mid-Erie Counseling and Treatment as directed by my Parole Officer. I will obey the rules of the program. I will keep all my appointments, the first of which is _____.

20. I will have no contact of any kind, in person, by phone, by letter or by third party with any person under 18 years of age without the prior written approval of my Parole Officer.

21. I will not call any sexually explicit (900/976) telephone services, including such places as Quest, Ashley Madison and chat lines. I will not enter or remain in any areas of sexual activity, such as adult bookstores, topless bars, massage parlors, sex shops or adult movie

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 35 of 115

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)
2019 WL 5784940

houses. I will submit copies of my telephone bill to the Parole Officer upon request.

22. I shall not enter or remain within 1,000 feet of places where any person under the age of 18 may congregate, including but not limited to: Schools, Playgrounds, Video Arcades, Sports Fields, Malls, Movie Theaters, Bowling Alleys, etc., without the prior approval from my Parole Officer.

23. I will notify my Parole Officer when I establish a relationship with a significant other, and I will inform the other party of my criminal history regarding sexual offenses.

25. I shall not purchase, engage or be in possession of pornographic materials or erotic magazines, tapes, photographs, "X" rated films/DVDs/videos. This includes, but limited to, such content on all telecommunication devices and publications as Playboy, Hustler, North American Man-Boy Love Association, Pedophile information exchange, Pedo-Alert Network or any other similar publications.

26. I shall not have children's toys or video games, video tapes, children's DVDs or excessive amounts of candy or child-like objects or child-like images or photos, or any type of sex toy in my possession, without the prior knowledge and permission of my Parole Officer.

27. I shall not participate in any on-line computer service that involves the exchange of pornographic electronic photos or messages, or establishes sexual encounters or liaisons.

28. I shall not use, own or possess a computer or any type of equipment with "on-line" capabilities.

30. I will not use or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my Parole Officer and the approval of his Area Supervisor.

31. I will participate in the Division of Parole's polygraph program as directed by my Parole Officer....

32. I will not have any Premium Channels on any of the televisions that I have access to in my Parole approved residence. Such Premium Channels include but are not limited to, The Movie Channel, Showtime, Cinemax and Home Box Office.

36. I will have no contact of any kind, in person, phone[,] letter, written, text messaging, electronically, third person or by any other means with a one, Valerie Cole, without the written permission of my Parole Officer.

**\*4** Dkt. #52-1, pp.1-5. The form setting forth the special conditions was signed by plaintiff and by an unknown parole officer "for Mattingly." Dkt. #52-1, p.5.

PO Mattingly supervised plaintiff from his release from prison on February 24, 2010 until a warrant was issued for violation of parole on March 16, 2010. Dkt. #78-4, ¶ 24 & Dkt. #80, ¶¶ 7-8. A Violation of Release Report dated March 16, 2010 charged plaintiff with 16 violations of the terms and conditions of his release, including multiple charges of failure to be truthful in his discussions with his parole officer and failure to comply with rules, resulting in plaintiff's discharge from his residential program. 11-CV-717 at Dkt. #36-1, pp.192-202. A Final Parole Violation Hearing was conducted on April 8, 2010. 11-CV-717 at Dkt. #36-1, p.157. Plaintiff pled guilty to a violation pertaining to his discharge from the residential program in return for a sentence of time served plus three months. 11-CV-717 at Dkt. #62-1, p.4.

On June 30, 2010, P.O. Mattingly received a telephone call from Laura O'Brien who claimed that plaintiff had been incarcerated with her son and that plaintiff requested that Ms. O'Brien send 25 $1,000 money orders to plaintiff's girlfriend, Valerie Cole, so that plaintiff could link the woman's son with a lawyer. Dkt. #45, p.10. Ms. O'Brien completed a supporting deposition setting forth the new allegations against plaintiff and Ms. Cole on July 12, 2010. Dkt. 80-1, 93 Ill.App.3d 781, 49 Ill.Dec. 165, 417 N.E.2d 855.

Plaintiff appeared before the Board of Parole on September 23, 2010 and was afforded a release date of September 29, 2010, at which time he commenced supervision in the State of Florida. Dkt. #36-1, pp.179-180 & Dkt. #68, ¶ 25. PO Mattingly declares that she was not involved in plaintiff's parole on September 29, 2010. Dkt. #78-4, ¶¶ 26-30. Supervisor Overfield declares that PO Diana Wingfield-Sherry, the parole officer at Livingston Correctional Facility, the facility from which plaintiff was released, oversaw plaintiff's release on parole and transfer to Florida, where plaintiff was subjected to Florida's Sex Offender Special Conditions. Dkt. #78-5, ¶¶ 20 & 27-28 & Dkt. #80, pp.18-19.

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)

2019 WL 5784940

A warrant was issued for plaintiff's arrest on February 7, 2011 after plaintiff failed to report, left his employment and vacated his address without his parole officer's permission. 11-CV-717 at Dkt. #36-1, p.179.

Plaintiff was stopped by the Sheriff's Department in Rutherford, Tennessee on May 10, 2011 and extradited to New York. 11-CV-717 at Dkt. #36-1, pp.246-247. Plaintiff pled guilty to the charge of failing to report to his parole officer and was assessed six months of delinquent time. 11-CV-717 at Dkt. #36-1, pp.228-244.

On August 17, 2012, plaintiff was convicted of grand larceny in the third degree in violation of New York Penal Law § 155.35 and sentenced as a second felony offender to an indeterminate term of imprisonment of 3½ to 7 years, consecutive to any parole time, with respect to the scheme to send $25,000 to his girlfriend, Valerie Cole. *People v. Maldonado*, 122 A.D.3d 1379, 997 N.Y.S.2d 205 (4th Dep't 2014), *leave to appeal denied*, 27 N.Y.3d 1002, 59 N.E.3d 1223 (2016).

Plaintiff was released on parole to Florida on or about January 18, 2018. nysdoccslookup.doccs.ny.gov. The maximum expiration date of his sentence is November 14, 2024. *Id.*

## DISCUSSION AND ANALYSIS

### Summary Judgment

**\*5** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

### Discretionary Sex Offender Status

The individual conditions which plaintiff challenges are a direct consequence of the determination to categorize plaintiff as a discretionary sex offender. "According to the New York State Parole Handbook, '[a] discretionary sex offender is generally a person who has a history of sexual offense or pattern of inappropriate sexual behavior, but is not subject to the Sex Offender Registry for any number of reasons.' " *Webster v. v. Himmelbach*, 271 F. Supp.3d 458, 462, n.1 (W.D.N.Y. 2017) (internal quotations omitted). NYSDOCCS Directive 8304, which "sets forth departmental policy 'to identify and provide intensive supervision strategies to both individuals subject to the New York State Sex Offender Registry and to individuals with a history of sexually inappropriate behaviors so that the interests of public safety and the supervision needs of the releasees are served," defines a discretionary sex offender as "[a]n offender found upon case review and determination ... to meet Department established criteria for specialized supervision as a sex offender." *Gordon v. LaClair*, 48 Misc. 3d 926, 929 (S. Ct. Franklin Cty 2015). That criteria includes individuals with a current or prior crime of conviction that is a sexually motivated offense, but not an offense included in the New

York State Sex Offender Registry, where "[i]t appears that the offender and/or community would benefit from intensive supervision practices that incorporate specialized sex offender 'containment' strategies." *Id.* The Directive does not mandate the application of any specific parole condition to discretionary sex offenders. *Id.* at 930.

## Personal Involvement

PO Mattingly seeks summary judgment on the ground that she had no personal involvement in the supervision of plaintiff's parole or the imposition of conditions for such parole between September of 2010 through May of 2011. Dkt. #78-1, p.4. PO Mattingly further argues that Supervisor Overfield was the individual who designated plaintiff as a discretionary sex offender. Dkt. #78-1, pp.7-8.

 **\*6** Plaintiff responds that Susan Mattingly recommended that plaintiff be supervised as a DSO and supervised plaintiff's parole in February of 2010. Dkt. #80, pp.37-39.

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)*; Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989). In the instant case, PO Mattingly declares that she made the recommendation that plaintiff be designated as a DSO. Dkt. #78-4, ¶ 21 & Dkt. #78-5, ¶ 16. Moreover, PO Mattingly supervised plaintiff and charged him with violations of the terms and conditions of his parole between February 24, 2010 and March 16, 2010. Dkt. #78-4, ¶ 24 & Dkt. #80, ¶ 7-8. This is sufficient to establish Susanna Mattingly's personal involvement in the imposition of DSO parole conditions challenged by plaintiff. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006) (enforcement of special condition of parole constitutes personal involvement).

## Qualified Immunity

Defendant argues that she is entitled to qualified immunity because at the time of the designation, there was no judicial determination that the imposition of sex offender conditions implicated a liberty interest and there was no clear right to a hearing prior to a determination to designate someone as a discretionary sex offender. Dkt. #78-1, p.14.

Plaintiff responds that qualified immunity is inappropriate because there are material questions of fact as to whether defendant's actions were objectively reasonable given that

plaintiff was not convicted of a sex offense and whether the special conditions of parole imposed upon him were reasonably related to the nature and circumstances of plaintiff's crimes. Dkt. #80, p.41.

"Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct." *Mara v. Rilling,* 921 F.3d 48, 68 (2d Cir. 2019) (internal quotations omitted). If the answer to the first question is no, there is no need for further inquiry because a defendant has no need for immunity absent a viable constitutional claim. *Id.* "But even if the answer is yes, or not definitively no, a defendant may still be entitled to qualified immunity if the right was not clearly established at the time of his challenged actions." *Id.* "Indeed, a court that decides this second question in a defendant's favor may award qualified immunity without conclusively answering the first." *Id.* "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir. 2004).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix v. Luna,* ⸺ U.S. ⸺, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015), *quoting Reichle v. Howards,* 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012). Thus, the right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official. *Reichle,* 566 U.S. at 665, 132 S.Ct. 2088 (internal quotations omitted). In *Reichle,* for example, the Supreme Court held that although it was clear at the time of plaintiff's arrest that the First Amendment prohibited government officials from retaliating against an individual for his speech, it was not clearly established that an individual was protected from a retaliatory arrest that was otherwise supported by probable cause. *Id.* The standard is deliberately forgiving to afford public officials breathing room to make reasonable but mistaken judgments without fear of liability. *Mara,* 921 F.3d at 68. "In short, if at least some reasonable officers in the defendant's position could have believed that the challenged conduct was within the bounds of appropriate police responses, the defendant officer is entitled to qualified immunity." *Id.* (internal quotations omitted). "Indeed, the Supreme Court has repeatedly observed that qualified immunity protects 'all but

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 38 of 115

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)

2019 WL 5784940

the plainly incompetent or those who knowingly violated the law.' " *Id., quoting Ashcroft v. al-Kidd,* 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

*Due Process*

**\*7** The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law ..." U.S. CONST. amend. XIV. The Due Process Clause contains both a procedural and substantive component. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars the deprivation of a constitutionally protected interest in life, liberty or property without due process of law, while the substantive component bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures to implement them. *Id.* (internal quotation omitted); *See Cty. of Sacramento v. Lewis,* 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.") (internal quotations omitted).

*Procedural Due Process*

Plaintiff argues that parole officers have no authority to classify him as a sex offender and that this label has imposed both a stigma and tangible burden upon him. Dkt. #52, pp.8-9. He further complains that he was not afforded notice of the special conditions, an explanation as to why they were being imposed or an opportunity to dispute the imposition of the special conditions. Dkt. #52, p.17 & Dkt. #80, p.36. Plaintiff claims that he has no history of sexual misbehavior subsequent to the sexual misconduct conviction. Dkt. #80, p.24.

Defendant argues that plaintiff has no liberty interest in any specific condition of parole and, therefore, no right to notice or a hearing regarding such conditions. Dkt. #78-1, pp.8 & 12. Even if plaintiff was entitled to due process relating to his designation as a discretionary sex offender, defendant argues that plaintiff had the opportunity to challenge such designation through an article 78 proceeding. Dkt. #78-1, p.16.

Plaintiff responds that an article 78 proceeding was not an adequate post deprivation remedy because such a proceeding became moot each time he was re-incarcerated. Dkt. #80, p.42.

Procedural due process claims are analyzed in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. *Kentucky v. Dep't. of Corrs.,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Court of Appeals for the Second Circuit has consistently held that, under New York's parole scheme, "plaintiffs have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable." *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir. 2001); *See also, Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.").

As a result, "it is well-established that 'the [New York] Parole Board's discretionary imposition of special conditions is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner.' " *Maldonado v. Fischer,* No. 11-CV-1091, 2012 WL 4461647, at \*4 (W.D.N.Y. Sept. 24, 2012), *quoting Walker v. Mattingly,* 09-CV-845, 2012 WL 1160772, at \*6 (W.D.N.Y. Apr. 5, 2012); *See Nash v. King,* No. 13-CV-753, 2015 WL 1461291, at \*3 (W.D.N.Y. March 30, 2015) ("Federal courts have consistently held that a parolee has no constitutionally protected interest in being free from special conditions of release") (internal quotation omitted); *Cooper v. Dennison,* No. 08-CV-6238, 2011 WL 1118685, at \*11 (W.D.N.Y. Mar. 24, 2011) ("parolee ... has no liberty interest in avoiding the imposition of special conditions of parole."); *Boddie v. Chung,* No. 09-CV-4789, 2011 WL 1697965, at \*1 (E.D.N.Y. May 4, 2011) ("A parolee has no constitutionally protected interest in being free of a special condition of parole."); *Pena v. Travis,* No. 01 Civ. 8534, 2002 WL 31886175, at \*13 (S.D.N.Y. Dec. 27, 2002) ("Because the imposition of special conditions is left to the discretion of the Board of Parol and parole officers, plaintiff does not have a protected liberty interest in being free from special conditions."). Thus, to the extent that plaintiff complains about the special conditions of release imposed upon him as a result of his designation as a discretionary sex offender, defendant's motion for summary

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)

2019 WL 5784940

judgment is granted because plaintiff does not have a liberty interest in being free from any such conditions.

 **\*8** Plaintiff fares no better if his designation as a discretionary sex offender is considered separate and apart from the special conditions of parole imposed upon plaintiff as a consequence of that designation. As explained by the Court of Appeals in *Vega v. Lantz*, "while it may be the case that, in certain circumstances, misclassification as a sex offender results in stigma plus, the possibility is of no particular assistance to [plaintiff] because he has not established a threshold requirement - the existence of a reputation-tarnishing statement that is *false*." 596 F.3d 77, 82 (2d Cir. 2010). Thus, although "it continues to be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest," *Id.* at 81-82, plaintiff in the instant case has been convicted of a sex offense, *to wit*, sexual misconduct in violation of N.Y. Penal Law § 130.20(2). Therefore, this case is distinct from *Singleton v. Doe*, where the district court denied summary judgment to parole officers who designated plaintiff as a discretionary sex offender based upon prison disciplinary proceedings finding plaintiff guilty of indecent exposure and lewd acts. 210 F. Supp.3d 359 (E.D.N.Y. 2016). In any event, the district court in *Singleton* determined that qualified immunity was appropriate because neither the Court of Appeals for the Second Circuit nor the Supreme Court had made clear whether a parolee's liberty interest in avoiding a designation as a sex offender extended to designation as a discretionary sex offender. *Id.* at 371; *See also Webster*, 271 F. Supp.3d at 464 ("it is an unsettled question in this Circuit as to whether a prisoner holds a liberty interest in being designated as a DSO."); *Gordon v. Semrug*, No.14-CV-324, 2017 WL 2241966, at \*6 (W.D.N.Y. May 23, 2017) ("But although a prisoner parolee may have a liberty interest in avoiding the stigma and tangible impairment associated with a registered sex offender designation, neither the Second Circuit nor the Supreme Court has made clear that the interest extends to a DSO designation."). As "[p]laintiff's right to receive due process prior to being designated a discretionary sex offender is not clearly established," defendant is entitled to qualified immunity. *Gordon*, 2017 WL 2241966, at \* 6 (collecting cases).

*Substantive Due Process*

Plaintiff claims that the imposition of sex offender conditions violates his constitutionally protected right to substantive due process because the conditions imposed upon him are arbitrary and capricious rather than reasonably related to the nature and circumstances of the offenses for which he is currently on parole or the history and characteristics of his prior conviction for sexual misconduct. Dkt. #52, p.6 & Dkt. #80, pp.15 & 21. Plaintiff notes that he completed his sentence of probation on the sexual misconduct conviction, which did not qualify as a sex offense at the time of his conviction, without any requirement for sex offender counseling or any other condition currently being imposed upon him. Dkt. #52, p.7 & Dkt. #80, p. 30. Plaintiff argues that sex offender counseling is intrusive and cannot be successfully completed unless plaintiff admits that he is a sex offender. Dkt.#80, p.25. Plaintiff also claims that the restriction of his ability to have contact with his wife, Valerie Cole, his children, or any person under the age of 18, is a violation of his First Amendment right to association and that he should not be required to disclose his criminal history to potential romantic partners or to disclose the identity of potential romantic partners to his parole officer. Dkt. #52, pp.15-16 & Dkt. #80, pp.16 & 32-33.

Defendant responds that there is a connection between the facts of plaintiff's criminal history and the special conditions imposed which preclude any potential that defendant acted in an arbitrary and capricious manner. Dkt. #78-1, p.9.

The substantive component of the Due Process Clause of the Fourteenth Amendment protects individual liberty against certain government actions regardless of the procedures used to implement them. *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). However, it is well-established that substantive due process protections extend only to those interests that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), and "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Reno v. Flores*, 507 U.S. 292, 303, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

"The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights." *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 848, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). More specifically, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), *citing Casey*, 505 U.S. at 847-49, 112 S.Ct. 2791 (1992) (describing cases in which

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 40 of 115

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)
2019 WL 5784940

substantive due process rights have been recognized); *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (recognizing that "choices to enter into and maintain certain intimate human relationships," such as marriage, "must be secured against undue intrusion by the State.").

**\*9** "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009), *quoting Lewis*, 523 U.S. at 847, n.8, 118 S.Ct. 1708. To satisfy this standard, a plaintiff must show that the government decision being challenged "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989), *cert. denied*, 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990). Within the prison context, very few conditions have been deemed sufficiently shocking to violate substantive due process rights, for example, transfer from prison to a mental hospital and involuntary administration of psychotropic drugs. *Tavares v. Amato*, 954 F. Supp.2d 79, 98 (N.D.N.Y. 2013), *citing Sandin v. Connor*, 515 U.S. 472, 479 n.4, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Mandatory sex offender programming for an individual convicted of a sex offense does not rise to the level of a substantive due process violation. *See Miller v. Annucci*, 9:19-CV-0030, 2019 WL 2370295, at \*13 (N.D.N.Y. June 5, 2019); *Blake v. Fischer*, No. 09-CV-266, 2010 WL 2522198, at \*13 (N.D.N.Y. Mar. 5, 2010); *But See Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*9 (S.D.N.Y. Jan. 11, 2019) (parolee "has a substantive liberty interest in not being labeled as a sex offender when he has committed no sexual offense."). As plaintiff in the instant case has committed a sex offense, *to wit*, sexual misconduct in violation of N.Y. Penal Law § 130.20(2), the Court finds that the decision to impose sex offender counseling upon plaintiff's parole conditions is not irrational or arbitrary.

Limitations on contact with a spouse or child are analyzed using the framework of substantive due process, which is subject to the same analysis as a familial association claim under the First Amendment. *See Doe v. Cappiello*, 758 Fed. App'x. 181, 184 (2d Cir. 2019) (First Amendment familial association and Fourteenth Amendment substantive due process subject to identical analysis). Under this analysis, "[c]onditions of release that restrict the right to intimate

association must be reasonably and necessarily related to the legitimate interests of the parole regime, such as rehabilitation and protection of the public, and tailored in light of the conduct for which the individual was convicted." *Harris v. N.Y. Div. of Parole*, 9:18-CV-1435, 2019 WL 1958017, at \*4 (N.D.N.Y. May 1, 2019) (internal quotations and alteration omitted).

In *Bostic v. Jackson*, the district court granted defendants' motion for summary judgment as to plaintiff's challenge to a condition of parole which limited contact and prevented him from residing with his wife where she was the victim of the crime for which plaintiff was convicted. No. 9:04-CV-676, 2008 WL 1882696, at \*4-5 (N.D.N.Y. Apr. 24, 2008). In the instant case, however, plaintiff's wife at the time this condition was instituted was Kimberly Maldonado. *See Maldonado v. Evans*, No. 11-CV-717, 2015 WL 1431646, at \* (W.D.N.Y. March 27, 2015) (setting forth how plaintiff's wife, Kimberly Maldonado, deceived parole officials regarding plaintiff's proposed residence, which was around the corner from Ms. Cole's residence), *aff'd*, 654 Fed. App'x 505 (2d Cir. 2016).

In *Matusick v. Erie County Water Authority*, the Court of Appeals for the Second Circuit noted that many courts had limited the constitutional protection to marriage, but determined that it should extend to romantic relationships involving deep attachments, including a relationship of bethrothal. 757 F.3d 31, 58-59 (2d Cir. 2014). As that case was not decided until February 25, 2014, however, even assuming that plaintiff's relationship with Valerie Cole would qualify as entitled to constitutional protection under *Matusick*, the right to constitutional protection of such a relationship was not clearly established at the time the parole condition was imposed. As a result, defendant is entitled to qualified immunity for plaintiff's claims for money damages arising from the imposition of the no contact condition between himself and Valerie Cole.

**\*10** In contrast, it is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process. *Doe v. Lima*, 270 F. Supp.3d 684, 702 (S.D.N.Y. 2017), *citing United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005), *aff'd, Doe v. Cappiello*, 758 Fed app'x 181 (2d Cir. 2019). Restrictions upon such a relationship must be narrowly tailored to serve a compelling government interest. *Myers*, 426 F.3d at 126. Thus, "parole conditions that bar a parent from all contract with a child or condition such contact on a parole officer's approval implicate a fundamental liberty

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 41 of 115

Maldonado v. Mattingly, Not Reported in Fed. Supp. (2019)

2019 WL 5784940

interest in a familial relationship, are subject to strict scrutiny, require individualized justification based on the threat posed by the defendant to the child, and require that the releasee be given an opportunity to be heard before their imposition." *Lima*, 270 F. Supp.3d at 703. Absent an individualized inquiry into whether an individual's sexual proclivities pose a threat to his child, the imposition of a harsh condition of supervised release that either prohibits interaction with his children or makes such interaction subject to supervision by a person approved by the probation officer violates the individual's substantive due process rights. *United States v. McGeoch*, 546 Fed. App'x 44, 49 (2d Cir. 2013). Therefore, to the extent that plaintiff can establish that he demonstrated "a full commitment to the responsibilities of parenthood," and "played an active role in the life of his son," prior to his incarceration, defendant is required to establish that the condition was narrowly tailored to protect plaintiff's children. *Myers*, 426 F.3d at 128. Accordingly, defendant's motion for summary judgment is denied with respect to plaintiff's allegation that the special conditions of parole prevented him from contact with his children.

To the extent that plaintiff complains that his parole conditions prevented him from associating with family members with young children, however, qualified immunity is granted because the contours of any such right remain unclear. *See Yunus*, 2019 WL 168544, at *18-19 (finding no fundamental right to contact with extended family members). Furthermore, the notification provision is a reasonable restriction on plaintiff's First Amendment rights. *See United States v. Reeves*, 591 F.3d 77, 82 (2d Cir. 2010) ("We have no doubt that in the appropriate circumstance a court ... could require a defendant to notify third-parties of risks arising from the defendant's criminal record, personal history, or characteristics."); *Muhammad v. Evans*, No. 11-CV-2113, 2014 WL 4232496, at *10 (S.D.N.Y. Aug. 15, 2014) (upholding condition requiring probationer to notify his probation officer of intimate relationships).

First Amendment

Plaintiff challenges the parole restrictions impacting his ability to enjoy public spaces, including church. Dkt. #52, p.16 & Dkt. #80, ¶ 19 & p.33. Plaintiff further argues that the ban on computer usage prevents him from pursuing his career as a musician and that the ban on premium cable prevents him from enjoying sports such as boxing. Dkt. #80, p.27.

"It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v.*

*Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). "The same goes for paroleees, who are effectively still prisoners vis-á-vis their constitutional rights." *Muhammad v. Jenkins*, No. 12 Civ. 8525, 2013 WL 5225573, at *10 (S.D.N.Y. Sept. 13, 2013). "Since *Salahuddin*, then, the right to participate in congregate religious services has been settled law, and a parole officer ... is charged with knowledge thereof" and cannot, therefore, reasonably believe that it was in his power to bar plaintiff from participating in communal worship altogether." *Id.; See United States v. Hernandez*, 209 F. Supp.3d 542, 546 (E.D.N.Y. 2016) (although the First Amendment rights of paroleed sex offenders are circumscribed, and conditions preventing defendants convicted of sex offenses from associating with minors have been upheld, no compelling government interest justifies prohibiting attending religious services where a minor is present). Thus, defendant is not entitled to qualified immunity with respect to plaintiff's claim that the conditions of parole prevented him from attending communal worship.

In *Pakingham v. North Carolina*, the Supreme Court held that registered sex offenders cannot be routinely or categorically barred from social media. ——— U.S. ———, 137 S. Ct. 1730, 1737, 198 L.Ed.2d 273 (2017) ("to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."); *See Yunus*, 2019 WL 168544, at *16 ("Under *Packingham*, blanket limitations on an individual's ability to access social media will receive intermediate scrutiny, even when imposed as conditions of parole."). Even before *Packingham*, the Court of Appeals for the Second Circuit rejected total bans on internet access as conditions of supervised release. *United States v. Eaglin*, 913 F.3d 88, 96 (2d Cir. 2019), *citing United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002), and *United States v. Peterson*, 248 F.3d 79, 82-83 (2d Cir. 2001). However, these cases involve the statutory standard imposed on federal conditions of supervised release. *See Yunis*, 2019 WL 168544, at *23. In light of this different legal standard, these cases "are not controlling authority as to the constitutional analysis of state parole conditions." *Id.* Thus, at least prior to *Packingham*, the constitutional right of individuals on probation to access social media or commercial internet sites was not clearly established. *Ennis v. Annucci*, 19-CV-501, 2019 WL 2743531, at *8 (N.D.N.Y. July 1, 2019).

**\*11** As to the condition relating to adult pornography and other sexually explicit material, including the limitation on premium cable channels, the Court of Appeals for the Second

Circuit has determined that the conditional liberty to which offenders on supervised release are subject may include a prohibition against possession of pornographic matter. *United States v. Savastio*, 777 Fed. App'x 4, 7 (2d Cir. 2019) (collecting cases).

## Damages

Defendant argues that plaintiff would only be entitled to nominal damages because, pursuant to 42 U.S.C. § 1997e(e), he has not alleged physical injury. Dkt. #78-1, p.17.

Plaintiff responds that this statue does not apply because his damages result from his designation as a DSO and the imposition of special conditions of parole. Dkt. #80, p.43.

Under the Prisoner Litigation Reform Act of 1995 ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18). 42 U.S.C. § 1997e(e). "As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). In the instant case, however, plaintiff is not seeking damages for injury suffered while confined in a jail, prison or other correctional facility; he is seeking damages for constitutional injury caused by the imposition of conditions of release on parole. *See, e.g., Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) (district court erred in classifying parolee as a prisoner under the PLRA). Accordingly, the limitations of 42 U.S.C. § 1997e(e) are not applicable.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (Dkt. #78), is granted except with respect to plaintiff's claim that the special conditions of parole prevented him from contact with his children between February 24, 2010 and March 16, 2010 and his claim that he was prevented from attending religious services between February 24, 2010 and March 16, 2010, and plaintiff's motion for summary judgment (Dkt. #80), is denied.

**SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2019 WL 5784940

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 43 of 115
Miller v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 2370295

2019 WL 2370295
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel MILLER and Kristerfer Passino, Plaintiffs,
v.
Anthony J. ANNUCCI, et al., Defendants.

9:19-CV-0030 (LEK/ATB)
|
Signed 06/05/2019

**Attorneys and Law Firms**

Daniel Miller, Sonyea, NY, pro se.

Kristerfer Passino, Marcy, NY, pro se.

Mark G. Mitchell, New York State Attorney General, Albany,
NY, for Defendants.

**MEMORANDUM DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 **\*1**  Pro se plaintiffs Daniel Miller and Kristerfer Passino
commenced this action in New York State Supreme Court,
Oneida County, against twenty defendants all alleged to be
employees of the New York State Department of Corrections
and Community Supervision ("DOCCS") or the Office of
Mental Health ("OMH"). Plaintiffs assert claims pursuant
to 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Americans
with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"),
and § 504 of the Rehabilitation Act ("RA") arising out of
their confinement at Marcy Correctional Facility ("Marcy
C.F."). See Dkt. No. 2 ("Complaint"). On January 18, 2019,
Defendants removed this action from state court and paid the
statutory filing fee. Dkt. No. 1 ("Notice of Removal").

On January 11, 2019, Defendants requested an initial
screening of the Complaint pursuant to 28 U.S.C. § 1915A.[1]
Dkt. No. 5 ("Defendants' Request for Screening"). On
February 4, 2019, the Court granted Defendants' motion
and the Clerk forwarded the Complaint to the Court for review.
Dkt. No. 9 ("February 4, 2019 Text Order"). Miller did
not object to the initial screening, but presented procedural
challenges to the removal.[2] Dkt. No. 7 ("Submission in

Support") at 1. Miller moved for a preliminary injunction
with a motion to seal selected exhibits submitted in support
of the motion for injunctive relief. Dkt. No. 6 ("First PI
Motion"); Dkt. Nos. 7, 12, 13, 16, and 20 ("Submissions in
Support"); Dkt. Nos. 14 and 19 ("Submissions in Support
with Motions to Seal"). Defendants oppose the motions. Dkt.
Nos. 10 ("Opposition to First PI Motion"), 11 ("Defendants'
Exhibit"), 17 ("Opposition to Motion to Seal"). On March 22,
2019, Miller filed a second motion for preliminary injunction,
Dkt. No. 22 ("Second PI Motion"), which defendants also
oppose. Dkt. No. 23 ("Opposition to Second PI Motion").
However, on May 6, 2019, Miller filed a motion seeking to
withdraw all pending motions. Dkt. No. 24 ("Letter Motion
to Withdraw").

[1]     Defendants also requested a review pursuant to 28
U.S.C. § 1915(e). Because Defendants have paid
the filing fee, a review pursuant to section
1915(e) is not warranted.

[2]     Passino did not file a response to the removal or
request for screening.

**II. REMOVAL**
The Complaint contains claims for violations of Plaintiffs'
First, Eighth, and Fourteenth Amendment rights, as well as
ADA, RA, and state law claims, related to incidents primarily
at Marcy C.F. from March 2016 through September 2018. See
generally Compl. On October 18, 2018, Plaintiffs filed their
Complaint in state court. Compl.

From December 17, 2018 until January 4, 2019, Plaintiffs
served Defendants with summonses and the Complaint in
accordance with a state court order allowing alternative
service. Notice of Removal at 3; Dkt No. 1-2 ("Order
Permitting Substitute Service").

On January 8, 2019, Defendants filed a notice of removal
pursuant to 28 U.S.C. § 1441 premised on federal-question
jurisdiction. Notice of Removal.

**A. Legal Standard**
§ 1441, which sets forth the jurisdictional basis for removal,
states that "any civil action brought in a State court of
which the district courts of the United States have original
jurisdiction, may be removed by the defendant or the
defendants, to the district court of the United States for the
district and division embracing the place where such action

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 44 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

is pending." See also Lincoln Prop. Co. v. Roche, 546 U.S. 81, 83 (2005) (explaining that § 1441 "authorizes the removal of civil actions from state court to federal court when the action initiated in state court is one that could have been brought, originally, in a federal district court"). [3] However, "[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013) (quoting Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994)).

[3]    Certain civil actions including suits against railroads or common carriers, civil actions arising under the workmen's compensation laws of a state, and any civil action arising under section 40302 of the Violence Against Women Act, may not be removed to any district court of the United States. See 28 U.S.C. § 1445. Plaintiffs do not claim that this case falls within any category of nonremovable actions.

*2 28 U.S.C. § 1446, which sets forth the procedural requirements for removal to federal court, states:

> The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

§ 1446(b)(1). The thirty-day window for removal contained in § 1446(b)(1), while not jurisdictional, is "rigorously enforce[d]" by courts absent a finding of waiver or estoppel. Somlyo v. J. Lu–Rob Enters., Inc., 932 F.2d 1043, 1046 (2d Cir. 1991), superseded on other grounds in Contino v. United States, 535 F.3d 124, 127 (2d Cir. 2008).

After an action is removed from state court to federal court, remand may be granted on one of two grounds: (1) a defect in removal procedure or (2) a lack of subject matter jurisdiction. 28 U.S.C. § 1447(c). A motion to remand "on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal...." Id. [4]

[4]    Defendants filed their Notice of Removal on January 8, 2019. Dkt. No. 1. Miller objected to the removal on January 30, 2019, within the 30-day time limit for raising procedural defects. Dkt. No. 7.

**B. Analysis**

Liberally construed, Miller objects to Defendants' removal of this action by asserting that the Notice of Petition and Petition for Removal were not served with a docket number or reference to an assigned judge. Dkt. Nos. 7, 14. Defendants have not responded to Miller's objection.

On the same day that the Notice of Removal was filed, Defendants provided Miller with a copy of the Notice. Notice of Removal. While Defendants did not serve a copy of the file-stamped Notice of Removal bearing the docket number and assigned judge, the failure to do so was not a violation of § 1446(d). Park v. McGowan, No. 11-CV-3454, 2011 WL 4963759, at *4 (E.D.N.Y. Oct. 19, 2011). On January 9, 2019, Plaintiffs were served with a Text Order, issued by The Honorable Andrew T. Baxter, U.S. Magistrate Judge, advising Plaintiffs that the action was removed. Dkt. No. 3. Miller does not allege that he did not receive the Text Order. Indeed, on January 25, 2019, Miller filed a letter motion addressed to Judge Baxter, with the docket number. Dkt. No. 6. The "pre-filing delivery of the Notice of Removal and subsequent confirmation" by the Court, one day later, satisfies the requirements of § 1446(d). See Park, 2011 WL 4963759, at *5.

Since this action was properly removed in accordance with §§ 1441(a) and 1446, the Court will review the Complaint pursuant to § 1915A.

**III. SUFFICIENCY OF THE COMPLAINT**

**A. Standard of Review**

Because Plaintiffs seek relief from an officer or employee of a governmental entity, the Court must consider the sufficiency

2019 WL 2370295

of the allegations set forth in the Complaint in light of § 1915A. Under § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." § 1915A(b); see also Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that § 1915A applies to all actions brought by prisoners against government officials even when he filing fee has been paid).

*3 When reviewing a complaint, the Court also looks to Rule 8 of the Federal Rules of Civil Procedure, which provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." See Fed. R. Civ. P. 8(a)(2). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009).

A pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. See, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims

set out in his pleadings."); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**B. Summary of the Complaint** [5]

[5]    The Complaint includes exhibits. See Compl. at 39–76. To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached as exhibits. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."). The Court may also consider matters of which judicial notice may be taken, such as public filings, judicial documents, and official court records associated with those proceedings. See Fed. R. of Evid. 201 and 1005; Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).

The incidents that form the foundation for the Complaint occurred while Plaintiffs were confined at Marcy C.F. See generally Compl. Plaintiffs are DOCCS inmates convicted of sexual offenses. Id. at 8.

*1. Factual Allegations regarding Miller*

In December 2015, Miller, who is disabled and confined to a wheelchair, was transferred from Downstate Correctional Facility ("Downstate C.F.") to Marcy C.F., without an evaluation, to participate in the Prison-Based Sex Offender Treatment Program ("PBSOTP"). [6] Compl. at 8.

[6]    "The PBSOTP provides an intensive sex offender treatment program to inmates incarcerated with DOCCS who have been classified as high risk for committing a sexual offense upon release from prison. This program is operated by OMH clinical personnel within DOCCS facilities and is designed to address the multiple risk factors presented by

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 46 of 115
Miller v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 2370295

this population." See https://omh.ny.gov/omhweb/forensic/bisot/ (last visited Apr. 18, 2019).

 **\*4** In March 2016, Miller, Passino, and other inmates filed an action in the New York State Supreme Court, Oneida County against the Director of the Mental Hygiene Legal Services ("MHLS"), Ann Marie Sullivan, and DOCCS Commissioner Anthony Annucci. [7] Id. at 9, 11; Dkt. No. 14-7 at 1–13; Miller v. Creahan, No. CA2016-000711 (N.Y. Sup. Ct., Oneida Cty) ("Miller I"). In that suit, Plaintiffs claimed that they were abused and mistreated by DOCCS staff at Marcy C.F. and by OMH staff assigned to the PBSOTP. Compl. at 8. Plaintiffs sought a declaratory judgment compelling MHLS to provide an attorney to advocate for patients in the PBSOTP. Id. at 9. Plaintiffs served the complaint in April 2016. Id.

[7]     The Director is not named as a defendant herein.

On April 20, 2016, defendant Nora L. Staring, Miller's primary clinician, attempted to persuade Miller to sign a proposed Behavior Contract ("BC") and Individual Service Plan ("ISP") that contained "false information." Compl. at 10–11. On April 28, 2016, Miller filed a complaint with the Department of Education and Office of Professional Ethics against Staring and defendant PBSOTP Unit Chief, Bud C. Ballinger, III. Id.

On April 29, 2016, Staring told Miller that she conspired with Ballinger and defendants Psychologist Christine A. Pallas and PBSOTP Assistant Unit Chief Aaron Shupp to retaliate against him for filing the civil action against OMH staff and to prevent him from filing additional actions. Id. at 11. On the same day, Staring, Ballinger, Pallas, and Shupp "attempt[ed] to intimidate" Miller to persuade him to sign a BC and ISP that limited his right to use the grievance system or commence civil actions, and also prevented Miller from seeking assistance with sweeping, mopping, bending, and lifting. Id. at 12. The BC and ISP also contained false inculpatory statements, allegedly by Miller, that related to violations of the PBSOTP. Id. Defendants also presented Miller with a document titled "Notice of Voluntary Dismissal" with the caption of Miller I. Id. Miller was warned that if he did not sign the documents, he could "be expelled from the PBSOTP" and referred for an Article 10 proceeding pursuant to the Mental Health Law ("MHL"). [8] Id. On May 4, 2016, Ballinger and Pallas attempted, for a second time, to coerce Miller into signing the documents. Id. at 13.

[8]     MHL Article 10 pertains to "Sex Offenders Requiring Civil Commitment or Supervision." N.Y. MHL § 10.01.

On or about May 1, 2016, Miller observed defendant Erica Hughes, Passino's primary clinician/psychologist, performing oral sex on Passino in Building 26, Room 14. Compl. at 10, 18. At 12:30 PM, defendant LCSW Megan Thomas ("M. Thomas"), Hughes, Pallas, and Staring approached Miller in his housing unit and threatened him with an Article 10 evaluation if he "reveal[ed] anything" he witnessed. Id. at 19.

On May 5, 2016, Miller's cube was searched, unsuccessfully, for contraband by a security staff member and a sergeant not named as defendants. Id. at 14. Later the same day, at approximately 7:30 PM, an unidentified sergeant told Miller that OMH Commissioner Ann Marie Sullivan, OMH Director of Forensic Services Naomi Freeman, and OMH Director of Sex Offender Treatment Christopher Kunkle disclosed information to Ballinger and Pallas related to Miller's confinement at Mid Hudson Psychiatric Facility. Id. at 14-15. Specifically, Ballinger and Pallas were informed that Miller previously accused an employee of Mid Hudson Psychiatric Facility of assault and filed a civil action against the employee. Id. They were also informed that, because of the accusation, the employee was prosecuted, convicted, and fired. Id. at 15. The sergeant explained that the information was disclosed in an attempt to prevent Miller from prosecuting his pending litigation. Id.

 **\*5** On May 9, 2016, Miller filed a motion for a temporary restraining order in Miller I. Compl. at 15; Dkt. No. 14-7 at 2–13. Miller sought an order enjoining Sullivan, Ballinger, Pallas, and defendant Marcy C.F. Superintendent Justin Thomas from preventing him from litigating his cases, suspending or terminating Miller from the PBSOTP without justifiable cause, transferring Miller to another facility, and preventing further retaliation. Dkt. No. 14-7 at 2–13. Miller served copies of the motion upon J. Thomas, Sullivan, Kunkle, Ballinger, Pallas, Annucci, and the New York Attorney General. Compl. at 16.

On May 11, 2016, Pallas and Staring attempted to persuade Miller to sign the BC, ISP, and Notice of Dismissal by threatening to terminate him from the PBSOTP. Id. at 16. On the same day, Ballinger, Pallas, and Staring filed a false misbehavior report alleging that Miller interfered with a meeting when he served "legal papers for an injunction" on Staring. Id. at 16–17. Sullivan, Freeman, Shupp, J. Thomas, and Kunkle directed them to file the report. Id. at 17–18.

On May 12, 2016, Sullivan, Freeman, Kunkle, Shupp, Ballinger, and J. Thomas participated in a video conference. Compl. at 17. The parties discussed transferring Miller out of the program and told Sergeant LaQuay [9] that Miller attempted to "post" Pallas' home address with intent to "cause her harm." Id.

[9]    LaQuay is not a named defendant.

On May 13, 2016, Miller received a termination letter from Ballinger. Id. at 18. The letter informed Miller that he was discharged because he served Staring with legal papers. Id. Miller was transferred to Franklin Correctional Facility ("Franklin C.F."). See Miller v. Annucci, et al., No. 7:17-CV-4698 (S.D.N.Y. filed June 2017) ("Miller II"), Dkt. No. 86 at 30.

From May 2016 until January 2017, Miller sent letters to defendants Executive Director of Central New York Psychiatric Center ("CNYPC") Deborah McCullogh and CNYPC Investigator Jill Grant complaining of the "sexual exploits" of OMH staff including Pallas and Hughes. Compl. at 28; see Miller II at 31. McCulloch and Grant refused to investigate the allegations and found the complaints to be "unsubstantiated." Id.

On June 21, 2017, Miller filed an action in the United States District Court for the Southern District of New York, in which he asserted claims for constitutional violations during his confinement at Green Haven Correctional Facility ("Green Haven C.F.") and Franklin C.F. [10] Miller v. Annucci, et al., No. 17-CV-4698 (S.D.N.Y. filed June 2017) ("Miller II"). Compl. at 22.

[10]    At the time Miller filed Miller II, he was confined at Green Haven C.F. See Miller II.

In August 2018, while Miller was confined at Groveland Correctional Facility, he requested and received approval for a hardship transfer to Woodbourne Correctional Facility ("Woodbourne C.F."). Compl. at 22; Dkt. No. 14-5 at 6–15. However, in September 2018, without explanation, Annucci, Sullivan, and Freeman, interfered with the transfer and redirected Miller to the PBSOTP at Marcy C.F. Id. Miller arrived at Marcy C.F. on September 19, 2018. Id. at 23.

On September 21, 2018, Miller wrote to Annucci, Sullivan, J. Thomas, Kunkle, Ballinger, defendant DOCCS

Deputy Commissioner Jeff McKoy, and defendant Deputy Superintendent of Marcy C.F. Mark Kinderman claiming that he was innocent of the charged sex crimes and requested reclassification. Id. at 23. Defendants refused to reclassify Miller. Id. at 24.

On September 25, 2018, during his intake evaluation with Weir, Miller told Weir he feared for his safety due to the presence of certain staff members. Id. at 25–26. On September 27, 2018, during a group session with defendant Andrea Kiss, a psychologist, Miller questioned the efficacy of the PTSOTP. Id. at 26.

**\*6** On September 28, 2018, defendants Weir, M. Thomas, and Kiss threatened Miller with further retaliation if he did not drop "all the complaints and lawsuits." Id. at 27–28.

### 2. Factual Allegations regarding Passino

From April 2016 through December 2016, Hughes forced Passino "to perform sexual acts with her," including oral sex, by threatening to falsify MHL Article 10 records pertaining to civil commitment. Compl. at 18. As discussed above, Miller witnessed Hughes performing oral sex on Passino on or about May 1, 2016. Id.

On approximately May 5, 2016, Passino gave Hughes, at Hughes' direction, a copy of Passino's confidential family court documents that included social security numbers and dates of birth. Id. at 13. That same day, Ballinger, Hughes, Staring, Shupp, and Pallas disclosed these confidential documents to defendant Offender Rehabilitation Coordinator Robert Gage. Id. Gage then gave the documents to DOCCS security staff "for the purpose of searching plaintiff Miller's cube, the objective of which was for leverage to coerce plaintiffs Miller and Passino to withdraw from the previous civil action...." Id. at 14. In May 2016, Passino executed an affidavit that was included as an exhibit in support of Miller's motion for a preliminary injunction in Miller I. Dkt. No. 14-7 at 21–27.

On "numerous occasions," from March 2017 until September 2017, defendant Julia Weir, a psychologist, "attempted to ... compel[ ] [Passino] to engage in sexual acts" under threats of suspension and/or termination from the program. Compl. at 19–20. From September 2017 until January 2018, Weir filed false reports accusing Passino of inappropriate behavior with staff. Id. at 20.

2019 WL 2370295

On November 28, 2017, Passino received a memorandum from Ballinger informing him that he was suspended from the program for thirty days due to "lack of progress." Dkt. No. 14-7 at 29.

In January 2018, Passino was terminated from the PBSOTP and transferred to Gowanda Correctional Facility ("Gowanda C.F."). Compl. at 20. As a result, he was prevented from visiting his son for five months. Id.

In July 2018, Passino returned to Marcy C.F. Compl. at 20. Upon his arrival, he disclosed the prior sexual abuse by Hughes and attempted abuse by Weir to his primary clinician/psychologist, defendant Caitlyn Taylor. Id. Passino had not previously reported the abuse because he was threatened with Article 10 confinement and a loss of good time credits. Id. at 20–21.

On August 30, 2018, defendant Licensed Clinical Social Worker Jean Burdick issued a memorandum advising Passino that he was suspended from the PBSOTP "due to an inability to demonstrate treatment motivation and ongoing engagement in unhealthy behaviors that have been addressed in multiple individual meetings...." Compl. at 21–22; Dkt. No. 14-7 at 30. Burdick and Taylor told Passino that they could "do anything we want, and we know how to cover it up." Id. at 21.

### 3. Causes of Action

Construing the Complaint liberally, Miller asserts (1) First Amendment retaliation claims; (2) Fourteenth Amendment due process claims; (3) conspiracy claims; (4) constitutional claims based upon the failure to investigate complaints; (5) ADA and RA claims; and (6) state law claims. Passino asserts: (1) First Amendment retaliation claims; (2) Eighth Amendment claims related to sexual abuse; (3) privacy claims; (4) conspiracy claims; (5) ADA and RA claims; and (6) state law claims. Plaintiffs seek declaratory relief, injunctive relief, and monetary damages. Id. at 35–39.

### C. Nature of Action

**\*7** Plaintiffs seek relief pursuant to § 1983, which establishes "a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp.

Ass'n, 496 U.S. 498, 508 (1990) (quoting § 1983); "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

## IV. ANALYSIS OF COMPLAINT

### A. Sovereign Immunity

The U.S. Constitution bars a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Hans v. Louisiana, 134 U.S. 1, 10–21 (1890). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 365–66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through § 1983, see Quern v. Jordan, 440 U.S. 332, 343–45 (1979), and that New York State has not waived its immunity from § 1983 claims. See generally Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38–40 (2d Cir. 1977); see also Dawkins v. State of New York, No. 93-CV-1298, 1996 WL 156764 at *2 (N.D.N.Y. 1996). Actions for damages against a state official in his or her official capacity "is no different from a suit against the State itself" and is therefore also barred. Will v. Mich. Dep't. of State Police, 491 U.S. 58, 71 (1989).

Plaintiffs' claims for monetary damages pursuant to § 1983 against Defendants in their official capacities (see Compl. at 5–8) are barred by the Eleventh Amendment and are dismissed with prejudice pursuant to § 1915A(b). Severino v. Negron, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

### B. First Amendment Retaliation

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—meaning, that the protected conduct was a "substantial or motivating factor" in the

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

defendant's decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); See also Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)).

### 1. Protected Conduct

**\*8** Construing the allegations in the light most favorable to the pro se Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged that they engaged in the following protected conduct to satisfy the first element to a retaliation claim:

- Plaintiffs' commencement of Miller I in April 2016 and the filing and service of motion for temporary restraining order in May 2016;

- Miller's April 2016 complaint with the Department of Education and Office of Professional Ethics against Staring and Ballinger;

- Miller's letters to McCulloch and Grant in May 2016 complaining of the "sexual exploits" of OMH staff, including Pallas and Hughes;

- Miller's commencement of Miller II in June 2017;

- Passino's verbal complaints in July 2018 to Taylor about Hughes' sexual abuse and Weir's attempted sexual abuse.

It is well-settled that filing a grievance or a lawsuit is constitutionally protected conduct. Johnson v. Eggersdorf, 8 Fed. App'x 140, 144 (2d Cir. 2001); See Lipsey v. SATF Prisons AD-Seg Prop. Officers, No. 15-CV-00691, 2018 WL 1877006, at *6 (E.D. Cal. Apr. 19, 2018) (finding that the filing of a motion for injunctive relief is protected conduct); King v. McIntyre, No. 11-CV-1457, 2015 WL 1781256, at *13 (N.D.N.Y. Apr. 8, 2015) (finding that a written letter of complaint to a superior officer is "at least arguably protected conduct") (citation omitted).

The Court now turns to whether plaintiffs were subjected to adverse actions, and whether there is a causal connection suggesting retaliatory intent.

### 2. Adverse Action and Causal Connection

The Second Circuit has defined "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " Gill, 389 F.3d at 381 (citation omitted) (omission in original). This objective test applies even if the plaintiff was not himself deterred from exercising his rights. Id.; see also Ford v. Palmer, 539 F. App'x 5, 7 (2d Cir. 2013) ("The Court must apply the "objective test [for First Amendment retaliation] [...] even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."). Conduct that is "de minimis" does not give rise to actionable retaliation. Dawes, 239 F.3d at 493 What is de minimis varies according to context. Id. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." Id. at 491 (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 386–87 (6th Cir. 1999) (en banc) (per curiam)). If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." Id. at 493.

A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), "the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months." Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003).

#### a. Miller

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

### i. Threats and Intimidation

**\*9** "[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010). Whether threats constitute adverse action depends on the specificity of the threat its context. See Barrington v. New York, 806 F.Supp.2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Compare Hepworth v. Suffolk Cnty., No. 02-CV-6473, 2006 WL 2844408, at \*8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate) with Bartley v. Collins, No. 05-CV-10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (threats such as "we are going to get you, you better drop the suit," do not rise to the level of adverse action).

Miller alleges that he was threatened and harassed as follows:

- On April 20, 2016, April 29, 2016 and May 4, 2016, Staring, Ballinger, Pallas, and Shupp "instructed" him to execute false and unfavorable behavior contracts, service plans, and a stipulation of discontinuance for Miller I "or be expelled from the PBSOTP and be referred for MHL Article 10 review for civil commitment as a sex offender." Compl. at 10–13. Miller claims that defendants were motivated to retaliate because he filed Miller I. Id.

- On May 1, 2016, Hughes, M. Thomas, Pallas, and Staring approached him in housing unit J-2 and told him to "concentrate on his own problems and treatment needs," and directed him "not [to] reveal anything he thinks he saw between a patient and his clinician in a room he had no business being near anyway." Id. at 19. M. Thomas told Plaintiff that "papers for an Article 10 evaluation can be made very easily in this program." Id.

- On May 5, 2016, Sullivan, Freeman, and Kunkle disclosed information related to Miller's prior complaints and legal action involving an employee at Mid Hudson Psychiatric Facility to Ballinger and Pallas. Id. at 14–15. Construing the Complaint liberally, Miller alleges that the information was divulged to harass him and deter him from pursuing his legal actions.

- On September 24, 2018, during a meeting in Building 26, Weir, M. Thomas, and Kiss threatened Miller. Id. at 27–28. M. Thomas stated, "This is not going to be like last time Mr. Miller, you are not going to recruit others to commence lawsuits and file grievances against me." Id. at 27. Kiss stated, "You know, I can easily put in a report that accents are a trigger for you to sexually offend again. What do you think that will look like when the case review team gets your file?" Id. Weir stated, "[y]our friend Passino is coming back. I know you were both plaintiffs in the previous lawsuit. I also know you think you have knowledge of 'inappropriate behavior' between clinicians and other patients. If you go down that path, you are going to find yourself in either CNYPC or St. Lawrence." Id.

Considering Miller's history with defendants and the specificity and nature of the threats, the Court finds that Miller has sufficiently pled threats that would deter a person of ordinary firmness from exercising his First Amendment rights, and thus constitute adverse actions. Moreover, the short periods between the protected speech and the adverse actions satisfies the causal connection element of a retaliation analysis. Thus, the Court finds that Miller has sufficiently alleged a retaliation claim related to threats against Staring, Ballinger, Sullivan, Kunkle, Pallas, Shupp, Freeman, Hughes, M. Thomas, Weir, and Kiss to require a response.

### ii. Cube Search

**\*10** Miller claims that DOCCS staff searched his cube for contraband in retaliation for Miller I. Compl. at 14–15. It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). Here, Miller has not pled facts suggesting that any named defendant was responsible for, or participated in, the cell search. Moreover, the Supreme Court has held that "inmates have no constitutional protection from cell searches, even those conducted for retaliatory reasons." Hudson v. Palmer,

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 51 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 2370295

468 U.S. 517, 530 (1984). Accordingly, Miller's retaliation claim related to the May 2016 cell search is dismissed without prejudice pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

### iii. False Reports and 2016 Termination from PBSOTP

On May 11, 2016, Pallas and Staring were directed by Sullivan, Freeman, Kunkle, Ballinger, Shupp, and J. Thomas to issue a false misbehavior report that accused Plaintiff of "serv[ing] Staring with legal papers for an injunction" and "interfer[ing] in OMG staff ability to have a meeting." Compl. at 16–18. On May 12, 2016, the same defendants falsely accused Miller of disclosing a staff member's personal information. Id. at 17. Both of these acts were in retaliation for Plaintiff's filing of Miller I. Compl. at 17–18. As a result, Miller was terminated from the PBSOTP. Id.

At this juncture, Miller has sufficiently alleged retaliation claims against Pallas, Staring, Ballinger, Sullivan, Freeman, Shupp, Kunkle, and J. Thomas related to the false reports and Miller's 2016 termination from the program to require a response.

### iv. Retaliatory Transfer

Miller claims that in September 2018, Annucci, Freeman, and Sullivan interfered with his scheduled transfer to Woodbourne C.F. and redirected him to Marcy C.F. in retaliation for filing Miller II. See Compl. at 22.

At this juncture, Miller has sufficiently alleged retaliation claims against Annucci, Freeman, and Sullivan to require a response.

### b. Passino

### i. Threats by Hughes

Passino claims that Hughes threatened him with "consequences" if he reported sexual abuse. Compl. at 19. Passino alleges that he was threatened with PBSOTP termination, the loss of good time credit, and Article 10 confinement if he did not "keep quiet." Id. at 20–21. Passino reported that he was "[p]etrified about those prospects" and

"afraid to make any complaints, and based on his low IQ, he was forced to remain quiet." Id. at 21.

Thus, the Court finds that Passino has sufficiently alleged retaliation claims against Hughes to require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### ii. Disclosure of Court Documents

Passino alleges that Bell, Hughes, Staring, Pallas, and Gage retaliated against him when they disclosed Passino's confidential court documents. See Compl. at 13. Even assuming Passino engaged in protected conduct with a temporal connection to the disclosure, the Complaint lacks facts suggesting that the disclosure of the court documents would deter a "similarly situated individual of ordinary firmness" from exercising his First Amendment rights. Passino admitted that he discussed his Family Court issues with Hughes, see Compl. at 13, and Passino has not pled that he suffered any actual injury as a result of the disclosure. Accordingly, Passino's retaliation claims based upon the disclosure are dismissed without prejudice for failure to state a claim.

### iii. False Reports by Weir and transfer to Gowanda C.F.

**\*11** Passino claims from September 2017 until January 2018, Weir filed false reports in retaliation for Miller I, which had been recently dismissed. See Compl. at 20. Specifically, Passino alleges that Weir accused him of "improper behavior in the housing unit, and improper language with staff, and other false reports." Id. Passino was "forced to sign a behavior contract" and then in January 2018, discharged from the PBSOTP and transferred to Gowanda C.F., which prevented him from visiting with his son. Id.

At this juncture, Passino has sufficiently alleged retaliation claims against Weir to require a response.

### v. August 2018 Suspension from PBSOTP

Passino alleges that on August 30, 2018, Burdick suspended him from the PBSOTP because he reported the prior sexual abuse by Hughes. See Compl. at 21–22.

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 52 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

Passino has sufficiently alleged retaliation claims against Burdick to require a response.

### C. Eighth Amendment Sexual Abuse

"Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." Crawford v. Cuomo, 796 F.3d 252, 256–57 (2d Cir. 2015). However, "there has been no case" in the Second Circuit "in which a plaintiff ha[s] established an actionable [Eighth Amendment] claim of sexual harassment ... without having physical contact with the alleged perpetrator, or without, at the very least, alleging egregious sexual conduct." Holland v. City of New York, 197 F.Supp.3d 529, 547 (S.D.N.Y. 2016); see also Smith v. Roberson, No. 15-CV-0930, 2016 WL 1056588, at *3 (N.D.N.Y. Mar. 16, 2016) (holding that inmate stated Eight Amendment claim against corrections officer who "chased her, exposed his genitalia to her and threatened her with sexual assault.").

Passino claims that for nine months, Hughes repeatedly forced him to engage in sexual activity, including oral sex. See Compl. at 18. These allegations state an Eighth Amendment claim against Hughes and require a response.

The Court reaches a different conclusion with respect to Weir. Passino does not allege that he had any physical contact with Weir, rather, he claims that she attempted to abuse him. See Compl. at 19–20. As presently pled, the Complaint does not include sufficient detail to suggest that Weir engaged in behavior that was so "severe or repetitive" to constitute "cruel and unusual punishment." Crawford, 796 F.3d at 256. Accordingly, Passino's Eighth Amendment claim against Weir is dismissed without prejudice pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Claims Related to Disclosure of Personal Information

Construed liberally, Passino asserts a claim against Ballinger, Shupp, Pallas, Staring, Hughes, and Gage for violations of his right to privacy based upon their disclosure of his confidential

family court papers, which included social security numbers and dates of birth. See Compl. at 13–14. "A right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." Roe v. Wade, 410 U.S. 113, 152 (1973). "Prison inmates do not shed all fundamental protections of the Constitution at the prison gates." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citing Turner v. Safely, 482 U.S. 78, 95 (1987)). Instead, prisoners maintain rights which are not inconsistent with their position as inmates, or with "legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974).

**\*12** Under certain circumstances, the disclosure by prison officials of inherently confidential and sensitive information regarding an inmate can support a due process violation claim under the Fourteenth Amendment. See Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994) (recognizing right of privacy shielding information that a person is infected HIV because "there are few matters that are quite so personal as the status of one's health" and, in particular, "[a]n individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance.").

As presently plead, however, Passino's claim does not fit within the privacy interests given constitutional protection. "[T]he contention that disclosure of one's social security account number violates the right to privacy has been consistently rejected." Pennyfeather v. Tessler, 431 F.3d 54, 56 (2d Cir. 2005) (quoting McElrath v. Califano, 615 F.2d 434, 441 (7th Cir. 1980)). Moreover, Passino has not alleged that he suffered any injury as a result of the disclosure of his confidential family information and thus fails to state a claim for relief. See Salvatierra v. Connolly, No. 09 CIV 3722, 2010 WL 5480756, at *22 (S.D.N.Y. Sept. 1, 2010), adopted, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011). Accordingly, Passino's claims related to his right to privacy are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim. [11]

[11]  To the extent that Plaintiff attempts to assert a constitutional claim based upon violations of the OMH Confidentiality Agreement and the Family Court Act, that claim is dismissed. § 1983 does not give prisoners the right to sue guards for violating prison regulations. See Hyman v. Holder, No. 96 Civ. 7748, 2001 WL 262665, *6 (S.D.N.Y. Mar. 15, 2001) (holding that the failure to follow a New

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 53 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

York State DOCCS Directive or prison regulation does not give rise to a federal constitutional claim); Cusamano v. Sobek, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."); see also Patterson v. Coughlin, 761 F.2d 886, 891 (2d Cir. 1985) ("[A] state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983 ...").

**E. Fourteenth Amendment Due Process**

Miller claims that he was unlawfully compelled to participate in the PBSOTP in 2016 and 2018, in violation of his procedural and substantive due process rights. See Compl. at 23–25.

*1. Procedural Due Process*

To successfully state a claim under § 1983 for denial of due process, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004).

While there is a question in this Circuit as to whether an individual not convicted of an express sex offense has a liberty interest in being free from mandated sex offender counseling, Henderson v. Heffler, No. 07-CV-0487, 2010 WL 2854456, at *5 (W.D.N.Y. July 19, 2010), a valid conviction for a sex offense satisfies any due process rights the prisoner had in avoiding mandatory treatment. See Tinsley v. Goord, No. 05-CV-3921, 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) (requirement that inmate participate in sex offender program "does not implicate a constitutionally protected liberty interest."); Rheaume v. Pallito, No. 11-CV-72, 2011 WL 6934821, at *4 (D. Vt. Nov. 28, 2011) ("courts have held that designating someone as a sex offender does not require a hearing where the designation is based upon a valid prior conviction"), report and recommendation adopted, No. 11-CV-72, 2011 WL 6936201 (D. Vt. Dec. 30, 2011).

**\*13** Miller was convicted of a sex offense. Compl. at 6. Thus, he does not have a liberty interest in being free from participation in a sex offender treatment program. Plaintiff's due process claims related to the PBSOTP are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

*2. Substantive Due Process*

Miller alleges that his substantive due process rights were violated because defendants failed to properly evaluate him prior to his admission to the PBSOTP or reclassify him based upon newly discovered evidence. See Compl. at 24–25. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised.' " Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). "Very few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process ... the Supreme Court [has] provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." Samms v. Fischer, No. 10-CV-349, 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

Miller's referral to the PBSOTP is not conscience-shocking or oppressive in the constitutional sense. Miller's participation in that program was based in part on his conviction for "sexually related offenses." See Compl. at 8. Accordingly, Miller's substantive due process claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim. See Blake v. Fischer, No. 09-CV-266, 2010 WL 2522198, at *13 (N.D.N.Y. Mar. 5, 2010), adopted, No. 9:09-CV-266, 2010 WL 2521978 (N.D.N.Y. June 15, 2010) (holding that "enrollment in the SOP was not arbitrary, conscience-shocking, or oppressive, but rather was rationally related to a legitimate penological purpose and determined to be neither unnecessary nor painful.").

**F. Conspiracy**

Plaintiffs bring claims that various defendants conspired to retaliate against them under Sections 1983 and 1985. See generally Compl. A conspiracy claim under § 1983 must allege that: (1) an agreement existed between two or more state actors to inflict an unconstitutional injury on plaintiff

Case 9:20-cv-00242-MAD-TWD Document 70 Filed 06/03/22 Page 54 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

and (2) an overt act was committed in furtherance of that goal. Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002). A conspiracy claim under § 1985 has four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Robinson v. Allstate Ins. Co., 508 F. App'x 7, 9 (2d Cir. 2013) (quoting United Bhd. of Carpenters v. Scott, 463 U.S. 825, 828–29, (1983)). To maintain a § 1985 conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds." Webb v. Goord, 340 F.3d 105, 110–11 (2d Cir. 2003). A claim for conspiracy under Section 1985 "must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." Robinson, 508 F. App'x at 9 (quoting Britt v. Garcia, 457 F.3d 264, 270 n. 4 (2d Cir. 2006)). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. Ciambriello, 292 F.3d at 325.

*14 A plaintiff's §§ 1983 or 1985 conspiracy claim fails if he is unable to allege the underlying constitutional violation. Droz v. McCadden, 580 F.3d 106, 109 (2d Cir. 2009). Since "[n]ot every state law tort becomes an actionable constitutional tort under section 1983 because it was committed by a state actor ... our initial inquiry is whether the alleged actions, if taken as true, deprived [plaintiff] of a constitutional right." Bisignano v. Harrison Cent. Sch. Dist., 113 F. Supp. 2d 591, 595–96 (S.D.N.Y. 2000) (citing Baker v. McCollan, 443 U.S. 137, 146 (1979) and Albright v. Oliver, 510 U.S. 266, 271 (1994)); see also Nasca v. Cnty. of Suffolk, No. 05-CV-1717, 2008 WL 53247, at *8 n.8 (E.D.N.Y. Jan. 2, 2008) ("Because the Court has found no constitutional violation exists, dismissal of the Section 1985 claim is warranted.") (collecting cases)).

*1. Miller*

a. April 29, 2016 and May 4, 2016 Conspiracy Claims

Miller alleges that Ballinger, Pallas, Staring, and Shupp conspired to retaliate against him when they attempted to coerce him to sign the false BC, ISP, and proposed stipulation discontinuing Miller I. While Miller's claim that Staring "admitted" there was a conspiracy, Compl. at 11, is in itself

insufficient, the allegations that the four defendants worked together to coerce him to sign the documents suggest they may have been acting on an agreement to do so.

Thus, construing the pro se plaintiff's pleadings liberally, the Court finds that the conspiracy claims under § 1983 against Ballinger, Pallas, Staring, and Shupp survive sua sponte review and require a response. The conspiracy claims under Section 1985, however, are dismissed for failure to state a claim because Miller does not allege that the defendants were motivated by class-based animus against Miller. See Robinson, 508 F. App'x at 9.

b. Conspiracy Claims Related to Cube Search

Miller claims that Hughes, Ballinger, Staring, Pallas, and Gage conspired to retaliate against Miller and initiated the cube search. See Compl. at 13–15. However, as more fully discussed in Part IV(B)(2)(a)(ii) supra, Miller has failed to state a retaliation claim against any defendant related to the cube search. Thus, Miller's conspiracy claims related to the cube search are dismissed for failure to state a claim. See Droz, 580 F.3d at 109 (holding that a plaintiff's § 1983 conspiracy claim fails if he is unable to allege the underlying § 1983 cause of action); Ellison, 2013 WL 5863545, at *3–4 (dismissing claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, because the plaintiff failed to adequately allege federal constitutional violations).

c. Conspiracy Related to 2016 Discharge from PBSOTP

Miller claims that Ballinger, Pallas, Staring, Sullivan, Freeman, Kunkle, Shupp, and J. Thomas conspired to retaliate against him when they issued false reports resulting in his 2016 discharge from the PBSOTP. See Compl. at 16–18. Miller alleges that these defendants participated in a video conference on May 12, 2016 and agreed to initiate a retaliatory transfer out of the PBSOTP. See id. at 17. To that end, Defendants "made allegations to Sergeant LaQuay" that Miller was "attempting to post defendant Pallas' home address to cause her harm." See id. Thus, Pallas and Staring, at the direction of Sullivan, Freeman, Kunkle, Ballinger, Shupp, and J. Thomas, issued a false misbehavior report. See id.

Construing the pro se plaintiff's pleadings liberally, the conspiracy claims under Section 1983 against Ballinger, Pallas, Staring, Sullivan, Freeman, Kunkle, Shupp, and J.

2019 WL 2370295

Thomas survive sua sponte review and require a response. The conspiracy claims under § 1985 are dismissed because Miller does not allege that the defendants were motivated by class-based animus. See Robinson, 508 F. App'x at 9.

### d. Conspiracy Related to 2018 Transfer

**\*15** Miller alleges that Sullivan, Freeman, Annucci, Ballinger, Shupp, M. Thomas, Burdick, and Weir conspired to retaliate against him when they interfered with his transfer to Woodbourne C.F. See Compl. at 22–23. Miller does not assert any facts giving rise to a conspiracy, but instead makes conclusory statements that defendants conspired with each other. Plaintiff's conclusory allegations do not support a "meeting of the minds" or a plausible conspiracy claim involving any of the defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be enough to raise a right to relief above the speculative level." Dorsey v. Fisher, No. 09-CV-1011, 2009 WL 4985421, at *3 (N.D.N.Y. Dec. 15, 2009) (citations omitted); See Webb, 340 F.3d at 110-11 (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds").

Accordingly, Miller's conspiracy claims related to the 2018 transfer is dismissed for failure to state a claim. See Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011).

### 2. Passino

Passino alleges that Hughes, Ballinger, Staring, Pallas, and Gage conspired to retaliate against him when they disclosed his confidential Family Court papers. See Compl. at 13–14. As presently pled, Passino does not allege facts suggesting a conspiracy, but rather conclusory statements that these defendants conspired. Moreover, as more fully discussed above, Passino has failed to state a retaliation claim against defendants related to the disclosure of his confidential information. Accordingly, Passino's conspiracy claims related to his confidential court documents are dismissed without prejudice for failure to state a claim.

### G. Failure to Investigate

Miller asserts a separate constitutional claim against McCulloch and Grant for failing to investigate his complaints. See Compl. at 34. "[C]ourts within the Second Circuit have

determined that '[t]here is ... no constitutional right to an investigation by government officials." Bernstein v. New York, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases). Accordingly, this claim is dismissed with prejudice pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

### H. ADA/RA [12]

[12]   Plaintiffs do not specify what portions of the ADA are triggered. Reading the Complaint liberally, it appears that they bring this Complaint under Title II.

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA, "protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability." Harrington v. Vadlamudi, No. 13-CV-795, 2014 WL 4829483, at *3 (N.D.N.Y. Sept. 29, 2014) (citing 29 U.S.C. § 749(a)). The protections offered under Title II and the RA extend to inmates in state correctional facilities. Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 213 (1998). To successfully plead a Title II claim, "a prisoner must establish that: "(1) he or she is a qualified individual with a disability; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." Allah v. Goord, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (citations omitted). § 504 of the RA "offer[s] essentially the same protections for people with disabilities." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 113 (2d Cir. 2001). Under Section 504, "an inmate must show that: (1) he is a 'qualified individual with a disability'; (2) he is 'otherwise qualified' to participate in the offered activity or program or to enjoy the services or benefits offered; (3) he is being excluded from participation or enjoyment solely by reason of his disability; and (4) the entity denying the inmate participation or enjoyment receives federal financial assistance." Allah, 405 F. Supp. 2d at 274–75.

2019 WL 2370295

*1. Passino*

**\*16**  Passino, who suffers from a learning disability, claims that Ballinger, Shupp, M. Thomas, Burdick, Hughes, Weir, and Taylor refused to provide him with extended time to complete his assignments in violation of the ADA/RA. See Compl. at 8, 9, 21, 32. Ballinger, Shupp, M. Thomas, Burdick, Weir, and Taylor are sued in their individual and official capacity. See id. at 6–7. Hughes, however, is sued only in her individual capacity. See id. at 7. To the extent that Plaintiff seeks monetary damages against these defendants in their individual capacities, these claims are dismissed because Title II of the ADA and the RA do not provide for individual capacity suits for monetary damages. See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); Goord, 405 F. Supp. 2d at 279.

Passino also fails to state a claim against Ballinger, Shupp, M. Thomas, Burdick, Weir, and Taylor in their official capacities because he has not pled facts suggesting that he was denied access to Marcy C.F.'s services, programs or activities due to a disability. See Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 443 (S.D.N.Y. 2004) ("Plaintiff's claim fails because it does not allege that Plaintiff was *prevented* from participating in or benefiting from prison programs and services because of his disability ... When an ADA claim does not state that a plaintiff was excluded from a prison service or program because of his disability, it must be dismissed.") (emphasis in original).[13]

[13]    The ADA claims against Ballinger, Shupp, M. Thomas, Burdick, Weir, and Taylor in their official capacities are also subject to dismissal pursuant to the Eleventh Amendment because Passino does not allege that the violation was motivated by discriminatory animus or ill-will based on the Passino's disability. See Garcia, 280 F.3d at 112.

To the extent that the Complaint could be construed as asserting Title II claims for injunctive relief against defendants in their official capacities, those claims are also subject to dismissal. Passino is no longer incarcerated at Marcy C.F., see http://nysdoccslookup.doccs.ny.gov/ (last visited Apr. 29, 2019), and "[i]t is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." Candelaria v. Greifinger, No. 96-CV-0017, 1998 WL 312375, at \*2 (N.D.N.Y. June 8, 1998) (quoting Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996)).

Accordingly, Passino's ADA and RA claims are dismissed pursuant to § 1915A(b) for failure to state a claim upon which relief may be granted.

*2. Miller*

Miller asserts that Ballinger, Pallas, Shupp, and Staring violated provisions of the ADA and RA when they included a stipulation in his BC that prevented Miller from seeking assistance "sweeping, mopping, bending, and lifting." See Compl. at 12, 30–31. All claims against these defendants in their individual capacities are dismissed because, as stated above, neither Title II of the ADA nor § 504 of the RA permit monetary damages in individual capacity suits. Garcia, 280 F.3d at 107; Goord, 405 F. Supp. 2d at 279. The ADA and RA claims against the defendants in their official capacities are dismissed because Miller, like Passino, does not allege he was denied access to Marcy C.F.'s services, programs or activities due to a disability. Carrasquillo, 324 F. Supp. 2d at 443. Finally, any claim for injunctive relief is dismissed because Miller is no longer confined at Marcy C.F. See http://nysdoccslookup.doccs.ny.gov/ (last visited Apr. 29, 2019). Candelaria, 1998 WL 312375 at \*2. Thus, Miller's ADA and RA claims are dismissed without prejudice pursuant to § 1915(A) for failure to state a claim upon which relief may be granted.

**I. State Law Claims**

**\*17**  Plaintiffs assert claims for professional malpractice and gross negligence. See Compl. at 34. The Complaint is devoid of corresponding factual information. "[T]he tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Id. (internal quotations and alterations omitted). Here, Plaintiff does not recite "elements" of a cause of action but merely assigns legal labels to the causes of action. See Compl. at 18–19. Because of the complete lack of factual allegations pertaining to these state law claims, the claims are dismissed for failure to state a claim upon which relief may be granted.

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 57 of 115

Miller v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2370295

## V. MOTION TO WITHDRAW

On May 7, 2019, Miller filed a motion to withdraw all pending motions, Letter Mot. to Withdraw, to which Defendants did not respond, Docket. Thus, the Court grants Miller's motion to withdraw his two pending motions for preliminary injunction.

Miller had also filed letter motions in support of his first motion for preliminary injunction, and included exhibits that he requested be filed under seal. Dkt. Nos. 14 and 19 ("Letter Motions in Support of First PI Motion"). The Court considers these motions withdrawn as well. Given Miller's pro se status and the fact that the injunction request these exhibits support —as well as the motions to which they were attached— has been withdrawn, the Court will not order the exhibits unsealed.

## VI. CONCLUSION

Accordingly, it is hereby

**ORDERED** that the following claims are **DISMISSED with prejudice**: (1) Section 1983 claims for monetary damages against defendants in their official capacities; and (2) claims against McCulloch and Grant for failing to investigate complaints; and it is further;

**ORDERED** that the following claims are **DISMISSED without prejudice**: (1) Miller's retaliation claim related to a cube search; (2) Passino's retaliation claims related to the disclosure of his court documents; (3) Passino's Eighth Amendment claims against Weir; (4) Passino's Fourteenth Amendment privacy claims; (5) Miller's due process claims; (6) Miller's 1985 conspiracy claim against Ballinger, Pallas, Staring, Sullivan, Freeman, Kunkle, Shupp, and J. Thomas related to his 2016 discharge from the PBSOTP; (7) Miller's conspiracy claims related to the cube search and the 2018 transfer; (8) Passino's conspiracy claims; (9) Miller and Passino's ADA and RA claims; and (10) Miller and Passino's state law claims; [14] and it is further

[14]     Should Plaintiffs seek to pursue one or more of the claims dismissed without prejudice by the Court herein, they must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which Plaintiffs has a legal right to pursue, and over which this Court

may properly exercise jurisdiction. Any amended complaint filed by Plaintiffs must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**ORDERED** that the following claims survive the Court's sua sponte review: (1) Miller's retaliation claims, related to threats, against Staring, Ballinger, Sullivan, Kunkle, Pallas, Shupp, Freeman, Hughes, M. Thomas, Weir, and Kiss; (2) Miller's retaliation claims, related to false reports and termination from the PBSOTP, against Pallas, Staring, Ballinger, Sullivan, Freeman, Shupp, Kunkle, and J. Thomas; (3) Miller's retaliation claims, related to his 2018 transfer, against Annucci, Freeman, and Sullivan; (4) Passino's retaliation claim, related to threats, against Hughes; (5) Passino's retaliation claim, based upon false reports and his transfer to Gowanda C.F., against Weir; (6) Passino's retaliation claim, related to his 2018 suspension, against Burdick; (7) Passino's Eighth Amendment claim against Hughes; (8) Miller's conspiracy claims against Ballinger, Pallas, Staring, and Shupp related to threats/harassment on April 29, 2014 and May 4, 2014; and (9) Miller's § 1983 conspiracy claim, related to his 2016 discharge from the PBSOTP, against Ballinger, Pallas, Staring, Sullivan, Freeman, Kunkle, Shupp, and J. Thomas; it is further

**\*18** **ORDERED** that McCoy, Kinderman, Gage, McCullogh, Grant, and Taylor are **DISMISSED** as defendants herein; and it is further

**ORDERED**, that a response to the Complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiffs must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiffs are also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in their address; their failure to do so will result in the dismissal of their action**; and it is further

**ORDERED**, that Miller's motion to withdraw all pending motions (Dkt. No. 24) is **GRANTED**;

**ORDERED**, that Miller's motions for preliminary injunctive relief (Dkt. Nos. 6 and 22) and letter motions in support (Dkt. Nos. 14 and 19) are **WITHDRAWN**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2370295

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2522198
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Gerrard J. BLAKE, Plaintiff,

v.

Brian FISCHER, Commissioner of New York State Department of Correctional Services; Glenn Goord, Former Commissioner of New York State Department of Correctional Services; George B. Alexander, Chairman of New York State Division of Parole; Kenneth S. Perlman, Deputy Commissioner for Program Services for New York State Department of Correctional Services; John H. Nuttall, Former Deputy Commissioner for Program Services for New York State Department of Correctional Services; Edwin H. Elfeldt, Coordinator for Sex Offender Counseling and Treatment Program for New York State Department of Correctional Services; L. Weingartner, Deputy Superintendent for Programs at Five Points Correctional Facility; Kathleen Altman, Correctional Counselor at Five Points Correctional Facility; Tousignant, Parole Officer at Upstate Correctional Facility; Kratzenberg, Parole Officer at Great Meadows Correctional Facility; Scroggy, Correctional Counselor at Great Meadows Correctional Facility; K. LaPolt, Deputy Superintendent for Programs at Great Meadows Correctional Facility; Joseph T. Smith, Superintendent of Shawangunk Correctional Facility; Neville Andrews, Deputy Superintendent for Programs at Shawangunk Correctional Facility; Ed Rudder, Sex Offender Program Psychologist at Shawangunk Correctional Facility; Stacy Bode, Clinical Social Worker for Sex Offender Program at Shawangunk Correctional Facility; Dick Fitchett, Former Senior Counselor for Sex Offender Program at Shawangunk Correctional Facility; B. McCullough, Senior Counselor for Sex Offender Program at Shawangunk Correctional Facility; Frank Chiapperino, Correctional Counselor for Sex Offender Program at Shawangunk Correctional Facility; John Townley, Correctional Counselor for Sex Offender Program at Shawangunk Correctional Facility; and E. Trinidad, Former Correctional Counselor for Sex Offender Program at Shawangunk Correction Facility, individually and in their official capacities, Defendants.

No. 09–CV–266 (DNH/DRH).
|
March 5, 2010.

**Attorneys and Law Firms**

Reisman, Rubeo & McClure, LLP, Mark Irwin Reisman, Esq., of Counsel, Hawthorne, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, James J. Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff Gerard Blake ("Blake"), an inmate formerly in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty-one present and former DOCS employees, violated his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments concerning requirements that Blake participate in sex offender treatment while incarcerated. Compl. (Docket No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Docket No. 40. Blake opposes the motion. Docket No. 52. For the following reasons, it is recommended that defendants' motion be granted in part and dismissed in part.

**I. Background**

The facts are related herein in the light most favorable to Blake as the non-moving party. *See* subsection II(A) *infra.*

On October 29, 2003, Blake pleaded guilty to one count of promoting prostitution in the third degree, in violation of N.Y. Penal Law § 230.25(1) [2], and was sentenced as a

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.     1

2010 WL 2522198

second felony offender to a term of two and a quarter to four and a half years. Compl. ¶¶ 37–39. On February 6, 2004, Blake was received into DOCS custody at Downstate Correctional Facility. *Id.* ¶ 40. An initial assessment of Blake's needs during incarceration and parole conditions pending release ("EEP") suggested training in transitional services, alcohol and substance abuse, and vocational training and work assignments. *Id.* ¶¶ 41–42. The EEP was confirmed and reiterated by DOCS staff when Blake was transferred to Sing Sing Correctional Facility. *Id.* ¶¶ 43–44. Neither EEP included any reference to the need for a sex offender program or parole conditions. *Id.* ¶¶ 40–45. Blake's appearance at the parole board on March 16, 2004 resulted in a denial of parole and leave to re-apply in two years. *Id.* ¶ 46.

2      Promoting prostitution requires proof of the intentional "[a]dvance[ment] or profit[ ] from prostitution by managing, supervising, controlling or owning, either alone or ... with others, ... a prostitution business ... involving prostitution activity by two or more prostitutes...." N.Y. Penal Law § 230.25(1).

On May 29, 2004, Blake was transferred to Five Points Correctional Facility ("Five Points"). Compl. ¶ 47. Upon arrival, Blake was told by defendant counselor Altman that his EEP had remained the same as that originally set by the counselors at Downstate, which still did not include provisions for a sex offender program or parole conditions. *Id.* ¶ 48. After the meeting, Blake corresponded with the alcohol and substance abuse coordinator and succeeded in having that condition removed from his EEP. *Id.* ¶¶ 48–50.

On March 11, 2005, Blake was involved in an altercation with another inmate. Compl. ¶ 51. On April 1, 2005, during his interview with Altman, Blake was informed that aggressive replacement training ("ART") was recently included in his EEP due to his involvement in the altercation. *Id.* ¶ 52. Blake disagreed with the decision and terminated the interview. *Id.* Shortly thereafter Blake filed a grievance against Altman for her decision to include ART in his EEP. *Id.* ¶ 53. Blake also corresponded with defendant Weingartner, the Deputy Superintendent for Programs, about the inclusion of ART into his EEP and on May 9, 2005, Weingartner advised that Blake's case was being referred to the DOCS Sex Offender Program ("SOP"). *Id.* ¶ 54–55; *see also* Dkt. No. 40–7 at 32 (explaining that Blake's offense of promoting prostitution "is considered an offense with inherent violent characteristics in that the females who perform this activity do so under the control of another, and frequently do so under the threat

of violence"). Blake also contacted defendant Goord, then the Commissioner of DOCS, again expressing concern about Altman and Weingartner's decisions to have him participate in ART and SOP. *Id.* ¶ 57.

**\*2** On June 10, 2005, Blake received a response from defendant Nuttal, the former DOCS Deputy Commissioner for Program Services, on Goord's behalf defending the decision to enroll Blake in SOP and explaining that

> [w]hile it is understood that your instant offense is not a registerable sex offense per penal law Article 130, your instant offense did involve sexual offending behavior in which you profited from prostitution; therefore, based on your sexual exploitation of women for profit, the recommendation to participate in the Sex Offender Counseling Program is appropriate as is the need to participate in the Aggression Replacement Training (ART) Program.

Dkt. No. 40–7 at 39; *see also* Compl. ¶ 59. In September 2005, after being advised that refusal to participate in the SOP would lead to a denial in earned eligibility credit ("EEC"), possibly losing good time credits, and another delay of eligibility for parole, Blake refused to attend and participate in SOP. Compl. ¶ 60. In September 2005, Blake filed an Article 78 proceeding [3] in Albany County regarding the appropriateness of being placed in SOP. Compl. ¶ 61; *see also* Dkt. No. 40–7. [4] The petition was ultimately dismissed. Compl. ¶ 61; Dkt. No. 40–8 at 2 ("[T]he court finds that the determination of the respondents as to both [ART and SOP] programs was rational and fully supported by the record below.").

3      N.Y. C.P.L.R. art. 78 establishes the procedure for state judicial review of the actions and inactions of state and local government agencies and officials.

4      Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in

the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). However, there are instances where the court may consider documents outside those previously referenced, including when the documents are only "partially quoted in [the] complaint ...; integral to [the] complaint ...; [or] relied upon ... in drafting the complaint...." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (internal quotation marks and citations omitted). Blake has lost the documents related to the Article 78; however, Blake still referenced and provided documents which were part of the Article 78 motion. *See* Compl. Additionally, at least a portion of Blake's current complaint incorporates the same allegations and relies upon the same facts proffered in the Article 78. As defendants' counsel was also the counsel involved in the Article 78 proceeding, he has provided a copy of the proceeding with his motion papers. Dkt. Nos. 40–7, 40–8. As the Article 78 was incorporated by reference, defendants' submission of the entire proceeding has been considered in the present motion.

On December 18, 2005, Blake was transferred to Upstate Correctional Facility ("Upstate") whereupon he was informed that his EEP now contained both ART and SOP. Compl. ¶¶ 62–63. On December 30, 2005, Blake was interviewed by defendant Tousignant, a parole officer at Upstate, who, Blake later determined, recommended sex offender treatment among the special parole conditions to which Blake would be subject if released on parole. *Id.* ¶¶ 64, 67.

On February 12, 2006, Blake was transferred to Auburn Correctional Facility (Auburn"). Compl. ¶ 65. Shortly thereafter, Blake's EEC was denied based upon his refusal to participate in the SOP. *Id.* ¶ 68. Additionally, on February 28, 2006, Blake was denied parole release and ruled eligible to re-apply in another two years. *Id.* ¶ 69. The decision made "reference to [Blake's] record indicating a sex offense occured [sic] and factored into its decision ... [when Blake] was denied his EEC." *Id.* On March 13, 2006, Blake requested a revision of his EEP. *Id.* ¶ 70. The request was refused. *Id.*

On February 16, 2007, after being temporarily incarcerated at Upstate, Blake was transferred to Great Meadow Correctional Facility ("Great Meadow"). Compl. ¶¶ 71, 73. Upon arrival, Blake was interviewed by defendant Scroggy, a counselor, who informed Blake "that due to changes in the law, [Blake's] crime of commitment was now a sex offense." *Id.* ¶ 74. Blake

agreed to go on the waiting list for the SOP program. *Id.* In December of 2007, Blake was interviewed by defendant Kratzenberg, a parole officer, and asked why the other co-defendants who pleaded guilty to promoting prostitution with Blake were not recommended for sex offender conditions. *Id.* ¶ 75. Kratzenberg could not answer the question or change the recommendations. *Id.*

**\*3** On January 20, 2008, Blake wrote to defendant LaPolt, the Great Meadow Deputy Superintendent for Progams, requesting reevaluation of his EEP. Compl. ¶ 76. Additionally, due to another altercation in which he was involved, Blake agreed to attend ART. *Id.* Blake entered the ART program on February 25, 2008. *Id.* ¶ 79. LaPolt refused to reevaluate Blake's EEP. *Id.* Shortly thereafter, Blake received notification that his EEC was again denied due to his "overall unacceptable level of program attendance," namely missing ninety days of programs from February 2006 to January 2008. *Id.* ¶ 77; Dkt. No. 1–1 at 4. Parole was again denied on February 19, 2008, with his eligibility to re-apply again extended for another two years, citing Blake's denial of EEC as a determinative factor. Compl. ¶ 78.

On February 26, 2008, Blake was transferred to Shawangunk Correctional Facility ("Shawangunk") where he was informed he would be "participating in the new Sex Offender Counseling and Treatment Program ["SOCTP"]." Compl. ¶¶ 80–81. When Blake met with defendant Trinidad, formerly a counselor, on February 27 for an initial interview, Trinidad presented Blake with two waivers, a waiver of confidentiality and a waiver for access to pornography, photographs and other material, and told Blake that if he did not sign the waivers he would face civil commitment and lose good time credits. *Id.* ¶ 82. On at least three other occasions, February 29, March 5, and April 1, Blake was approached by defendants Trinidad, Townley, Chiapperion, and Fitchett, all counselors, and was told that he must sign the two waivers; Blake refused. *Id.* ¶¶ 84, 86, 96.

On March 10, 2008, Blake was informed by defendant McCullough, a counselor, that he would be starting the SOCTP on March 17. Compl. ¶ 89. At that time Blake also requested to be enrolled in a second program as a recreation aide, but the request was denied insofar as the only other program spots available to Blake were educational, volunteer vocational, or corridor porter. *Id.* In order to avoid a threatened misbehavior report, Blake agreed to participate in the program. *Id.* ¶ 90. During this time period, Blake continued to write letters seeking explanation as to why

2010 WL 2522198

he was enrolled in SOP, Blake's cell was searched and seven photographs were confiscated as being in violation of program policy, and two of Blake's books and magazines were confiscated for failure to comply with program policies. [5] *Id.* ¶¶ 91–93, 98, 105, 108. After Blake appealed, the materials were provided to him. *Id.* ¶ 120.

[5]    Liberally construing Blake's complaint, he may also allege a claim for defendants' theft of his property. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804. State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N .Y. Corr. Law § 24(2). In this case, Blake contends that there was an unconstitutional deprivation when his photographs and magazines were confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 procedure exists and affords an adequate state court remedy. Second, because Blake seeks monetary damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the proper venue to litigate such a claim is in state court.

On March 24, 2008, Blake received a response from defendant Smith, Superintendent at Shawangunk, explaining that his placement in SOP "was the result of Central Office Guidance Unit." Compl. ¶ 94. This was confirmed by defendant Rudder, a psychologist, and non-party Rocky who informed Blake "that the final decision was up to Central Office" as to whether or not Blake was to be subject to SOP. *Id.* ¶ 95. The Central Office also denied Blake's grievances alleging that promoting prostitution was not a sex crime stating that, while his conviction was not a sex offense crime

under the Sex Offender Registration Act or eligible for civil management review by the Office of Mental Health, those conditions were not a prerequisite for enrollment in SOCTP. Dkt. No. 1–1 at 5. "Rather, a number of factors may serve as the basis for a referral ... including conviction of a sex offense, records indicating that a sexual offense occurred during the commission of the crime ..., or a guilty disposition of a sex offense ...." *Id.*

**\*4** On April 2, 2008, Blake was placed in keeplock [6] by Chiapperino for refusing to sign the two aforementioned waivers despite Blake's participation in the SOCTP since mid-March. Compl. ¶ 99. The following day, Blake signed the waivers under duress. *Id.* ¶ 100. On April 17, 2008, an unidentified defendant informed Blake that the SOCTP program did not have any official policies or procedures. *Id.* ¶ 102. [7] Shortly thereafter, defendants Bode, a social worker, and Fitchett provided all inmates with a memorandum entitled "Shawangunk Correctional Facility Sex Offender Program Inmate Participation Handout," which purported to contain the rules and regulations of the program until an official policy and procedure was developed by the Central Office. *Id.* ¶ 103. On July 30, 2008, the Central Office issued a decision in response to Blake's grievance, in which it advised that DOCS was revising SOCTP guidelines and until those revisions were completed, the October 2001 Policies and Procedures for the Sex Offender Counseling Program, were to be followed. Dkt. No. 1–1 at 7. Moreover, the decision indicated that the waiver of confidentiality form was being reformatted and that, under the current state of the law,

[6]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

[7]    To the extent that, liberally construing Blake's complaint, he alleges that the failure to follow internal procedures at the SOCTP at Shawangunk resulted in a deprivation of due process, such contentions lack merit. First, as discussed *infra,* Blake has no liberty interest in his participation in the sex offender program. Second, the violation of a state procedural right does not automatically confer a federal right to due process. *See generally Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990) ("The fact that the State may have specified its

own procedures that it may deem adequate for determining the preconditions to adverse official action does not settle what protection the federal due process clause requires.") (internal quotation marks and citations omitted). Thus, even if defendants did not comply with internal procedures during Blake's tenure at the treatment program, such transgressions are insufficient to establish a constitutional violation.

**[Blake] is not required to register as a sex offender,** nor is [he] subject to civil management review by the Office of Mental Health (OMH). Accordingly, [Blake's] SOCTP records **are not subject to disclosure** to the Board of Examiners or OMH at this time ... [S]uch records **would only be available to a community treatment provider in the future should such a provider engage [Blake] in treatment and request a copy of the SOCTP file.**

*Id.* (emphasis added to the original).

Beginning in May 2008, Blake wrote various defendants and filed grievances seeking to have his record expunged of all references to SOP. Compl. ¶¶ 106–107, 110–12, 114, 119, 121, 134. Additionally, on May 25, 2008, Blake sent a letter to defendants Elfeldt, an SOP coordinator, Rudder, and Fitchett seeking revocation of the previously signed waiver of confidentiality pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), Pub .L. 104–191, 110 Stat.1936 (1996), and its privacy protections. *Id .* ¶ 115. Allowing "outside agencies and any community organizations" access to records that purported Blake as a sex offender "created a stigma...." *Id.* On May 28, 2008, Blake was informed by Fitchett and Rudder that Elfeldt was displeased with his revocation of the waiver of confidentiality and was having Blake's waiver be investigated by the Office of the Counsel. *Id.* ¶ 117. On June 19, 2008, Blake received a letter from Elfeldt stating that Blake "would need to make available his records to outside agencies and any community organization, though [Blake] was not a sex offender by any New York state laws." *Id.* ¶ 124.

On September 11, 2008, Blake reviewed his guidance file and found paperwork showing that, prior to filing a grievance against Altman, Altman had submitted referrals indicating that Blake did not need SOCTP. Compl. ¶ 138; *see also* Dkt. No. 40–7 at 25 (inmate review worksheet dated January 3, 2005 indicating that SOCTP was not necessary), 26 (same), 28 (same). Additionally, on May 12, 2005, Elfeldt requested that a Non–Sex Offender Referral be resubmitted in twenty-four months, but no such resubmission had occurred. Compl.

¶ 138. Blake noticed that portions of his file were missing, and when he inquired as to what was omitted, Townley indicated that McCullough had removed the sections. *Id.* On the following day Blake filed a grievance seeking disclosure of the sections of his file which were omitted. *Id.* ¶ 139. Blake was advised that another review would "be scheduled at which time a list of the withheld documents w[ould] be provided." Dkt. No. 1–1 at 23.

**\*5** In November 2008, Blake was informed that all he needed to do to complete the SOCTP was formulate a release plan. Compl. at 144. On November 14, 2008, Blake met with Rudder, Chiapperino, and McCullough to review the release plan previously administered. *Id.* ¶ 145. Blake again complained that he should not have to participate in the SOCTP without a prior sexual transgression. *Id.* On November 28, 2008, the SOCTP furnished inmates the new waivers for confidentiality. *Id.* ¶ 146. Bode, Rudder, and Chiapperio approached Blake and asked him to sign the waivers, but he protested claiming he was no longer a participant as of November 14 when his release plan was submitted. *Id.* ¶ 147. Bode, Rudder, and Chiapperio informed Blake that he was not finished with the SOCTP until a transfer order was submitted, so Blake signed the waivers, still claiming that he was no longer a participant in the program. *Id.* ¶¶ 147–48. This action followed.

## II. Discussion

In his complaint, Blake alleges that defendants violated his First Amendment rights when he was designated to receive SOP after filing a grievance against Altman. Additionally, Blake alleges that his Eighth Amendment rights were violated when he was labeled a sex offender and required to participate in treatment. Similarly, Blake contends that his due process rights were violated when he was labeled a sex offender, suffered the stigma of that label, and failed to receive the appropriate due process prior to and after being labeled. Lastly, Blake contends that his Fourteenth Amendment rights to Equal Protection were violated when he was the only one of his co-defendants required to undergo SOP. Defendants move to dismiss on the grounds that (1) the statute of limitations bars Blake's claims, (2) Blake has failed to allege the personal involvement of certain supervisory defendants, (3) his constitutional claims are meritless, (4) Blake is not entitled to damages for emotional distress,[8] and (5) defendants are entitled to qualified immunity.[9]

**Blake v. Fischer, Not Reported in F.Supp.2d (2010)**

2010 WL 2522198

8    Pursuant to the Prisoner Litigation Reform Act of 1995 ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Because Blake has failed to allege that he has suffered any concomitant physical injury, he is precluded from recovering any type of compensatory damages related to emotional distress. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999) ("[I]n the case of suits seeking damages for mental or emotional injuries ... a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury].")." Therefore, defendants' motion to dismiss on this ground should be granted.

9    Defendants initially argued, and then retracted, a failure to prosecute claim on Blake. Defs. Mems. of Law (Dkt.Nos.40–9) at 23, 56 at 1).

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

### B. Statute of Limitations

**\*6** Defendants move to dismiss Blake's Fourteenth Amendment claims on the ground that they are barred by the statute of limitations. [10] While there is no provision in 42 U.S.C. § 1983 for the statute of limitations for a civil rights claim, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a); *Moor v. County of Alameda,* 411 U.S. 693, 702–03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249–51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y.C.P.L.R. 214(2). Federal law governs the determination of the accrual date for the purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues when the plaintiff "knows or has reason to know" of the harm. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). The critical time for accrual purposes is when a plaintiff is aware that he or she is suffering a wrong for which damages may be recovered in a civil rights action. *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980).

10    Defendants concede that this argument applies only to Blake's Fourteenth Amendment claims. Defs. Mem. of Law (Dkt. No. 40–9) at 19.

While Blake was informed that he was being classified as a sex offender in April and May of 2005, Blake was not informed that his classification required participation in the SOP, and that refusal to do so could result in the denial of EEC, good time credits, and parole until September 2005. Compl. ¶¶ 54–55, 60. However, Blake did not suffer a concrete injury until the denial of his EEC and parole in February 2006. *Id.* ¶¶ 68–69. As this moment represented the time upon which Blake knew of the alleged harm he had suffered, this is when the statute of limitations began to run.

Blake filed his present complaint in December 2008, three months before the expiration of the statute of limitations.

Accordingly, defendants' motion on this ground should be denied.

### C. Personal Involvement

Defendants contend that Blake has failed to allege the personal involvement of defendants Andrews, Fischer or Goord.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

**\*7** (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts;

(5) or the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

Fischer, Goord, and Andrews cannot be named solely for their respective supervisory positions of Commissioner, Superintendent, and Deputy Superintendent. *Wright,* 21 F.3d at 501. Additionally, the mere receipt of letters is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish

individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Moreover, Goord's actions in referring grievance letters to Nuttall who ultimately responded to the grievance and continued communications with the inmate, is also insufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) ("The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriquez v. N.Y. State Dep't of Corr. Servs.,* 491 F Supp.2d 342, 347 (W.D.N.Y.2007)). There are no allegations of negligent supervision, or creation of a hiring or retention policy which allowed for continuous constitutional violations to continue.

Blake also asserts that Andrews, Fischer, and Goord were grossly negligent in supervising Altman, but fails to advance any plausible facts which would establish a basis for such negligence. Compl. ¶ 149. Such allegations, without more, are insufficient to establish personal involvement as all they proffer is liability based on the theory of *respondent superior. Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) ("[T]he doctrine of *respondeat superior* cannot be used to establish [personal] liability under § 1983.") (citations omitted).

Therefore, the defendants' motion to dismiss on this ground should be granted and defendants Andrews, Fischer, and Goord should be dismissed from the complaint.

### D. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against the plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Even if an actionable claim is stated, "defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of

the protected conduct." *Vega v. Artus,* 610 F.Supp.2d 185, 206 (N.D.N.Y.2009) (citations omitted). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*8** In this case, Blake contends that as a result of his grievance against defendant Altman, he suffered the adverse action of having the SOP included in his file. To support such contentions, Blake states that his file shows that prior to filing the grievance against Altman, there were multiple referrals submitted, at least one authored by Altman, indicating that Blake did not need the SOP. Compl. ¶ 138. Blake filed the grievance against Altman in April 2005 and was informed by Weingartner that his case was being referred for consideration of SOP in May 2005. Compl. ¶¶ 53–55. Thus, in less than one month after the grievance was filed, Blake's case underwent SOP review.

Initially it appears that defendants have provided substantial evidence that Blake's transfer to the SOP was imminent. Blake's "offense did involve sexual offending behavior ... based on [his] sexual exploitation of women for profit," so that, regardless of his grievance, defendants' would have recommended him for the SOP. Dkt. No. 40–7 at 39; *see also* Dkt. No. 40–7 at 32. Such contentions are further supported by the fact that Blake's placement in SOP was determined by the Central Office Guidance Unit, and not any of the named defendants. Compl. ¶¶ 94–95; Dkt. No. 1–1 at 5. There are no facts proffered which plausibly suggest that the Central Office or Weingartner were aware of the grievance or that the grievance had any impact on Central Office's eventual decision to enroll Blake in SOP.

However, such contentions conflict with Blake's allegations that Blake was treated differently than his two co-defendants. All three men were convicted of the same crime, and presumably incarcerated for the same duration, yet Blake was the only individual required to undergo the SOP and have parole conditions proposed upon his release. Compl. § 75. If defendants' were going to recommend individuals with Blake's conviction to the SOP, the other two co-defendants reasonably should have also been included in the rehabilitation but were not. Such actions may suggest intentional adverse action against Blake.

On this record and at this stage, therefore, defendants' motion as to this claim should be denied.

## E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to prison conditions. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). This prong is satisfied by a showing that the "conditions are ... totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Tinsley v. Goord,* No. 05–CV–3921, 2006 WL 2707324, at \*3 (S.D.N.Y. Sept. 20, 2006) (citing *Horne,* 155 F.3d at 31) (internal quotation marks omitted). Second, the prisoner must show that the prison official demonstrated deliberate indifference to the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.

**\*9** In this case, Blake alleges that any placement in sex offender training programs or setting special parole conditions of parole amounted to an infliction of cruel and unusual punishment. However, courts have consistently found requiring participation in such programs constitutional. A correctional institution's goal of rehabilitating inmates, and reducing rates of recidivism, by providing such treatment programs represent "important and laudable goals, and the institution of the program itself was well within the State's authority as part of its operation of correctional facilities ... [Moreover,] the State's pursuit of these goals or its administration of the SOTP [does not] ... violate [ ] contemporary standards of decency." *Neal v. Shimoda,* 131 F.3d 818, 833 (9th Cir.1997); *see also Tinsley,* 2006 WL 2707324, at \*3–\*4 (holding that sex offender treatment status did not subject the inmate to sort of unnecessary or wanton infliction of pain). Thus, Blake is unable to state an Eighth Amendment claim here as a matter of law.

Accordingly, defendants' motion as to this claim should be granted.

## F. Fourteenth Amendment

### 1. Due Process

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. See Jenkins v. Haubert, 179 F .3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).

#### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). In this case, Blake contends that mandating the SOP, based on his conviction for promoting prostitution in the third degree,[11] was a violation of his liberty interest to remain free from a sex offender classification. ABlake contends that he should have been provided procedural protections in connection with being recommended for sex offender training.

[11]   "Effective January 1, 2000, promoting prostitution in the second degree became a sex offense ... triggering [the Sex Offender Registration Act]'s requirements." People v. Carey, 850 N.Y.S.2d 260, 261 (3d Dep't 2008). However, promoting prostitution in the third degree does not triggers the Sex Offender Registration Act ("SORA"). Thus, while T promoting prostitution may constitute a sexual offense, it does not trigger the requirements

of SORA. If Blake's offense of conviction alone triggered SORA, SORA would have provided all procedural protections required in the event that a liberty interest was found. Neal v. Shimoda, 131 F.3d 818, 831 (9th Cir.1997).

**\*10**   Where an individual, not convicted of an express sex offense, is then required to participate in a SOP, circuits have split as to whether or not a liberty interest exists for the inmate to be free from the label of a sex offender, required to participate in treatment. Compare Coleman v. Dretke, 395 F.3d 216, 222–23 (5th Cir.2004) (holding that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions" and categorizing the "compelled treatment on which [the inmate's] parole was conditioned," as qualitatively different from conditions imposed upon other inmates); Chambers v. Colorado Dep't of Corr., 205 F.3d 1237, 1242–43 (10th Cir.2000) (holding that an inmate has right to procedural due process for good time credits are removed from him since "after five years of being labeled a sex offender without ... admitting that status and with his receiving ten days of earned time credits a month, the ... benefit [was removed] ... implicat [ing] ... a liberty interest in not being labeled a sex offender."); Kirby v. Siegelman, 195 F.3d 1285, 1291–92 (11th Cir.1999) ("[Inmates still] retain [ ] a 'residuum of liberty' that would be infringed by classification as a sex offender without complying with minimum requirements of due process;" accordingly "[a]n inmate who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender."); Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir.1997) ("[T]he stigmatizing consequences of the ... 'sex offender' label couples with the subjection ... to a mandatory treatment program whose successful completion is a precondition for parole eligibility create the kind of deprivations ... that require procedural protections.") with Grennier v. Frank, 453 F.3d 442, 445 (7th Cir.2006) (finding that a prisoner who was not convicted of a sex offense had no protected liberty interest in being free from sex offender classification upon parole); Gunderson v. Hvass, 339 F.3d 639 (8th Cir.2003) (holding that registering as a sex offender and its impact on one's reputation, despite the lack of a sexual offense conviction, "is not sufficient to invoke the procedural protections of the due process clause.").

However, courts within the Second Circuit appear to be reaching a consensus that recommendations for sex offender classification and programming do not trigger due process rights. See Vega v. Lantz, No. 03–CV–2248, 2008 WL

3992651, at *15–17 (D.Conn. Aug. 25, 2008); *Fitfield v. Eaton,* No. 07–CV–6521 L, 2009 WL 3429791, at *2–3 (W.D.N.Y. Oct. 20, 2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in SOP because inmate had no liberty interest in parole, conditional release, discretionary good time credits, or choosing his programming; *Tinsley,* 2006 WL 2707324, at *5 (finding no constitutionally protected right, either federally or state-created, which allows "prisoners [to] ... avoid classification as sex offenders or participat[e] in related treatment programs.").

 **\*11** It is undisputed that inmates have no constitutionally protected interest in parol, or other conditional release from prison, prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7 (1979). However, the holdings in *Neal, Coleman,* and *Kirby* found liberty interests because parole eligibility was preconditioned on the successful completion of the SOP. *Kirby,* 195 F.3d at 1288 (finding that inmate "must participate in group therapy sessions ... as a prerequisite for parole eligibility."); *Coleman,* 395 F.3d at 222–23 ("[T]he Due Process Clause ... provides Coleman with a liberty interest from freedom from stigma and compelled treatment on which his parole was conditioned...."); *Neal,* 131 F.3d at 830. In fact, *Neal* contemplated a situation identical to the present case whn it stated:

> [t]he liberty interest implicated by the establishment of the SOTP is not merely the requirement that sex offenders complete the specified treatment program. If that were all that was at stake, we could probably not say that a liberty interest had been created, given the fact that prisons frequently maintain treatment and behavioral modification programs ... that have long withstood legal challenge.

*Neal,* 131 F.3d at 830.

This follows the Second Circuit's holdings that inmates have no constitutionally protected liberty interest in internal classifications or eligibility for rehabilitative programs. *See Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980). This is also consistent to the Second Circuit's holding that inmates

have no constitutional right to discretionary good time release or participation in prison programs which expedite the date of release. *See Abed v. Armstrong,* 209 F.3d 63, 66–67 (2d Cir.2000) ("Although inmates have a liberty interest in good time credits they have already earned, no such interest has been recognized in the opportunity to earn good time credit where, as here prison officials have discretion to determine whether an inmate ... is eligible to earn good time credit."); *see also* N.Y. CORRECT. LAWW § 803(a) (explaining that inmates may receive credit to reduce their sentence for "good behavior and efficient and willing performance ... in an assigned treatment program [but] may [also have such credits] be withheld, forfeited or canceled in whole or in part for ... failure to perform properly in the ... program assigned.").

The instant case does not represent one in which parole eligibility was conditioned upon participation in and completion of the SOP. First, Blake was recommended to attend SOP classes, but his participation and attendance were not mandatory. *Matos v. Goord,* 27 A.D.3d 940, 941 (3d Dep't 2006) (explaining that an inmate "cannot be compelled to attend the [sex offender training] program."). Second, Blake was not precluded from having his parole eligibility examined. Blake was given multiple opportunities to have his parole reviewed, and the parole board declined to grant his parole based on a variety of reasons. Compl. ¶¶ 69, 78. To the extent that Blake was denied earned eligibility or good time credits after receiving notice from defendants that failure to participate in his recommended SOP would result in such, Blake still has failed to state a constitutional claim as those decisions to award such credits are discretionary. *See* N.Y. Correct. Law § 803(a). [12] Thus, Blake's circumstances differed from that relied upon by multiple authorities to which he cites. Additionally, denial of Blake's motion is consistent with the authority cited by defendants, as well as the well established case law, that inmates are not entitled to parole, discretionary good time credits, or participation in programming. Therefore, Blake has failed to identify a liberty interest which would require procedural protections.

[12]    To the extent that Blake argues "that he was barred from any *already-earned* good time credit ..., Section 1983 is not the proper vehicle to seek redress ... and a write of habeas corpus is a prisoner's sole recourse in challenging the procedures used to deny him good-time credits." *Fitfield,* 2009 WL 3429791, at *3 (internal quotation marks and citations omitted).

**\*12**  Furthermore, the Supreme Court has held that "[a] prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not ... constitute [an] atypical and significant hardship [ ] in relation to the ordinary incidents of prison life." *McKune v. Lile,* 536 U.S. 24, 37–38 (2002). "Since 'most offenders will eventually return to society, [a] paramount objective of the corrections system is the rehabilitation of those committed to its custody.' " *Id.* at 36 (*quoting Pell v. Procunier,* 417 U.S. 817, 823 (1974)). The SOP has been held to be such a program, especially in instances such as the present where the conviction stemmed from a sexually based act. *See Johnson v. Baker,* 108 F.3d 10, 11–12 (2d Cir.1997) (referring to the SOP as rehabilitative and rationally related to the State's interest in assisting inmates); *Rizzuto v. Goord,* 34 A.D.3d 1164 (3d Dep't 2006) (finding that inmate's "engage[ment] in sexual exploitation in connection with one of his criminal convictions, [ specifically the operation of a prostitution ring, made] ... the recommendation that he be required to participate in the sexual offender counseling program ... rational ....").

While Blake's conviction does not trigger SORA, it does constitute a sexually based crime whereupon Blake acted as a pimp, profiting off women selling themselves for sex. Dkt. No. 40–7 at 39 ("While it is understood that your instant offense is not a registerable sex offense ... [it] did involve sexual offending behavior in which you profited from prostitution; therefore, based on your sexual exploitation of women for profit, the recommendation to participate in the [SOP] is appropriate...."). This presents a situation similar to in *Vega,* where the Second Circuit determined that the conviction "could be found to reflect problematic sexual attitudes and behavior which justify labeling his crimes 'sexual offenses' ... [supporting] the Department's determination that his convicted conduct is reasonably termed a 'sexual offense' ...." requiring treatment and rehabilitation. *Vega v. Lantz,* 596 F.3d 77, 2010 WL 698384, at \*5 (2d Cir. Mar. 2, 2010). Moreover, it presents facts similar to those in *Rizzuto.* Such conclusions by defendants represent a reasonable motivation for DOCS to require rehabilitation. Blake's individual participation in such a program has already been judicially deemed legitimate and rational. Compl. ¶ 61; Dkt. No. 40–8 at 2 ("[T]he court finds that the determination of the respondents as to both [ART and SOP] programs was rational and fully supported by the record below.")

Accordingly, even viewing the allegations of the complaint in the light most favorable to Blake, there is no plausible set of facts which would establish a violation of his procedural due process rights. Defendants' motion on this ground should be granted.

## b. Substantive Due Process [13]

[13]  Blake contends that his retaliation claims come under a Fourteenth Amendment due process analysis. Analysis may be made under either the Fourteenth or First Amendment as they are identical. *Blue v. Koren,* 72 F.3d 1075, 1082 n. 3 (2d Cir.1995) ("[A] right to defend oneself ... without being subjected to retaliation ... may be easily derived either from the ... Due Process Clause or from the First Amendment ...."). Accordingly, our analysis will proceed pursuant to the First Amendment.

**\*13**  Liberally reading the complaint it also appears that Blake has alleged a substantive due process claim concerning his sex offender classification and recommendation for treatment. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense...." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). However, for the reasons discussed *supra,* enrollment in the SOP was not arbitrary, conscience-shocking, or oppressive, but rather was rationally related to a legitimate penological purpose and determined to be neither unnecessary nor painful.

Accordingly, defendants' motion to dismiss on this ground is granted.

## 2. Stigma–Plus Claim [14]

[14]  Blake relies on *Vega I* to assert that "[b]eing classified in prison as a sex offender ... causes a 'stigma-plus' ...." Blake's Mem. of Law (Dkt. No. 52) at 9 (citing *Vega,* 2008 WL 3992651, at \*14). However, such reliance on the district court decision in *Vega* is misplaced because it was recently reversed. 2010 WL 698384. The stigma-plus holding was reversed because Vega failed to proffer, or prove, that the claims that he committed a sexual offense were false. *Id.* at \*4–

**Blake v. Fischer, Not Reported in F.Supp.2d (2010)**
Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 70 of 115

2010 WL 2522198

5. Thus, Vega was not mischaracterized as a sex offender. *Id.* The same can be argued in the present case, where Blake's conviction of organizing and exploiting women and profiting from their actions of prostituting themselves, represented a sexual offense. Additionally, the conviction has not been attacked, and any such attack would be belied by Blake's voluntary guilty plea to the charge. Compl. ¶¶ 37–39. Therefore, in addition to the lack of publicity required to prove a stigma-plus claim, Blake's claims also fail due to his failure to allege a statement injurious to his reputation which could be proven false.

In order to plead a "stigma plus" claim, an individual must "allege (1) the utterance of a statement about [him or] her that is injurious to [his or] her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005) (internal quotation marks and citations omitted). "The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made ... only in private, ordinarily does not implicate a liberty interest." *Id.* (citations omitted). Moreover, there must be a plus factor, composed of "a specific and adverse action clearly restricting the plaintiff's liberty...." *Id.* at 87–88 (citations omitted).

In this case, Blake has failed to allege a sufficiently public statement which would constitute a stigma. Blake's conviction, indisputably, does not require him to publicly register as a sex offender. Dkt. No. 1–1 at 7. Furthermore, Blake's records would only be released to subsequent providers from whom Blake chose to seek treatment and only upon request. *Id.* Thus, Blake's claim lacks the element of notoriety which would compel a finding of stigma. *See Gunderson,* 339 F.3d at 644 (finding that where there is no "public dissemination of ... registration," and instead the information "in considered 'private data,' " there has been a failure to satisfy the test). Without such publicity, the "[d]amage to reputation alone, ... is [in]sufficient to invoke the procedural protections of the due process clause." *Id.*

Accordingly, defendants' motion on this ground should be granted.

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> **\*14** [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted). With respect to prisoners, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotation marks and citations omitted). To succeed, a plaintiff must show "that [he] were intentionally treated differently from other similarly-situated individuals without any rational basis." *Clubside, Inc. v. Valentin,* 468 F .3d 144, 158–59 (2d Cir.2006). Additionally, a plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves...." *Neilson,* 409 F.3d at 104.

Blake has failed to establish membership in a protected class. However, it appears that Blake has adequately alleged a class of one claim, namely that he was treated differently from two other individuals that were convicted, with him, of the

2010 WL 2522198

same crime. To satisfy a class of one claim, Blake must "allege (1) that [he was] intentionally treated differently ... and (2) that the disparate treatment was either (a) irrational or wholly arbitrary or (b) motivated by animus." *Assoko v. City of New York,* 539 F.Supp.2d 728, 735 (S.D.N.Y.2008) (citations and internal quotation marks omitted). Viewing the facts in the light most favorable to Blake, it appears that his SOP conditions, while not irrational, were arbitrarily applied to Blake, as neither of his co-defendants were required to participate in similar programming. Compl. ¶ 75. Blake's co-defendants were incarcerated for substantially the same offenses, and presumably for a comparable amount of time, thus, the failure to also include them in the SOP and impose special parole conditions is indicative of plausible animus on the part of the defendants and arbitrary and discriminatory conduct.

Accordingly, defendants' motion as to this claim should be denied.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

**\*15** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached with respect to Blake's Eighth Amendment allegations because, as discussed *supra,*

it has not been shown that defendants violated Blake's constitutional rights.

#### 1. Retaliation

It has been well-established law for decades that state actors cannot retaliate against individuals for engaging in constitutionally protected conduct. *Mt. Healthy City Sch. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Such conduct has also been prohibited in prisons. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) (holding that interference with an inmate's "right to petition government for redress of grievances, as guaranteed by the First and Fourteenth Amendments," is protected by § 1983) (citations omitted). Accordingly, the right of an inmate to file grievances without fear of reprisals was established long before Blake was incarcerated and subjected to the SOP. In this case, viewing the allegations in the light most favorable to Blake, defendants took no actions which were reasonable in light of the well established law. At this stage, the allegations suffice to merit discovery on this issue.

Accordingly, defendants' motion on this ground should be denied.

#### 2. Stigma–Plus Due Process

Until its recent decision in *Vega,* the Second Circuit case law offered no guidance with respect to whether a liberty interest existed to remain free from being labeled a sex offender and referred to treatment. *See Vega,* 2008 WL 3992651, at *18 (discussing the lack of precedent as "only recently [has the issued been] addressed by one Connecticut state court and one New York federal district court"); *Tinsley,* 2006 WL 2707324, at *4–*5 (explaining that the Second Circuit offers no guidance on whether a "prisoner's classification as a sex offender during imprisonment implicates a liberty interest ....," and noting that "nothing suggests that either New York state law or prison regulations have created a liberty interest in prisoners avoiding classification as sex offenders or participating in related treatment programs.") (citations omitted). Thus, qualified immunity should be granted because there was no well-established case law on point at the time of the conduct alleged in the complaint. However, even if there was preexisting case law, as discussed *supra,* defendants' actions in placing Blake into treatment programs was consistent with defendants' duties to rehabilitate and prepare

2010 WL 2522198

inmates for reintegration into society. Thus, defendants acted reasonably in referring Blake to SOP given his offense of conviction and goals of rehabilitation.

**\*16** However, qualified immunity protects defendants from an award of monetary damages on this claim but not from an award of injunctive relief barring Blake from receiving compensatory relief but still allowing the possibility of injunctive relief. *See Ward v. Housatonic Area Regional Transit Dist.,* 154 F.Supp.2d 339, 346 (D.Conn.2001); *see also Vega,* 2008 WL 3992651, at \*19. Therefore, defendants motion as to Blake's stigma-plus claim on this ground should be granted as to his claim for damages against defendants in their individual capacities and denied as to his claim for injunctive relief.

### 3. Equal Protection

There is a well-established right to equal protection, ensuring that the government treat all similarly situated individuals the same at the time of the conduct alleged here. *City of Cleburne, Tex.,* 473 U.S. at 439. Moreover, the safe harbors of the Equal Protection Clause have been afforded specifically to prisoners since at least 1995. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995). Thus, the right to equal treatment has been established far before Blake's incarceration or referral to the SOP. In this case, viewing the allegations in the light most favorable to Blake, there are no actions which defendants engaged in which can be said to be reasonable in light of the well-established case law.

Accordingly, defendants' motion as to this claim should be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 40) be:

1. **GRANTED** as to:

   A. The Eighth Amendment claim and that claim should be **DISMISSED** in its entirety;

   B. All Fourteenth Amendment due process claims except for the stigma-plus claim for injunctive relief; and

   C. Defendants Andrews, Goord, and Fischer in all respects and those three defendants should be **DISMISSED** from this action in all respects; and

2. **DENIED** as to:

   A. The First Amendment retaliation claim;

   B. The Fourteenth Amendment stigma-plus due process claim for injunctive relief; and

   C. The Fourteenth Amendment equal protection claim.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the **Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2522198

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 73 of 115

Mercer v. Sullivan, Not Reported in Fed. Supp. (2018)

2018 WL 6787159

2018 WL 6787159
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James R. MERCER, Jr., Plaintiff,

v.

Ann Marie T. SULLIVAN, et al., Defendants.

9:18-CV-1148 (MAD/ATB)
|
Signed 12/26/2018

**Attorneys and Law Firms**

JAMES R. MERCER, JR., Plaintiff, pro se, 87-C-0688,
Marcy Correctional Facility, P.O. Box 3600, Marcy, NY
13403.

**DECISION and ORDER**

Mae A. D'Agostino, United States District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff James R. Mercer, Jr. ("Plaintiff") commenced
this action by submitting a pro se civil rights complaint
pursuant to 42 U.S.C. § 1983 ("Section 1983") together with
an application to proceed in forma pauperis. Dkt. No. 1
("Compl."), Dkt. No. 2 ("IFP Application"). By Decision
and Order filed October 22, 2018 (the "October Order"),
Plaintiff's IFP Application was granted and the Court
reviewed the sufficiency of the Complaint in accordance with
28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. *See* Dkt. No.
5. In the October Order, the Court dismissed the following
claims, without prejudice: 1) Fourteenth Amendment due
process claims; (2) Equal Protection claims; (3) Eighth
Amendment claims; (4) First Amendment claims related
to the grievance process; (5) retaliation claims based upon
failure to investigate; (6) conspiracy claims; (7) state law
claims; and (8) claims for declaratory and injunctive relief. [1]
Dkt. No. 5 at 27-28. The Court directed defendants Gavin
Elder ("Elder"), Jean Burdick ("Burdick"), Bud. C. Ballinger,
III ("Ballinger") and Megan X. Thomas ("Thomas") to
respond to Plaintiff's First Amendment retaliation claims. *Id.*
at 28. Plaintiff was advised that if he chose to pursue one or
more of the claims dismissed without prejudice by the Court,
he must file an amended complaint, which would supersede
and replace the original complaint in its entirety. *Id.* at 28,
n. 13. Plaintiff was cautioned that any amended complaint

filed must also comply with the pleading requirements of
Rules 8 and 10 of the Federal Rules of Civil Procedure. *Id.*
Summonses were issued to defendants and, on November
27, 2018, defendants filed acknowledgments of service. Dkt.
Nos. 6, 10. Defendants have not yet answered the Complaint.

[1]    Plaintiff's 1983 claims for monetary damages
       against defendants in their official capacity were
       dismissed, with prejudice. Dkt. No. 5 at 27.

Presently before the Court is Plaintiff's Amended Complaint.
Dkt. No. 8 ("Am. Compl.").

**II. SUMMARY OF THE AMENDED COMPLAINT**
The factual recitation set forth in the Amended Complaint
is substantially similar to what was set forth in the original
Complaint. *Compare* Compl. *with* Am. Compl. The incidents
that form the foundation for the Amended Complaint
occurred while Plaintiff was at Marcy C.F. *See generally*,
Am. Compl. [2] The following facts are set forth as alleged by
Plaintiff in the Amended Complaint.

[2]    Plaintiff has not plead whether he was confined
       at Marcy C.F. in the custody of the Department
       of Corrections and Community Supervision
       (DOCCS) or in the custody of the Office
       of Mental Health. According to DOCCS'
       website, Plaintiff is presently at Marcy C.F., in DOCCS'
       custody, with a parole eligibility date of September
       2019. *See* http://nysdoccslookup.doccs.ny.gov (last
       visited Dec. 17, 2018).

In 2013, defendant Commissioner of the New York State
Office of Mental Health ("OMH") Ann Marie T. Sullivan
("Sullivan") entered into a contract with the New York
State Department of Corrections and Community Supervision
("DOCCS") to provide a sex offender treatment program
at Marcy C.F. Am. Compl. at 4. The program, entitled the
New York State Office of Mental Health ("OMH") Prison-
Based Sex Offender Treatment Program ("PBSOTP"), was a
voluntary, outpatient program. [3] *Id.* The PBSOTP operated
without written or posted polices, procedures, rules and
regulations. *Id.* at 5-6.

[3]    "The PBSOTP provides an intensive sex offender
       treatment program to inmates incarcerated with
       DOCCS who have been classified as high risk for
       committing a sexual offense upon release from

prison. This program is operated by OMH clinical personnel within DOCCS facilities and is designed to address the multiple risk factors presented by this population." *See* www.omh.ny.gov/omhweb/ foensic/bisot/ (last visited Dec. 11, 2018).

**\*2**  In August 2016, Plaintiff was involuntarily transferred to Marcy C.F. to participate in the PBSOTP. Am. Compl. at 5. OMH employees advised Plaintiff that he had a right to "refuse treatment" however, he was required to complete an "OMH PBSOTP Program Refusal Form" that advised Plaintiff of the possible consequences of his decision including: "negative decisions" by the Board of Parole and Time Allowance Committee and denial of privileges related to the Family Reunion Program ("FRP"). *Id.* Thus, Plaintiff participated in PBSOTP under "coercion and duress." *Id.*

On September 19, 2016, Plaintiff's assigned clinician, defendant LCSW Jean Burdick ("Burdick") prepared a Violent Risk Scale: Sex Offender ("VRSSO") Report. Am. Compl. at 14, 20, 21. Plaintiff objected to the report claiming that it contained false information. Id. Burdick provided Plaintiff with a form entitled "Patient/Resident Request for Amendment of the Mental Health Record." *Id.* Plaintiff completed the form, and upon Burdick's instructions, on October 13, 2016, Plaintiff filed the form with defendant Unit Chief Bud C. Ballinger, III ("Ballinger"). *Id.* On December 15, 2016, Plaintiff was interviewed by Burdick and Ballinger in relation to the request for an amendment to his VRSSO report. Am. Compl. at 14, 15, 22. Burdick and Ballinger provided a copy of Burdick's response indicating, "[y]our request will be filed as part of your mental health record; however, your request for correction/addendum has been denied." *Id.* The false information remains in Plaintiff's records. *Id.*

In October 2016, Plaintiff filed New York State Freedom of Information Law ("FOIL") requests seeking copies of the policies, procedures, rules, and regulations regarding PBSOTP. Am. Compl. at 5. For a fee, Plaintiff was able to purchase copies of policies, procedures, and forms. *Id.* at 5-6. Central New York Psychiatric Center ("CNYPC") Administrative Policy 2.9 provides:

> It is the policy of CNYPC that OMH patients at CNYPC, and those located at DOCCS facilities, have the right to express concerns or complaints about patient care and/or treatment. A system has been put into place and is maintained that will ensure that every inmate-patient, or person acting on the inmate-patient's behalf, is aware of his/her right to submit complaints, that staff are knowledgeable of the complaint process, and that each complaint is recorded and investigated through resolution.

Am. Compl. at 6.

Pursuant to Policy 2.9, Plaintiff submitted a Formal Complaint on December 9, 2016 to defendant CNYPC Risk Management Specialist M. Bernstein ("Bernstein") that addressed the following issues: (1) the lack of written policies for the PBSOTP; (2) the lack of a formal grievance process; and (3) copying fees for treatment records. Am. Compl. at 12-13. When Plaintiff failed to receive a response, he sent five letters to Sullivan and defendant Deborah J. McCulloch ("McCulloch"), the Executive Director of CNYPC. *Id.* at 6, 7, 8, 13.

On February 23, 2017, defendant Inpatient Director of Risk Management Jill Grant ("Grant") sent a letter to Plaintiff, related to his December 2016 complaint, advising that McCulloch would review his case "in the very near future." Am. Compl. at 9, 13. On March 1, 2017, March 17, 2017, and April 7, 2017, relying upon Policy # 2.9, Plaintiff sent letters to Grant. *Id.* Plaintiff did not receive any response to his letter or his Formal Complaint. *Id.*

On June 2, 2017, Plaintiff provided Burdick with a copy of Plaintiff's "litigation," filed in New York State Supreme Court, Albany County, against Sullivan related to the lack of polices, procedures, rules, and regulations. Am. Compl. at 23. Shortly thereafter, Plaintiff met with Burdick and was advised that he must complete a "Behavior Contract" assignment. *Id.* Plaintiff told Burdick that he felt she was retaliating against him for filing litigation against Sullivan. *Id.* Plaintiff objected to the assignment and Burdick responded, "[y]ou do not have a choice." *Id.* On June 19, 2017, Plaintiff executed the Behavior Contract, under duress. Am. Compl. at 23. The contract provided, "Mr. Mercer will refrain from discussing programmatic grievances in treatment group settings at all times." *Id.*

**\*3** On July 13, 2017, Plaintiff sought permission from the court to supplement his petition in his pending litigation against Sullivan. Am. Compl. at 23. Specifically, Plaintiff sought to include an additional retaliation claim against Burdick. *Id.* Plaintiff provided Burdick with copies of the documents filed with the court. *Id.* at 23-24.

On July 21, 2017, defendant Megan X. Thomas ("Thomas"), was assigned as Plaintiff's social worker. Am. Compl. at 25. On August 4, 2017, Plaintiff met with Thomas, Ballinger, Burdick, and defendant Elder ("Elder"), and received an updated Behavior Contract. *Id.* at 26. Plaintiff objected to the contract and claimed that it was issued in retaliation for Plaintiff's litigation. *Id.* Thomas responded, "I don't care about the Attorney General's Office or the Court[,] [d]o you like having a target planted on your back? What you are doing is self sabotage." *Id.*

On August 25, 2017, Plaintiff met with Thomas and Elder. Am. Compl. at 17, 18, 26. Thomas and Elder expressed their concern with Plaintiff's complaints related to the PBSOTP. *Id.* Plaintiff asked Elder why he repeatedly "retaliated against [him] when I have a right to file complaints and seek judicial intervention?" *Id.* Elder responded that Plaintiff should not have filed complaints and written letters without speaking to Treatment Team Leaders. *Id.* Minutes before the meeting ended, Thomas told Plaintiff that he was being placed in an "out of group" period designated as "Reflections." Am. Compl. at 17, 18, 26. Plaintiff objected. *Id.* Elder told him that it was not a choice. *Id.* at 18. Plaintiff accepted the assignment and received a Behavior Contract from Thomas. *Id.* As he was leaving the room, Plaintiff placed the "Reflection" assignment and contract on the table, Elder stated, aggressively, "[y]our actions will have consequences." Am. Compl. at 17, 18, 26.

On August 29, 2017, Ballinger, Elder, and Thomas suspended Plaintiff from the PBSOTP. Am. Compl. at 15-18. The suspension was based upon: (1) "grievance thinking," (2) Plaintiff's execution of the Behavior Contract "under duress;" (3) Plaintiff's refusal to accept the Reflections period; and (4) Plaintiff's attempt to deliver a legal document with an assignment. *Id.* Plaintiff was not afforded any notice prior to being suspended. *Id.*

On September 4, 2017, Thomas prepared a VRSSO with false information. Am. Compl. at 28.

On October 5, 2017, Plaintiff returned to the program and received an updated Behavior Contract from Elder and Thomas. Am. Compl. at 19, 27.

On October 13, 2017, pursuant to Policy 2.9, Plaintiff submitted a Formal Complaint to Bernstein, Sullivan, and Ballinger alleging that Elder and Thomas retaliated against him when they suspended him from the program. Am. Compl. at 10, 15, 16. On November 2, 2017, Bernstein responded and advised that "the issues raised in your letter are primarily the same as those being litigated in the Albany County Supreme Court, the Risk Management Department will not be responding at this time." *Id.* On November 8, 2017, Plaintiff sent a letter to Bernstein explaining the scope of his October 2017 complaint. *Id.* On November 20, 2017, Bernstein responded, "a legal decision has been made on this matter. It has been determined that the issues raised in your previous correspondence are all related to the subject of your current litigation[.]" *Id.* at 10-11. In November 2017, Thomas prepared two VRSSO reports, with false information, in retaliation for Plaintiff's complaints against Elder and Thomas. Am. Compl. at 27-28.

**\*4** On March 7, 2018, Thomas prepared a VRSSO with false information. Am. Compl. at 28, 29.

On July 11, 2018, Plaintiff forwarded a Formal Complaint to Bernstein and Ballinger accusing defendant Burdick of retaliation for making "unfounded accusations" to DOCCS' security staff resulting in Plaintiff being "placed in a compromising position of nudity." Am. Compl. at 9-12, 16, 19, 24, 25.

On July 12, 2018, Ballinger, Elder, and Thomas discharged Plaintiff from the PBSOTP. Am. Compl. at 9, 16. Plaintiff was not afforded any notice prior to being discharged. *Id.*

In a letter dated July 23, 2018, Bernstein responded that the July 11, 2018 complaint was investigated and the claim was deemed unfounded. Am. Compl. at 11, 17. On July 27, 2018, Plaintiff asked for direction on how to appeal Bernstein's decision. *Id.* at 12. On August 3, 2018, Bernstein advised that Plaintiff could appeal to McCulloch. *Id.* On August 27, 2018, McCulloch responded and concurred with the July 23, 2018 decision. *Id.* Plaintiff appealed to Sullivan, but did not receive a response. Am. Compl. at 12, 20.

2018 WL 6787159

On September 18, 2018, Plaintiff sent a request to Ballinger to re-enter the program. Am. Compl. at 20. On October 24, 2018, Plaintiff's request was granted. *Id.*

Construing the Amended Complaint liberally, plaintiff asserts the following: (1) Fourteenth Amendment due process claims; (2) equal protection claims; and (3) retaliation claims. *See generally* Am. Compl. Plaintiff requests monetary damages. *Id.* at 37-38. For a complete statement of Plaintiff's claims, refer to the Amended Complaint.

## III. ANALYSIS [4]

[4] The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the October Order and it will not be restated in this Decision and Order. *See* Dkt. No. 5 at 2-4.

### A. Previous Claims
As a result of the review of the original Complaint, the Court directed Elder, Burdick, Ballinger, and Thomas to respond to the First Amendment retaliation claims. *See* Dkt. No. 5 at 22-23. These claims are repeated and realleged in the Amended Complaint, *see* Am. Compl. at 35, and thus, survive review as well.

### B. Fourteenth Amendment Due Process
Plaintiff claims that he was compelled to participate in the PBSOTP, under duress, without due process of law. Am. Compl. at 29-31. Plaintiff also claims that PBSOTP operated without any written rules, procedures, or regulations and thus, his due process rights were violated because he received no notice related to the preparation of business records and disciplinary proceedings. *Id.* at 32-35,

The law related to due process and mandated sex offender counseling was discussed in the October Order:

Courts in this Circuit are split on the issue of whether an individual, not convicted of an express sex offense, has a liberty interest in being free from mandated sex offender counseling. *See Henderson v. Heffler*, No. 07-CV-0487C, 2010 WL 2854456, at *5 (W.D.N.Y. July 19, 2010) (citing *Rose v. Goldman*, No. 02 CV 5370, 2009 WL 4891810, at *6 (E.D.N.Y. Dec. 16, 2009) ) (addressing the issue of whether prisoners not convicted of a sex

offense have a liberty interest in not being treated as a sex offender without due process); *see also Blake v. Fischer*, No. 09-CV-266 (DNH/DRH), 2010 WL 2522198, at *12 (N.D.N.Y. Mar. 5, 2010) (collecting cases) ("Courts within the Second Circuit appear to be reaching a consensus that recommendations for sex offender classification and programming do not trigger due process rights."). In cases however, where the inmate was convicted of a sexual offense, DOCCS decision to require rehabilitation has been "judicially deemed legitimate and rational." *Blake*, 2010 WL 2522198, at *12 (citing *Vega v. Lantz*, 596 F.3d 77, 2010 WL 698384, at *5 (2d Cir. Mar. 2, 2010) ). "[T]he Supreme Court has held that '[a] prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not ... constitute [an] atypical and significant hardship [ ] in relation to the ordinary incidents of prison life.' " *Id.* at *10.

**\*5** Dkt. No. 5 at 15.

In the October Order, the Court dismissed the due process claims holding:

In this case, Plaintiff was convicted of a sex offense, thus, Plaintiff does not have a liberty interest in being free from participation in a sex offender treatment program. *See Rheaume v. Pallito*, No. 5:11-CV-72, 2011 WL 6934821, at *4, n.1 (D. Vt. Nov. 28, 2011) (holding that because the plaintiff was convicted of a sex offense, the case is distinguishable from *Rose* ). Having concluded that Plaintiff does not have a protected liberty interest in his classification as a sex offender, the Court does not address Plaintiff's procedural due process claims regarding the lack of written rules and/or regulations, the suspension, or discharge. *See Tinsley v. Goord*, No. 05 CIV 3921, 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006).

Dkt. No. 5 at 15-16.

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 77 of 115

Mercer v. Sullivan, Not Reported in Fed. Supp. (2018)

2018 WL 6787159

Despite the fact that Plaintiff was afforded the opportunity to amend his Complaint, the amended pleading does not cure the deficiencies in the prior pleading related to the due process claim. As he did in the original Complaint, Plaintiff continues to maintain that he was not designated as a sex offender. Am. Compl. at 30-31. Plaintiff's litigation history belies that contention. In 1996, Plaintiff filed a petition for habeas corpus relief. *Mercer v. Herbert*, 133 F. Supp. 2d 219 (W.D.N.Y. 2001). In an Order filed on 2011, the Court discussed the procedural history of Plaintiff's criminal case and noted that, after a jury trial, Plaintiff was found guilty of three counts of Kidnaping in the Second Degree, nine counts of Sodomy in the First Degree, four counts of Sodomy in the Second Degree, two counts of Sodomy in the Third Degree, two counts of Rape in the First Degree, one count of Rape in the Second Degree, three counts of Sexual Abuse in the First Degree, and one count of Assault in the Second Degree. [5] *Id.* at 221.

[5]     Plaintiff's crimes were committed against three teenage girls in Niagara County between June 16 and June 28, 1986. *Mercer v. Herbert*, 133 F. Supp. 2d 219, 221 (W.D.N.Y. 2001).

Additionally, the Amended Complaint lacks facts suggesting the participation in the PBSOTP involved atypical and significant hardship or that Plaintiff suffered any "adverse consequences" as a result of his participation in the program. *See Ericksen v. Booth*, No. CIV.A. 2:08CV104, 2009 WL 1974195, at *5 (N.D.W. Va. July 7, 2009), *aff'd*, 355 F. App'x 678 (4th Cir. 2009) (holding that "simple damage to reputation does not give rise to a liberty interest claim; rather, the damage must be accompanied by some significant deprivation of an interest protected by state or federal law, or by an alteration of legal status"); *see also Gursky v. Dep't of Corr., New Lisbon Corr. Inst.*, No. 10-CV-113, 2010 WL 2471693, at *4 (W.D. Wis. June 15, 2010) (holding that plaintiff did not have a liberty interest in not being forced to participate in a sex offender treatment program).

Accordingly, for the reasons set forth in the October Order, Plaintiff did not have a protected liberty interest in being free from "non-voluntary" sex offender treatment. Thus, Plaintiff's due process claims are dismissed. *See Tinsley*, 2006 WL 2707324, at *5 (holding that "nothing suggests that either New York state law or prison regulations have created a liberty interest in prisoners of avoiding classification as sex offenders or participating in related treatment programs. Nor do we believe that requiring an inmate to participate in a sex

offender treatment program "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." ").

### C. Equal Protection

**\*6**  The law related to equal protection was discussed in the October Order and will not be restated herein. Dkt. No. 5 at 16. In the October Order, the Court dismissed the equal protection claims because Plaintiff failed to identify any individuals treated differently than Plaintiff under similar situations. *Id.* at 17. In the Amended Complaint, while Plaintiff summarily states that he was, "treated differently from others in 'treatment,' " (see Am. Compl. at 36), the amended pleading lacks any facts supporting this conclusory statement and thus, fails to state an equal protection claim. Accordingly, for the reasons set forth in the October Order, Plaintiff's Fourteenth Amendment Equal Protection claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Lloyd v. City of New York*, 43 F. Supp. 3d 254, 265 (S.D.N.Y. 2014) (dismissing the plaintiff's equal protection claim because nothing in the complaint suggested that similarly-situated inmates were treated more favorably than the plaintiff, or that the plaintiff was singled out for discriminatory treatment).

### D. Violations of DOCCS' Regulations and Directives

Plaintiff claims that defendants violated DOCCS' "regulatory and statutory law." Am. Compl. at 29-30. A Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations. *See Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, *6 (S.D.N.Y. Mar. 15, 2001) (holding that the failure to follow a New York State DOCCS Directive or prison regulation does not give rise to a federal constitutional claim). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (collecting cases); *see also Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) ("[A] state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983 ..."); *Fluent v. Salamanca Indian Lease Auth.*, 847 F.Supp. 1046, 1056 (W.D.N.Y. 1994) (holding that section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles). Failure to follow a DOCCS' Directive does not give rise to a § 1983 claim. Accordingly, to the extent that Plaintiff attempts to

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 78 of 115

Mercer v. Sullivan, Not Reported in Fed. Supp. (2018)
2018 WL 6787159

assert a cause of action against any defendant based upon the failure to follow DOCCS' directives, these claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 29, 2014).

### E. False Reports

Plaintiff claims that defendants prepared false VRSSO reports. *See* Am. Compl. at 36-37. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) ); *accord, Pittman v. Forte*, No. 9:01-CV-0100, 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.); *see also Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

As discussed *supra*, Plaintiff's retaliation claims survive initial review and require a response. To the extent that Plaintiff attempts to assert separate constitutional claims based upon the preparation of false reports, those claims are dismissed for failure to state a claim upon which relief may be granted.

### IV. CONCLUSION

**\*7  WHEREFORE**, it is hereby

**ORDERED** that the Amended Complaint (Dkt. No. 8) is accepted for filing and is the operative pleading; and it is further

**ORDERED** that Plaintiff's First Amendment retaliation claims against Elder, Burdick, Ballinger, and Thomas survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response; and it is further

**ORDERED** that all remaining claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [6] and it is further

[6]    Generally, when a district court dismisses a *pro se* action *sua sponte*, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend. *See Shuler v. Brown*, No. 9:07-CV-0937 (TJM/GHL), 2009 WL 790973, at *5 & n.25 (N.D.N.Y. March 23, 2009) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint."), *accord, Smith v. Fischer*, No. 9:07-CV-1264 (DNH/GHL), 2009 WL 632890, at *5 & n.20 (N.D.N.Y. March 9, 2009); *Abascal v. Hilton*, No. 9:04-CV-1401 (LEK/GHL), 2008 WL 268366, at *8 (N.D.N.Y. Jan. 130 2008); *see also Yang v. New York City Trans. Auth.*, 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F. Supp.2d 375, 384 (S.D.N.Y. 1998) (denying leave to amend where plaintiff had already amended complaint once); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading).

**ORDERED** that defendants shall file a response to the Amended Complaint within **thirty (30) days** of the filing date of this Decision and Order; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on Plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6787159

---

Case 9:20-cv-00242-MAD-TWD    Document 70    Filed 06/03/22    Page 79 of 115

Mercer v. Sullivan, Not Reported in Fed. Supp. (2019)
2019 WL 569074

2019 WL 569074
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James R. MERCER, Jr., Plaintiff,

v.

Ann Marie T. SULLIVAN, et al., Defendants.

9:18-CV-1148 (MAD/ATB)
|
Signed 02/12/2019

**Attorneys and Law Firms**

JAMES R. MERCER, JR., Plaintiff, pro se, 87-C-0688, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

HON. LETITIA JAMES, Attorney General of the State of New York, AIMEE COWAN, ESQ., Asst. Attorney General, 615 Erie Blvd. West, Suite 102, Syracuse, NY 13204.

**DECISION AND ORDER**

MAE A. D'AGOSTINO, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff James R. Mercer, Jr. ("Plaintiff") commenced this pro se action in September 2018 pursuant to 42 U.S.C. § 1983. *See generally* Dkt. No. 1 ("Compl."). In a Decision and Order filed October 22, 2018 (the "October Order"), Plaintiff's application to proceed in forma pauperis ("IFP Application") (Dkt. No. 2) was granted, and after reviewing the sufficiency of the Complaint pursuant to 28 U.S.C. § 1915(e)(B) and 28 U.S.C. § 1915A(b), the Court directed defendants Gavin Elder ("Elder"), Jean Burdick ("Burdick"), Bud C. Ballinger, III ("Ballinger"), and Megan X. Thomas ("Thomas") to respond to Plaintiff's First Amendment retaliation claims. Dkt. No. 4 at 5. The Court dismissed the following claims, without prejudice: (1) Fourteenth Amendment due process; (2) equal protection; (3) claims related to the grievance process; (4) retaliation based upon failure to investigate; (5) conspiracy; and (6) state law.[1] *Id.* at 27-28. Summonses were issued and Defendants filed acknowledgments of service. Dkt. Nos. 6, 10.

1    Plaintiff's 1983 claims for monetary damages against defendants in their official capacity were dismissed, with prejudice. Dkt. No. 5 at 27.

On November 15, 2018, Plaintiff filed an Amended Complaint. Dkt. No. 8. In a Decision and Order filed on December 26, 2018 (the "December Order"), the Court accepted the Amended Complaint as the operative pleading and reviewed the pleading for sufficiency. Dkt. No. 12. For the reasons set forth in the October Order, the Court directed Elder, Burdick, Ballinger, and Thomas to respond to the retaliation claims in the Amended Complaint. *Id.* at 8. The Court dismissed the remaining claims. *See generally*, Dkt. No. 12.

On January 2, 2019, Plaintiff filed a motion for reconsideration of portions of the December Order. Dkt. No. 14. Defendants oppose the motion. Dkt. No. 17. On January 3, 2019, Elder, Burdick, Ballinger, and Thomas filed an Answer to the Amended Complaint and the Court issued a Mandatory Pretrial Discovery and Scheduling Order. Dkt. Nos. 15, 16.

On January 23, 2019, Plaintiff filed a motion to withdraw the action.[2] Dkt. No. 19. Defendants have no objection to Plaintiff's motion but argue that dismissal should be "with prejudice." Dkt. No. 20.

2    Plaintiff voluntarily withdrew the motion for reconsideration. Dkt. No. 21 at 1.

**II. DISCUSSION**

**A. Legal Standard**

Rule 41(a) provides that after an answer or motion for summary judgment has been filed, an action shall not be dismissed at the plaintiff's request except where all parties have signed a stipulation of dismissal, or upon order of the court. Fed. R. Civ. P. 41(a)(1)(B); 41(a)(2); *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir. 1996) ("Once a defendant has answered the complaint, a plaintiff may no longer dismiss an action as a matter of right."). The Rule further provides that unless the stipulation or order states otherwise, the dismissal is without prejudice. Fed. R. Civ. P. 41(a)(1)(B); 41(a)(2). Generally, a district court may exercise its discretion to permit a plaintiff to dismiss an action pursuant to Rule 41(a)(2) "if the defendant will not be prejudiced thereby." *Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 338 F.3d 119, 126 (2d Cir. 2003); *see also Gap, Inc. v. Stone Int'l Trading, Inc.*, 169 F.R.D. 584, 588 (S.D.N.Y. 1997)

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 569074

(citations omitted) ("Although voluntary dismissal without prejudice is not a matter of right, the presumption in this circuit is that a court should grant a dismissal pursuant to Rule 41(a)(2) absent a showing that defendants will suffer substantial prejudice as a result."). The decision whether to grant a Rule 41(a) motion for voluntary dismissal lies within the sound discretion of the court, *Catanzano v. Wing*, 277 F.3d 99, 109 (2d Cir. 2001), and is to be ordered "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

**\*2** The Second Circuit has set forth factors that are relevant to a district court's determination of whether a defendant would be prejudiced by dismissing an action, including: (1) plaintiff's diligence in bringing the motion; (2) any undue vexatiousness on plaintiff's part; (3) the extent to which the suit has progressed; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss. *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990).

## B. Analysis

"When analyzing whether a party was diligent or not in bringing a motion, courts have focused on whether or not the moving party encouraged the non-moving party to continue discovery without any intention of pursuing its claims." *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05 CV 3939, 2008 WL 4127549, at \*5 (S.D.N.Y. Sept. 2, 2008) (citations omitted). The Court also examines the length of time an action has been pending. *See Staten Island Terminal, LLC v. Elberg*, No. 11-CV-3262, 2012 WL 1887126, at \*3 (E.D.N.Y. May 23, 2012). This action has been pending for approximately five months. Because the Court finds no lack of diligence by Plaintiff in moving to withdraw, this factor weighs in favor of dismissal without prejudice.

Turning to the second factor, whether there is evidence of undue vexatiousness, the Court considers whether the party had "ill-motive." *S.E.C. v. Chakrapani*, 09 Civ. 325, 2010 WL 2605819, at \*3 (S.D.N.Y. June 29, 2010). Here, Defendants do not allege, nor have they demonstrated that Plaintiff acted with "ill motive in bringing or maintaining his claims" in this action, and thus this factor weighs in favor of dismissal without prejudice. *See Morgan v. Town of DeWitt*, No. 5:12-CV-1136 (LEK/TWD), 2013 WL 5217947, at \*2 (N.D.N.Y. Sept. 16, 2013).

Similarly, the third factor - the extent to which the suit has progressed - does not suggest that a dismissal of the action would be prejudicial to Defendants. Generally, this factor weighs against dismissal without prejudice only if the case has progressed to an advanced stage, such as the eve of trial, or when discovery is complete and partial dispositive motions have been adjudicated. *See Jewelers Vigilance Comm., Inc. v. Vitale Inc.*, No. 90 Civ. 1476, 1997 WL 582823, at \*3 (S.D.N.Y. Sept. 19, 1997) (citing *Zagano*, 900 F.2d at 14-15). Here, discovery is not complete and no discovery motions have been filed. It does not appear that any depositions have been scheduled or held. Generally, "[w]here discovery has been limited, ..., courts will dismiss cases and/or claims without prejudice." *Omega Institute, Inc. v. Universal Sales Sys., Inc.*, No. 08-CV-6473, 2010 WL 475287, at \*5 (W.D.N.Y. Feb. 5, 2010). Additionally, no dispositive motions have been filed, this action is not trial ready, and the case has not progressed to the point where dismissal without prejudice would be inappropriate. *Compare Lopez v. Whitmore*, No. 9:13-CV-952 (BKS/ATB), 2015 WL 4394604, at \*8 (N.D.N.Y. July 16, 2015) (holding that it would be unfair to allow the plaintiff to voluntarily withdraw because the defendants filed a summary judgment motion supported by numerous affidavits and exhibits). As a result, this factor also weighs in favor of dismissal without prejudice.

The fourth *Zagano* factor, namely the duplicative expense of relitigation, also weighs in favor of dismissal without prejudice. The potential prospect of a second litigation is insufficient to constitute prejudice. *See Hinfin Realty Corp. v. Pittston Co.*, 206 F.R.D. 350, 356 (E.D.N.Y. 2008) (finding no prejudice where the grounds of a second lawsuit will likely be the same and the defendant "can use some of the material discovered and the legal work already done, if the case is renewed in the future"); *see also Banco Central De Para. v. Para. Humanitarian Found., Inc.*, No. 01 Civ. 9649, 2006 WL 3456521, at \*6-7 (S.D.N.Y. Nov. 30, 2006) ("[E]ven if [plaintiff] were to re-litigate the remaining claims in a future action, whatever work that defendants have done in preparing for trial can easily be used in a subsequent, similar action.").

**\*3** Fifth and finally, Plaintiff adequately explains his reason for seeking to withdraw the action. This factors weighs in favor of dismissal without prejudice.

Defendants' conclusory objection to dismissal without prejudice is without merit. Plaintiff's request to voluntarily dismiss this action without prejudice is granted.[3]

3      Plaintiff is advised that if he desires to re-file this action at a later time, he must do so before the applicable statute of limitations expires.

## III. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion (Dkt. No. 19) requesting voluntary dismissal of this action is **GRANTED** and this action is **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's motion for reconsideration (Dkt. No. 14) is **DENIED as moot**.

The Clerk is directed to close this case; and it is further

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 569074

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1582173
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leroy PEOPLES, Plaintiff,

v.

Gina R. LEON, Ellen E. Alexander, Jane Doe,
John Doe, and Tina M. Stanford, Defendants.

9:18-CV-1349 (LEK/ML)
|
Signed 01/04/2021

**Attorneys and Law Firms**

LEROY PEOPLES, Plaintiff, pro se, 05-A-2620, Great
Meadow Correctional Facility, Box 51, Comstock, NY
12821.

HON. LETITIA JAMES, Attorney General for the State of
New York, KEITH J. STARLIN, ESQ., Assistant Attorney
General, Attorney for Defendants, Gina R. Leon, Ellen E.
Alexander and Tina M. Stanford, The Capitol, Albany, New
York 12224-0341.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

MIROSLAV LOVRIC, United States Magistrate Judge

*1  Plaintiff *pro se* Leroy Peoples ("Peoples" or "Plaintiff"),
an inmate in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS")
at Great Meadow Correctional Facility ("Great Meadow
C.F."), brings this action pursuant to 42 U.S.C. § 1983
against Defendants, in their official capacity, for violations
of his First and Fourteenth Amendment rights. Dkt. No.
1 ("Compl."). Presently before the Court is Defendants'
motion for summary judgment and dismissal of Peoples'
Complaint pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure. Dkt. No. 71. For the following reasons,
it is recommended that Defendants' motion for summary
judgment be granted in part and denied in part.

# I. BACKGROUND [2]

[2]

Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall
contain a Statement of Material Facts. The
Statement of Material Facts shall set forth,
in numbered paragraphs, each material fact
about which the moving party contends there
exists no genuine issue. Each fact listed shall
set forth a specific citation to the record
where the fact is established. The record for
purposes of the Statement of Material Facts
includes the pleadings, depositions, answers
to interrogatories, admissions and affidavits. It
does not, however, include attorneys' affidavits.
The opposing party shall file a response to the
Statement of Material Facts. The non-movant's
response shall mirror the movant's Statement
of Material Facts by admitting and/or denying
each of the movant's assertions in matching
numbered paragraphs. Each denial shall set
forth a specific citation to the record where
the factual issue arises. The Court shall deem
admitted any properly supported facts set forth
in the Statement of Material Facts that the
opposing party does not specifically controvert.
The non-movant's response may also set forth
any additional material facts that the non-movant
contends are in dispute. Any facts set forth in
the Statement of Material Facts shall be deemed
admitted unless specifically controverted by the
opposing party.
Local Rule 7.1(a)(3).
Defendants filed a Statement of Material Facts.
Dkt. No. 71-1. Plaintiff responded and admits
the facts contained in certain paragraphs of
Defendants' Statement of Material Facts. Dkt. No.
82.

# A. Facts [3]

[3]

The parties annexed exhibits to their submissions.
without objection or challenge to the authenticity
of the documents. Dkt. Nos. 71-3 through 71-22;
71-26 through 71-28; 82-2 and 82-3. Therefore,

**Peoples v. Leon, Slip Copy (2021)**

2021 WL 1582173

the Court will consider the exhibits in the context of the within motion. *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### 1. Plaintiff's Criminal History

**\*2** On May 22, 2000, Peoples was convicted of attempted Criminal Possession of a Controlled Substance in the 3rd Degree with Intent to Sell. Dkt. No. 71-6 at 6-7. When Peoples failed to return to court for his sentencing, a warrant was issued. Dkt. No. 71-4 at 3. On September 17, 2001, Peoples was sentenced to a prison term of eighteen to fifty-four months. *Id.*; Dkt. No. 71-6 at 7.

On July 1, 2002, Peoples was released on parole. Dkt. No. 71-4 at 3; Dkt. No. 71-6 at 3, 7. Peoples returned to prison in January 2003, after violating his conditions of parole. *Id.* On March 19, 2003, Peoples was re-released on parole. *Id.*

In June 2003, Peoples was arrested for two gunpoint abductions, rapes, and robberies. Dkt. No. 71-1 at ¶35; Dkt. No. 82 at p. 2, ¶14. Pursuant to Indictment No. 2103/03, Peoples was charged with two counts of rape, sodomy, kidnapping, robbery, and sexual abuse stemming from two different incidents on March 7, 1998 and April 7, 2003. Dkt. No. 71-4; Dkt. No. 82-2 at 11-18. The second incident occurred nineteen days after Peoples was released on parole. Dkt. Nos. 71-3, 71-4, 71-5, 71-26 at 40. In January 2005, Peoples pled guilty to two counts of rape in the first degree. *Id.* Peoples' guilty plea was precipitated by DNA evidence obtained by authorities. Dkt. No. 71-1 at ¶38; Dkt. No. 82-1 at ¶17. Peoples' conviction has not been overturned. Dkt. No. 71-26 at 47.

At the sentencing hearing, the victim of the March 1998 rape provided a statement to the court. Dkt. No. 71-5 at 3-6. In her statement, the woman described being attacked from behind by Peoples, who was masked and armed with a gun, while she was walking to a laundromat. *Id.* at 3-5. The woman claimed that Peoples put his gun to her head and walked her back to her home at gunpoint. *Id.* The woman stated that Peoples forced her into a stairway, pulled a hat over her face, told her to pull down her pants and "raped [her] from the back" while he held the gun to her head. *Id.* The woman told the court that Peoples told her to turn around and face him, stole her wallet, and fled. Dkt. No. 71-5 at 3-6.

On January 27, 2005, Peoples was sentenced to a term of 3 1/3 to 10 years for the first rape and to 16 years for the second rape, to run concurrently, and a five year period of post-release supervision ("PRS"). Dkt. No. 71-3. Because Peoples was fifteen at the time he committed the first rape, he was sentenced as a juvenile. Dkt. No. 71-1 at ¶41; Dkt. No. 82 at p. 2, ¶20, p. 6, ¶13. The sentencing court certified Peoples as a "Sex Offender" pursuant to New York Correction Law § 168-d. Dkt. No. 71-3. The court advised Peoples that he would be obligated to register as a sex offender in New York. Dkt. No. 71-5 at 9.

### 2. Parole Proceedings

In August 2018, defendant Offender Rehabilitation Counselor ("ORC") Gina R. Leon ("Leon") interviewed Peoples in preparation for an October 2018 hearing before the New York State Board of Parole (the "Board"). Compl. at 2; Dkt. No. 71-6 at 1. Peoples did not submit a parole packet for his October 2018 interview and asked Leon to forward his 2016 packet to the Board for consideration. Dkt. No. 71-2 at ¶ 15. Following the interview, Leon prepared a Parole Board Report and Confidential Report with thirty-six recommended special conditions of release, the Offender Case Plan, and assisted in the preparation of the COMPAS instrument [4]. Dkt. No. 71-6; Dkt. No. 71-10; Dkt. No. 71-23 at ¶ 5; Dkt. No. 71-11.

[4]    COMPAS is a risk-assessment instrument used to "inform decision-making throughout the various phases of incarceration and community supervision." *See* www.doccs.ny.gov (last visited Nov. 13, 2020).

**\*3** On October 16, 2018, defendants Board of Parole Commissioner Ellen Alexander ("Alexander"), John Doe, and Jane Doe conducted a parole release interview with Peoples to determine if he would be granted discretionary

early release to parole or held until his maximum expiration
("ME") date and released to PRS. Dkt. No. 71-2 at ¶¶ 12, 18.
During the hearing, Peoples "accepted responsibility" for the
"gunpoint rapes" and admitted to selling and possessing crack
and/or cocaine. Dkt. No. 71-16 at 4, 5. Peoples stated that
he was "unable to complete" the recommended Sex Offender
Counseling and Treatment Program ("SOCTP") while in
DOCCS' custody. *Id.* at 6.

On October 17, 2018, the Board denied Peoples discretionary
release to parole, concluding that he should be held until June
7, 2019, his maximum expiration date. Dkt. No. 71-16 at 13.
The Board explained:

> Based on your interview and overall record, after weighing
> the statutory factors, discretionary release is denied. Your
> instant offense involved your actions committing two
> gunpoint rape related offenses. This is a continuation
> of your criminal history and record on community
> supervision, which includes a previous prison term for a
> drug related offense.
>
> The panel notes your rehabilitation efforts, including your
> achievement of your G.E.D., the tailor shop and completion
> of ART and ASAT. You have not been able to complete
> the sex offender program. Your disciplinary record includes
> multiple disciplinary offenses, including infractions since
> your last interview. Also considered were your 2016 parole
> packet, a letter from the Appellate Advocates as well
> as official letters of opposition and support and your
> sentencing minutes.
>
> We have reviewed your case plan, your release plans
> and your risk and needs assessment which indicates your
> elevated risk of felony violence and need for reentry
> substance abuse services and treatment.

Dkt. No. 71-16 at 13.

The Board issued a Form 9026 Parol Board Decision Notice
with thirty-six special conditions ("Special Conditions") of
release. [5] Dkt. No. 1-2 at 3-11; Dkt. No. 71-2 at ¶ 19. Of these
thirty-six conditions, Peoples objects to the following:

> 3. I will participate in a substance abuse treatment program
>    as directed by the P.O.
>
> 4. I will participate in an alcohol abuse treatment program
>    as directed by the P.O.

8. I will participate in anti-aggression/anti-violence
   counseling as directed by the P.O.

10. I will have no contact with any person under the age of
    eighteen without written permission of the P.O.

11. I will comply with all case specific sex offender
    conditions to be imposed by the P.O.

14. I will comply with geographical restrictions as directed
    by P.O.

15. I will abide by the mandatory condition imposed by the
    Sexual Assault Reform Act ("SARA").

16. I will not use or possess any medications or
    supplements designed or intended for the purpose
    of enhancing sexual performance or treating erectile
    dysfunction without the written permission of my parole
    officer and the approval of his or her area supervisor.

18. I will not use the internet to access pornographic
    material, access a commercial social networking
    website, communicate with other individuals or groups
    for the purpose of promoting sexual relations with
    persons under eighteen, and communicate with a person
    under the age of eighteen unless I receive written
    permission from the Board of Parole to use the internet
    to communicate with a minor child under eighteen years
    of age who I am the parent of and who I am not otherwise
    prohibited from communicating with.

20. I will not own, use, possess, purchase or have control
    of any computer, computer related material, electronic
    storage devices, communication devices and/or the
    internet unless I obtain prior written permission from my
    parole officer.

**\*4** 21. If I am permitted by my parole officer to possess
    a computer at my residence, permission will be granted
    for only one computer.

22. I will provide all personal, business, phone, internet
    service provider, and/or cable records to my parole
    officer upon request.

23. I will provide copies of financial documents to my
    parole officer upon request. These documents may
    include, but are not limited to, all credit card bills, bank
    statements, and income tax returns.

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess.

**\*5** 34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate,

junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Dkt. No. 1-2 at 5-11; Dkt. No. 71-1 at ¶ 20.

5    The conditions imposed by the Board are the same conditions previously recommended by Leon. *Compare* Dkt. No 71-6 at 26-28 *with* Dkt. No. 1-2 at 5-10.

In March 2019, pursuant to the Sex Offender Registration Act ("SORA") (Correction Law § 168), the Board of Examiners of Sex Offenders made a risk level and designation recommendation to Queens County Supreme Court, the sentencing court. Dkt. No. 82-3 at 7. In May 2019, the Honorable Ira H. Margulis determined that Peoples' risk level was 3 and designated him a "sexually violent offender" pursuant to Correction Law § 168-d. 6 *Id.*

6    On May 24, 2019, Peoples filed a Notice of Appeal of the order adjudicating him a Level 3 risk of re-offense and designating him a sexually violent offender. Dkt. No. 82-3 at 6. The record does not contain any evidence related to the outcome of the appeal.

On June 5, 2019, Peoples was released from DOCCS' custody and began serving his term of PRS subject to the Special Conditions. Dkt. No. 22; Dkt. No. 71-26 at 11. In August 2019, Plaintiff was arrested for violating the conditions of his parole and held at Broome County Jail ("Broome C.J."). Dkt. No 71-26 at 61. On May 20, 2020, a final revocation hearing was conducted. Dkt. No. 82-3 at 8-17. Peoples plead guilty to tampering with his GPS monitoring device and removing it from this ankle. Dkt. No. 82-3 at 16; Dkt. No. 71-26 at 65-66. The Administrative Law Judge ordered Peoples held for eighteen months, which began to run on August 6, 2019. *Id.* Peoples was transferred from Broome C.J. to Elmira Correctional Facility ("Elmira C.F."). Dkt. No. 74.

**\*6** In August 2020, Peoples was transferred from Elmira C.F. to Attica Correctional Facility ("Attica C.F.") and placed in protective custody due to his prior affiliation with the "Bloods-GKB" gang. Dkt. No. 76; Dkt. No. 71-4 at 3; Dkt. No. 82-2 at 40-42. Peoples is currently in DOCCS' custody. Dkt. No. 79.

### B. Procedural History

On November 16, 2018, the Court received the Complaint in the within action. Dkt. No. 1. Upon review of the Complaint, the Court directed defendants Leon, Alexander, Jane Doe, John Doe, and the Chairwoman of the New York State Board of Parole Tina Stanford ("Stanford") to respond to the § 1983 claims challenging the impositions of certain Special Conditions. *See generally,* Dkt. No. 8.

On May 3, 2019, Leon, Alexander, and Stanford filed an Answer to the Complaint. Dkt. No. 19. On February 27, 2020, Peoples was deposed. Dkt. No. 71-26. On July 17, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Peoples' claims. Dkt. No. 71.

### II. LEGAL STANDARD

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56; *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury,

and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

Peoples asks the Court to consider his Complaint as an affidavit in opposition to the motion for summary judgment. Dkt. No. 82-1 at 13. "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)." *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019). Here, Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 7. Therefore, the undersigned will accept Plaintiff's Complaint as an affidavit to the extent that the statements contained therein are based on Plaintiff's personal knowledge or are supported by the record. *See Berry v. Marchinkowski*, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005).

 **\*7** All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Furthermore, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191–92 (2d Cir. 2008). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION [7]

[7] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

Defendants move for summary judgment arguing that: (1) the claims for monetary damages are barred by the Eleventh Amendment; (2) the First and Fourteenth Amendment claims related to the Special Conditions must be dismissed because the conditions were reasonably related to Plaintiff's crimes and tailored to serve legitimate state interests; (3) judicial immunity bars Plaintiff's claims against Alexander; and (4) Stanford was not personally involved in the October 2018 determination. Defendants also argue that they are entitled to qualified immunity on the First and Fourteenth Amendment claims. Dkt. No. 71-29.

### A. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977)).

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as a claim against

the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y. 2008).

**\*8** However, "[u]nder the doctrine in *Ex Parte Young*, 'a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers ... in their official capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective.' " *Clark v. DiNapoli*, 510 Fed. App'x 49, 51 (2d Cir. 2013) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007)). "A plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning there must be some "plausible threat of future violations." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986)); *see W. Mohegan Tribe and Nation*, 395 F.3d at 21 (noting that, "in determining whether the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective' "); *see also New York State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

Here, Plaintiff seeks both monetary and non-monetary relief. Dkt. No. 1-1 at 19-20. Plaintiff's claims against Defendants in their official capacities for monetary damages are barred by the Eleventh Amendment. Accordingly, I recommend that Defendants' motion for summary judgment and dismissal of all claims for monetary damages against Defendants in their official capacities be granted.

### B. Constitutional Claims Related to Special Conditions

Defendants move for summary judgment and dismissal of the section 1983 claims challenging the Special Conditions arguing that the conditions are reasonably related to Peoples' criminal history, past conduct, tailored to deter recidivism, and serve legitimate state interests in protecting the public. *See* Dkt. No. 71-29 at 4-19. Peoples asserts both general and specific challenges to the imposition of twenty-six of the thirty-six Special Conditions.

"[U]nder New York law, the Board of Parole is entitled to impose conditions on the conditional release of an inmate." *Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000); N.Y. Exec. Law §§ 259-c, 259-g, 259-i(2); N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.3 ("A special condition may be imposed upon a [parolee] either prior or subsequent to release ... each special condition may be imposed by a member of the Board of Parole, an authorized representative of the division of parole, or a parole officer," memorialized by "a written copy of each special condition imposed.").

In its determinations, "the Parole Board may consider all of the circumstances surrounding the conviction - including conduct for which petitioner has not been convicted." *Robles v. Williams*, No. 02 CIV 6102, 2007 WL 2403154, at \*4 (S.D.N.Y. Aug. 22, 2007) (internal quotation marks omitted). Further, it is not "arbitrary nor capricious" for the Board to consider remorse when deciding whether to deny parole. *Matter of Simon v. Travis*, 95 N.Y.2d 470, 477 (2000); *see also M.G. v. Travis*, 236 A.D.2d 163, 169 (1997).

Parolees are entitled to some form of due process in the imposition of special conditions of parole. *Pollard v. U.S. Parole Comm'n*, No. 15-CV-9131, 2016 WL 3167229, at \*4 (S.D.N.Y. June 6, 2016) (citing *U.S. v. Green*, 618 F.3d 120, 122 (2d Cir. 2010)). This "limited due process right" entitles a parolee to conditions of parole that are reasonably related to his prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. *See Singleton v. Doe*, No. 14-CV-0303, 2014 WL 3110033 at \*3 (E.D.N.Y. July 7, 2014); *U.S. v. Myers*, 426 F.3d 117, 123-24 (2d Cir. 2005) (summary order); *Robinson v. Pagan*, No. 05-CV-1840, 2006 WL 3626930, at \*6 (S.D.N.Y. Dec. 12, 2006) (citation omitted); *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*20 (S.D.N.Y. Jan. 11, 2019) (internal citation omitted). "If a special condition implicates a fundamental liberty interest," the court "must carefully examine it to determine whether it is 'reasonably related' to the pertinent factors, and 'involves no greater deprivation of liberty than is reasonably necessary[.]' " *Myers*, 426 F.3d at 126. Courts "must use common sense to guide [their] interpretation of supervised release conditions." *U.S. v. Moritz*, 651 Fed. App'x 807, 810 (10th Cir. 2016) (citations omitted).

**\*9** In support of the motion, Leon provided a Declaration and swears that she reviewed the following documents in deciding what special conditions to recommend: sentence and commitment orders; pre-sentence investigation reports;

sentencing minutes; the parole board criminal history report; DOCCS program assignment history; disciplinary history; legal date computation; DOCCS' program refusal notification forms; letters from the District Attorney's office, the criminal defense attorney, and various individuals; release planning records; and the parole packet from Peoples' prior hearing in 2016. Dkt. No. 71-23 at ¶¶ 5, 7. Leon avers that her recommendations were reasonably related to Peoples' criminal history, his past conduct, and tailored to prevent recidivism, protect the public, and promote Peoples' rehabilitation. *Id.* at ¶ 9.

Alexander also provided a Declaration in support of the motion. Dkt. No. 71-2. Alexander stated that the Board's decision was guided by the factors set forth in N.Y. Executive Law § 259-1(2)(c)(A). [8] *Id.* at ¶ 13. Alexander avers that the Board reviewed the following records/documentation, in connection with the decision whether to grant Peoples early release to parole: sentence and commitment orders; pre-sentence investigation report; sentencing minutes (including a victim statement); criminal history; DOCCS institutional records; letters from the District Attorney and defense counsel; the COMPAS instrument; the Offender Case Plan; release planning records; letters from various individuals/ entities; and Peoples' parole packet from his October 2016 interview. *Id.* at ¶¶ 14, 15. After the October 2018 interview, Alexander and the other Board members determined that Peoples would not be granted discretionary release and that he would remain incarcerated until his maximum expiration date. Dkt. No. 71-2 at ¶ 19. The Board imposed thirty-six special conditions of parole, which Alexander asserts are reasonably related to Peoples' criminal history, his past conduct, tailored to prevent recidivism, protect the public, and prevent future offenses. *Id.* at ¶¶ 20, 48. Alexander also opined that Peoples attempted to make excuses for his crimes and did not express remorse for his victims. *Id.* at ¶ 46.

[8]     Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision, the procedures adopted pursuant to subdivision four of section two hundred fifty-nine-

c of this article shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interactions with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department and any recommendation regarding deportation made by the commissioner of the department pursuant to section one hundred forty-seven of the correction law; (v) any current or prior statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated; (vi) the length of the determinate sentence to which the inmate would be subject had he or she received a sentence pursuant to section 70.70 or section 70.71 of the penal law for a felony defined in article two hundred twenty or article two hundred twenty-one of the penal law; (vii) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest prior to confinement; and (viii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement.

N.Y. Exec. Law § 259-i(2)(c)(A).

**\*10** In the Parole Board Release Decision Notice, the Board explained that "[y]our instant offense involved your actions committing two gunpoint rape related offenses" was a reason for the decision to deny parole. Dkt. No. 1-2 at 4.

In opposition to the motion, Peoples presents three general challenges to the imposition of all twenty-six conditions.

### 1. General Objections

First, Peoples claims that the conditions were improperly imposed by the Board, rather than by the sentencing court. Dkt. No. 1-1 at 10; Dkt. No. 82-1 at 7. As discussed *supra*, the Board of Parole is charged with "the duty and discretion of setting conditions for an inmate on parole release." *Doe*, 221 F.3d at 139; *Robinson*, 2010 WL 11507493, at *3 (citing N.Y.C.R.R. §§ 8003.2 and 8003.3); N.Y. Penal Law § 70.40(1)(b). Accordingly, Peoples' objection, on this ground, lacks merit.

Peoples also challenges the special conditions claiming that Defendants improperly considered circumstances surrounding his convictions, including the use of a gun, and refused to consider certain "mitigating factors." Dkt. No. 82-1 at 3-6. In his opposition to the motion, Peoples presents those "mitigating factors", for the first time. To wit, Peoples asserts that he did not use a gun during the commission of the crimes and claims that an "inoperable b.b. gun was discovered in the second crime." Dkt. No. 82 at p.5-8, ¶¶ 2, 3, 7, 12, 14, 15. Additionally, Peoples claims that he knew one of the victims, that she was "not a stranger," and now contends that he did not "rob her, abduct her at gunpoint, or rape[ ] her by forcible compulsion[.]" Dkt. No. 82 at p. 6, ¶4; Dkt. No. 82-1 at 4-5. Peoples also insists that one of the assaults was a consensual sexual encounter in a pre-arranged meeting place as payment for drugs. *Id.* at p. 6, ¶¶ 4-6.

As discussed *supra*, "[t]he Board may consider all of the circumstances surrounding the conviction—including conduct for which petitioner has not been convicted—so long as some record evidence of such conduct exists in the record and it is not the sole basis for the Board's determination." *Williams v. Travis*, 783 N.Y.S.2d 413, 414 (2004). Here, the record contains extensive references to Peoples' use of a gun during the commission of the crimes and to the fact that the victims were strangers and that they were raped by forcible compulsion.

During the plea hearing, Peoples admitted to two counts of engaging in "sexual intercourse with a female to whom [he] [was] not married by means of forcible compulsion." Dkt. No. 82-2 at 28. Upon inquiry, Peoples admitted that the women were strangers and that he displayed "what appeared to be a handgun." *Id.* at 28-29. During the parole hearing, Peoples was asked the following question and gave the following answer:

Q. Okay. So are you accepting responsibility for these gunpoint rapes?

A. I have, I am and this is part of my past that I cannot take away.

Dkt. No. 71-16 at 4.

Peoples' new, self-serving statements, presented for the first time in his opposition to the motion for summary judgment, are unsupported by the record and do not create an issue of fact for a jury. Indeed, no reasonable jury could find the assertions credible and conclude, based upon the statements, that the Board's decision to consider all aspects of the seriousness of Peoples' offense was arbitrary or capricious. *See Stolow v. Greg Manning Auctions Inc.*, 80 Fed. App'x 722, 725 (2d Cir. 2003) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony.")); *Fox v. Harris*, No. 6:15-CV-0616 (LEK/ATB), 2017 WL 1319835, at *2 (N.D.N.Y. Apr. 7, 2017) (holding that the plaintiff "cannot escape summary judgment via 'self-serving statements ... made in his opposition that contradict his sworn deposition testimony.' ") (citation omitted).

**\*11** Finally, Peoples contends that Defendants failed to consider his plea transcript. Dkt. No. 82-1 at 3-6. Leon and Alexander do not state whether they considered Peoples' plea transcript during their reviews. However, as noted *supra*, the statements in the plea transcript do not offer any support for Peoples' objection. As noted *supra*, Plaintiff admitted raping two strangers with "forcible compulsion" using "what appeared to be a handgun." Dkt. No. 82-2 at 28-29.

Having determined that Peoples' general objections to the imposition of the Special Conditions lack merit, the Court will address Peoples' specific challenges to the Special Conditions, in turn. [9]

[9]    Plaintiff does not present any constitutional challenge to the following Special Conditions: 1, 2, 5, 6, 7, 9, 12, 13, 17, 19. Dkt. No. 1-1 at 10-14 and Dkt. No. 82-1.

## 2. Specific Objections

### a. Requirement to Participate in Programs

> 3. I will participate in a substance abuse treatment program as directed by the P.O.

> 4. I will participate in an alcohol abuse treatment program as directed by the P.O.

> 8. I will participate in anti-aggression/anti-violence counseling as directed by the P.O.

Peoples objects to these conditions as arbitrary and capricious because he satisfactorily completed Aggression Replacement Training ("ART") and Alcohol and Substance Abuse Treatment ("ASAT") while in DOCCS' custody and claims that he has "been clean and sober for quite some time." Dkt. No. 1-1 at 10; Dkt. No. 71-16 at 10. Alexander avers that the conditions were imposed due to Peoples' "lengthy, significant history of alcohol and substance abuse and history of selling controlled substances" and history of violent behavior and disciplinary violations while in custody, that continued even after Peoples completed ART. Dkt. No. 71-2 at ¶¶ 49(A) and (B). Alexander also explains that the conditions are reasonable because, although Peoples participated in ASAT ten years ago, he has not lived outside of prison at all since that time. *Id.*

According to the record before the Court, Peoples began using and abusing alcohol and marijuana at ages eleven and twelve. Dkt. No. 71-1 at ¶¶ 59-60; Dkt. No. 82 at p. 2, ¶ 25. Plaintiff also has a history of crack/cocaine and Ecstasy use. *Id.* Peoples was arrested, as a juvenile, in 1996 and 1998 and convicted of criminal possession of a controlled substance with intent to sell. Dkt. No. 71-6 at 7-8. Peoples admitted that he was smoking marijuana when he was arrested in March 2000 for possession of crack/cocaine with the intent to sell and stated that he was "on drugs" at the time he committed one of the rapes. Dkt. No. 71-1 at ¶¶ 60-61; Dkt. No. 82 at p. 2, ¶ 25.

During the parole hearing, Peoples admitted to selling drugs and stated that his "actions came about because [he] was growing up in an environment where [he] resorted to drugs and anger to address all of [his] problems." Dkt. No. 71-16 at 4, 5, 9. Peoples told the Board that he would participate in substance abuse services if it was a condition of parole. *Id.* at 10. Although Peoples claims that he has "been clean and sober for quite some time," during his deposition, he testified to testing positive for marijuana on June 13, 2020. Dkt. No. 71-26 at 86-87. The COMPAS instrument indicates that Peoples has a history of substance abuse including committing offenses while high/drunk, prior drug charges/

convictions, history of drug and alcohol problems, history of prior treatment, and history of failed drug tests. Dkt. No. 71-10 and 4, 10. As a result, Leon concluded that Peoples was at risk for substance abuse problems. *Id.* at 5, 10.

**\*12**   The record is also replete with evidence suggesting that anti-aggression programming is reasonably related to Peoples' history. Due to the nature of Plaintiff's conviction, the sentencing court designated Peoples as a "sexually violent offender". Dkt. No. 82-3 at 7. During his pre-trial detainment and incarceration, Peoples incurred several disciplinary infractions and was found guilty of violating prison rules on twenty-three occasions and received violations for possessing unauthorized medications, smuggling, fighting, violent conduct, creating a disturbance, assaulting an inmate, harassment, and threats. Dkt. No. 71-1 at ¶¶ 69, 71; Dkt. No. 82 at p. 3, ¶30, at p. 8, ¶21. Peoples incurred thirty one months of recommended loss of good time as a result of disciplinary infractions. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶30. Indeed, some of the infractions occurred after Peoples participated in ART. Dkt. No. 71-1 at ¶89; Dkt. No. 82 at p. 3, ¶41. Between his October 2016 parole interview and his October 2018 parole interview, Peoples was found guilty of three Tier II violations and two Tier III violations including one assault involving physical injuries to another inmate. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶32. Peoples does not dispute his disciplinary history and admits that he refused to complete sex offender programming. Dkt. No. 71-1 at ¶¶68, 75-77; Dkt. No. 82 at p. 3 at ¶34, p. 8, ¶20; Dkt. No. 71-16 at 5, 9.

During the parole interview, when asked by Alexander, "what do you think about why you did [your crimes] and what impact you've had on your victims?" Dkt. No. 71-16 at 4. Peoples responded that he believed his "actions came about because I was growing up in an environment where I resorted to drugs and anger to address all of my problems." *Id.*

In light of Peoples' history of drug abuse, history of criminal conduct involving drugs, the forcible and violent circumstances surrounding his crimes, and disciplinary record in prison, the Special Conditions directing him to participate in alcohol, substance and anti-aggression programs are not arbitrary or capricious. *See Ahlers v. New York State Div. Of Parole,* 1 A.D.3d 849, 850 (2003). Indeed, Peoples' recent placement in DOCCS protective custody, due to his gang affiliations, further supports the need for Peoples to participate in anti-aggression programming. Dkt. No. 76. The Court finds the conditions to be "reasonably related to

legitimate penological objectives and rationally related to [plaintiff's] history and potential recidivism."

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### b. Minors

> 10. I will have no contact with any person under the age of eighteen without written permission of the P.O.

Peoples challenges this condition because his victims were not under eighteen. Dkt. No. 1-1 at 11. Peoples also claims that the condition precludes him from having contact with his younger brother and extended family members. *Id.* at 10-11.

"[I]t is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process." *Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *10 (W.D.N.Y. Nov. 6, 2019) (citations omitted). Courts however, have not extended the "same solicitude" to non-custodial parents who did not play an active role in a child's life, prior to incarceration. *Yunus*, 2009 WL 168544, at *34 (citing *Meyers*, 426 F.3d at 128) (holding that the parolee must demonstrate some "commitment to the responsibilities of parenthood").

Here, Peoples does not have any children and does not claim to have a custodial relationship with any member of his extended family or his younger brother. Dkt. No. 71-1 at ¶81; Dkt. No. 82 at p. 3, ¶38. Moreover, in 2001, Peoples' mother obtained an Order of Protection against Peoples on her behalf and on behalf of Peoples' minor brother. Dkt. No. 71-1 at ¶82; Dkt. No. 71-6 at 3-4 [10]. Peoples testified that he has four nieces/nephews under the age of eighteen, however, the record lacks facts establishing that Peoples had a close relationship with any of them. Dkt. No. 71-26 at 107. The condition does not act as a total bar preventing Peoples from maintaining familial relationships with his nieces and nephews or ban him from all contact with any person under 18 years of age. Rather, Peoples is required to seek permission from his parole officer. To this end, Peoples testified that when he was on parole from June 2019 until August 2019, he never

requested, or was denied, permission to have contact with anyone under the age of eighteen. Dkt. No. 71-26 at 82.

[10]    Peoples does not dispute the truth of this assertion but objects to the fact because "defendants have not produced the actual Order of Protection[.]" Dkt. No. 82 at p. 9, ¶26.

**\*13** Pursuant to the record before the Court, this condition is not arbitrary or capricious. *See Maldonado*, 2019 WL 5784940, at *3, 10 (finding same condition restricting contact with minors to be reasonable); *see also Yunus*, 2009 WL 168544, at *34 (reasoning that there is no authority for proposition that a parolee has a fundamental right to visit family members). Accordingly, the Court finds that this condition does not violate Peoples' due process rights and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### c. Travel Restrictions

> 14. I will comply with geographical restrictions as directed by P.O.

Peoples contends that he should be permitted to travel within the state and argues that restricting his movement to his county of residence constitutes an "unconstitutional bill of attainder." Dkt. No. 1-1 at 11. Defendants argue that the condition is necessary as Peoples previously fled to Connecticut to avoid arrest. Dkt. No. 71-2 at ¶ 49(E).

Courts have held that limitations on the freedom of travel and association may be imposed without violating the parolee's constitutional rights. *See Bostic v. Jackson*, No. 9:04-CV-676 (NAM/GJD), 2008 WL 1882696, at *2 (N.D.N.Y. Apr. 24, 2008); *Cusamano v. Alexander*, 691 F.Supp.2d 312 (N.D.N.Y. 2009) (finding no due process violation where the parolee's special conditions included travel limitations). Moreover, travel restrictions may assist parole officers in monitoring a parolee's activities and thus, serve a valid penological interest. *Trivsan v. Annucci*, No. 14-CV-6016, 2019 WL 2304647, at *5 (E.D.N.Y. May 30, 2019).

Based upon the record and Peoples' prior conduct, the Court does not find the imposition of this condition to be arbitrary

or capricious. In 2000, a warrant was issued when Peoples failed to return to court for sentencing on his drug conviction. Dkt. No. 71-4 at 3. During his deposition, Peoples testified that while he was on parole in 2003, one of the conditions was that he not leave the state without prior permission from his parole officer. Dkt. No. 71-26 at 43-43. Despite that condition, Peoples traveled from Queens to Connecticut without permission from his Parole Officer. *Id.* Additionally, at his parole revocation hearing, Peoples plead guilty to tampering with his GPS monitoring device and removing it from his ankle. Dkt. No. 82-3 at 16.

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### d. Sexual Assault Reform Act ("SARA") Conditions

15. I will abide by the mandatory condition imposed by the Sexual Assault Reform Act ("SARA").

34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

**\*14** 36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Peoples does not dispute that he has been designated as a level three offender but objects to these conditions arguing his crimes did not involve minors, school grounds, or public parks. Dkt. No. 82-1 at 8; Dkt. No. 1-1 at 12.

In 2000, pursuant to SARA, the mandatory conditions set forth in N.Y. Executive Law § 259-c(14) applied only to sex offenders convicted of certain enumerated offenses and only if the victim had been under the age of eighteen. *Williams v. Dep't of Corr. & Cmty. Supervision*, 150, 24 N.Y.S.3d 18, 21 (2016). In 2005, SARA was amended to include level three sex offenders, regardless of the age of the victim. *Id.* Initially, courts in New York offered varying interpretations of the scope of the 2005 amendment. In November 2020, the New York Court of Appeals issued two decisions and addressed the scope of the 2005 amendments. *People ex rel. Negron v. Sup't Woodbourne Corr. Fac.*, 2020 WL 6828791, at \*1 (N.Y. Nov. 23, 2020) and *People ex rel. Johnson v. Sup't Adirondack Corr. Fac.*, 2020 WL 6828834 (N.Y. Nov. 23, 2020). In both cases, the Court held that the 2005 amendments to SARA apply "to any defendant who is serving a sentence for various enumerated sex offenses, when the victim of the offense was under the age of 18 at the time of the offense or, [...] the defendant has been designated a level three sex offender." *Id.* The Southern District similarly interpreted the 2005 amendments to SORA. *Yunus*, 2018 WL 3455408, at \*4. Peoples is a level three sex offender convicted of violating Penal Law § 130.35, one of the enumerated offenses. Dkt. No. 82-2 at 11. Therefore, pursuant to the controlling caselaw on this issue, Peoples is subject to the mandatory condition.

In a further attempt to invalidate the conditions, Peoples also argues that the 2005 amendments were enacted in August 2005 and September 2005, after his conviction and sentencing, and, therefore, enforcing the conditions against him violates the Ex Post Facto Clause. Dkt. No. 82-1 at 8.

"Ex post facto" is a term of art applicable only to "punishment" - legislative action that retroactively "punishes as a crime an act previously committed, which was innocent when done," "makes more burdensome the punishment for a crime, after its commission," or "deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925). The Ex Post Facto Clause prohibits laws which "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). Courts in New York and in the Second Circuit have held that the 2005 SARA amendments are "non-punitive", do not violate the Ex Post Facto Clause and were enacted to protect the community, not punish offenders. *Smith v. Flynn*, No. 16-CV-9242, 2018 WL 3946453, at *7 (S.D.N.Y. Aug. 16, 2018) (citing *Wallace v. New York*, 40 F.Supp.3d 278, 314 (E.D.N.Y. 2014) and *Williams v. Dep't of Corr. and Cmty. Supervision*, 24 N.Y.S.3d 18, 23 (1st Dep't 2016)); *Devine v. Annucci*, 56 N.Y.S.3d 149 (2017) (holding that the retroactive application of SARA does not violate the Ex Post Facto Clause). Consequently, the Court is not persuaded by Peoples' arguments.

**\*15**  Accordingly, the Court does not find the imposition of these conditions to be arbitrary or capricious and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### e. Medications

16. I will not us or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor.

Peoples argues that this condition violates his right to privacy. Dkt. No. 1-1 at 12. Defendants have not responded to Peoples' arguments.

Based upon the facts surrounding Peoples' convictions, the condition does not involve a greater deprivation of liberty than is necessary as the condition is not a complete ban on taking medication for sexual enhancement. Additionally, Peoples does not allege that, during his time on parole, that he requested, and was unreasonably denied, permission to possess any medications intended to enhance his sexual performance. Accordingly, because the evidence suggests that the condition is reasonably related to Peoples' criminal history and to the goals of protecting the public, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### f. Computer and Internet Restrictions

18. I will not use the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under eighteen, and communicate with a person under the age of eighteen unless I receive written permission from the Board of Parole to use the internet to communicate with a minor child under eighteen years of age who I am the parent of and who I am not otherwise prohibited from communicating with.

20. I will not own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless I obtain prior written permission from my parole officer.

21. If I am permitted by my parole officer to possess a computer at my residence, permission will be granted for only one computer.

22. I will provide all personal, business, phone, internet service provider, and/or cable records to my parole officer upon request.

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

**\*16** 28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor

will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess. Peoples' argument that these conditions were improperly imposed and unrelated to his criminal history because his crimes did not involve a minor or the internet, *see* Dkt. No. 82-1 at 8, lack merit.

Because Peoples is a level three sex offender, N.Y. Executive Law § 259-c(15) dictates that he is:

> ... prohibited from using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child. [11]

N.Y. Exec. Law § 259-c(15) (the Electronic Security and Targeting of Online Predators Act ("e-STOP")); *M.F. v. New York Exec. Dep't Div. of Parole*, No. 08 CV 1504, 2010 WL 9461647, at *2 (S.D.N.Y. Mar. 24, 2010) (citing N.Y. Exec. § 259-c(15)). The aforementioned condition applies regardless of whether the internet played any role in the sex offender's crimes. *Yunus*, 2018 WL 3455408, at *4.

[11]   As used in this subdivision, a "commercial social networking website" shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users;

(ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age; provided, however, that, for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein.

N.Y. Exec. Law § 259-c.

**\*17** During Peoples' sentencing, he was "certified" as a sex offender and advised that he was obligated to register as a sex offender in New York. Dkt. No. 71-3. As a result of that designation and pursuant to DOCCS Directives 8304(III) (A) [12] and 9202 [13], Peoples is a mandatory sex offender subject to conditions of release referred to as "GES SC 40 A-F". Dkt. No. 71-22; Dkt. No. 71-2 at ¶ 49(J). Conditions GES SC 40 A-F were recommended by Leon and included in the Board's Decision and Notice as Special Conditions 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, and 31. Dkt. No. 1-1 at 7-9; Dkt. No. 71-6 at 27; Dkt. No. 71-2 at ¶¶ 49(J), (L)-(N).

[12]   DOCCS Directive 8304(III)(A) defines mandatory sex offenders as "[a]ll offenders subject to registration with the New York State Offender Registry." Dkt. No. 71-21.

[13]   DOCCS Directive 9202, entitled Management of Sex Offender Use of Computer Related Materials and Electronic Devices, provides, in pertinent part:
B. Condition of Supervision: Condition(s) of release relating to use and access to computers, computer related material, electronic storage devices, communication devices, and the Internet on sex offenders will be imposed as follows:
1. ORCs and SORCS are to identify mandatory sex offender cases on an ongoing basis and include the special condition (GES SC 40 A-F) on the Parole Board Report or other report prepared for the Parole Board.

Dkt. No. 71-22.

Peoples also contends that the aforementioned "sweeping" conditions are overly-broad, prevent him from pursuing "entrepreneurial aspirations," and are not necessary or legitimate. Dkt. No. 82-1 at 10-14. Peoples seeks to invalidate these conditions relying upon the Supreme Court decision in *Packingham v. North Carolina*, 137 S.Ct. 1730

(2017). In *Packingham*, the Court held that a broad North Carolina criminal statute barring registered sex offenders from accessing commercial social networking websites was unconstitutional. *Id.*

Defendants argue that *Packingham* does not apply because the restrictions at issue were imposed as parole conditions. Dkt. No. 71-29 at 14-17. Upon review of recent caselaw, the Court does not agree with Defendants' restrictive interpretation of the holding in *Packingham*.

In *Yunus v. Robinson*, the Southern District considered, and rejected, a similar argument. The court noted "[e]ven before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction 'relates to [the offender's] prior conduct.' " *Yunus*, 2018 WL 3455408, at \*30 (citations omitted). The Court reasoned, "[t]here is no indication in *Packingham* that parolees are exempted from the Court's decision [...] "[i]n fact, the [Supreme] Court was clear that the distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for it's holding[.]" *Yunus*, 2019 WL 168544, at \*16.

This district court and others have rejected similar arguments. *See Lopez v. Stanford*, No. 18-CV-3493, 2020 WL 6900909, at \*8 (E.D.N.Y. Nov. 24, 2020) (rejecting the defendants' argument that *Packingham* is inapplicable to parole conditions); *Hartwick v. Annucci*, No. 5:20-CV-408 (DNH), 2020 WL 6781562, at \*9 (N.D.N.Y. Nov. 18, 2020) (citing to *Packingham* in context of the plaintiff's challenge to parole conditions); *Manning v. Powers*, 281 F.Supp.3d 953, 961 (C.D. Cal. 2017) (holding that the plaintiff's challenge to a social media parole condition "is controlled by the Supreme Court's recent decision in *Packingham*").

**\*18** In January 2019, the Second Circuit addressed a similar argument, in the context of a condition of supervised release imposed at sentencing. In *U.S. v. Eaglin*, 913 F.3d 88 (2d Cir. 2019), the Second Circuit was presented with a constitutional challenge to a condition that barred the plaintiff from "accessing the Internet from any computer or Internet-capable device in any location unless authorized by the [c]ourt or as directed by the U.S. Probation Office upon approval of the [c]ourt." *Id.* at 94. The condition was defined as a broad ban on social networking sites. *Id.* at 96. The court acknowledged the differences between the facts at hand and

*Packingham*. To wit, a criminal statute was not at issue and Eaglin's challenged condition of supervised release applied only to him and for a limited duration. Nevertheless, the Circuit concluded that *Packingham's* holding applied stating, "[i]n our view, *Packingham* [ ] establishes that, in modern society, citizens have a First Amendment right to access the internet" and "to access certain social networking websites[.]" *Eaglin,* 913 F.3d at 96-97. The court held that the ban was substantially unreasonable holding that, "[i]n light of our precedent, and as emphasized in *Packingham's* recognition of a First Amendment right to access certain social networking websites, the imposition of a total internet ban as a condition of supervised release inflicts a severe deprivation of liberty." *Id.* at \*97. The Circuit further noted that Eaglin was not convicted of a crime involving the internet, that the ban would restrict his access to banking and employment, and that the condition was not necessary to protect the public. *Id.* at 97-98.

Defendants also argue that *Packingham* does not apply because Peoples may possess or purchase a computer, with permission from his parole officer. Dkt. No. 71-29 at 11-14. Once again, *Yunus v. Robinson* is instructive. In *Yunus,* the plaintiff, a parolee convicted of two counts of kidnapping, claimed that the following conditions violated his First Amendment rights:

> No. 12: Plaintiff cannot engage or participate in any online computer service that involves the exchange of electronic messages;

> No. 35: Plaintiff may not "own or possess a beeper, scanner or cell phone without permission of his parole officer";

> No. 39: Plaintiff may not possess a computer or computer-related materials without approval by his parole officer; and

> No. 48: Plaintiff is prohibited from accessing a commercial social networking website.

*Yunus*, 2019 WL 168544, at \*15.

The court rejected the defendants' argument that the conditions were "not absolute" and concluded:

> These limited exceptions do not satisfy the concerns about access to the 'vast democratic forums of the internet' for a multiplicity of purposes that was the basis for the Supreme Court's decision. *Packingham*, 137 S. Ct. at 1735-37 (internal quotation marks omitted). Furthermore, the possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of

supervised release limiting internet or technology access, even when analyzed under a less demanding standard. *See United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson*, 248 F.3d 79, 81, 82-84 (2d Cir. 2001). Therefore, the possibility of case-by-case exceptions from some of these conditions does not exempt them from *Packingham*, a conclusion reinforced by the nearly blanket manner they have allegedly been applied.

*Yunus,* 2019 WL 168544, at \*16.

Courts in this circuit and others have held a condition requiring prior written approval from a probation officer cannot salvage an otherwise overly broad restriction. *See U.S. v. Maxson*, 281 F.Supp.3d 594, 600 (D. Md. 2017) (citing *inter alia U.S. v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) ("If a total ban on Internet use is improper but a more narrowly tailored restriction would be justified, the solution is to have the district court itself fashion the terms of that narrower restriction. Imposing a total ban and transferring open-ended discretion to the probation officer to authorize needed exceptions is not a permissible alternative.")); *see also Scott v. Rosenberger*, No. 19-CV-1769, 2020 WL 4274226, at \*9 (S.D.N.Y. July 24, 2020) ("... the possibility of case-by-case exceptions to a ban does not save an overly broad condition.").

In support of the contention that *Packingham* does not apply, Defendants cite to *U.S. v. Savastio*, 777 Fed. App'x 4 (2d Cir. 2019) and *U.S. v. Browder*, 866 F.3d 504 (2d Cir. 2017). Upon review, the Court finds Defendants' reliance upon the aforementioned cases is misplaced.

**\*19** In *Savastio*, the plaintiff was on supervised release. The court "reject[ed] Savastio's attempt to rely on the principles articulated in *Packingham*" noting that, "[t]he Supreme Court explicitly linked its holding to 'the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system.' " *Savastio*, 777 Fed. App'x at 4.

For several reasons, the Court is not persuaded that the holding in *Savastio* is controlling herein. First, *Savastio* is a summary order and thus, lacks precedential effect. *See* Local Rule of the Second Circuit 32.1.1. Second, the facts of *Savastio* are readily distinguishable. Savastio pled guilty to possession of child pornography. *Savastio*, 777. Fed. App'x at 5. The condition of release that Savastio challenged read as follows:

Your internet use will be limited and/ or restricted under conditions to be set by the U.S. Probation Office in accordance with their Computer and Internet Monitoring Program. Such internet restriction may include a limitation of your daily internet use and/or the ban of certain websites, applications, chat rooms, or other internet activities as determined by the U.S. Probation Office. These determinations will be based upon an evaluation of your risk and needs, along with consideration of the factors outlined in 18 U.S.C. § 3553(a).

*Savastio*, 777 F. App'x at 5. The Circuit noted that given the plaintiff's history of accessing child pornography over the internet, the condition was reasonably related to his history. *Id.* Additionally, the court found *Packingham* "inapposite", because the condition allowed Savastio to receive permission from the probation office or district court and defined the condition as a monitoring requirement. *Id.* at 7-8. Here, Peoples has not been convicted of any crime involving pornography, minors, or the internet. Moreover, Peoples' condition is not a "monitoring condition" and does not contain similar qualifying language.

In *Browder*, the Circuit referred to *Packingham* only in dicta, noting the differences between *Packingham* and Browder's challenges. *Browder*, 866 F.3d 504, 511, n. 26. Notably, Browder's condition was a "computer monitoring" condition, not a complete internet ban. *Id.* Most "significantly" however, was the fact that Browder presented a Fourth Amendment challenge, while *Packingham* involved the First Amendment. *Id.* Here, Peoples' claims rest with the First Amendment and his condition cannot be described as a "monitoring" condition, but rather, a total internet ban. Therefore, for the same reasons, Peoples' challenge is distinguishable from *Browder*.

In opposition to Defendants' motion, Peoples references a case presently before the United States District Court for the Eastern District of New York, *Jones, et al. v. Stanford and Annucci*, No. 1:20-CV-1332 (E.D.N.Y. filed March 12, 2020), challenging the constitutionality of e-

STOP. *See* Dkt. No. 82-1 at 8-9, 10. *Jones* presents a factual scenario strikingly similar to the facts presented herein. In *Jones*, the plaintiffs presented constitutional challenges to parole conditions imposed pursuant to e-Stop and DOCCS Directives 9201 and 9202. *Id.*, Dkt. No. 1. The plaintiffs were convicted of various sexual offenses including attempted rape, rape, sexual abuse, and sexual misconduct involving a minor. *Id.* at 11-18. The plaintiffs were designated at risk Levels One, Two, and Three, and as a condition of their release, an internet and social media ban was imposed. *Id.*

**\*20** In August 2020, the plaintiffs filed a motion for a preliminary injunction seeking to enjoin the defendants from enforcing e-Stop and the Directives. *Jones*, at Dkt. No. 28. In a Memorandum & Order issued on September 9, 2020, the court granted the plaintiff's application and preliminarily enjoined the defendants from applying e-Stop and Directive 9201 "wholesale to Registrants who have not used the internet to facilitate the commission of their underlying sex offense." *Id.*, Dkt. No. 37. The defendants argued that *Packingham* did not apply to "those on community supervision" and cited to *Savastio*. *Id.* at 9. Relying upon *Eaglin* and *Yunus*, the court rejected that argument. *Id.* The court distinguished the facts from those in the "non-precedential" case, noting that in *Savastio*, the condition was a "monitoring condition" that "did not amount to an outright ban on Savastio's access to all forms of social media." *Id.*

The court also noted that the ban was not narrowly tailored to the plaintiffs or in its application to social media. *Jones*, Dkt. No. 37 at 7-17. Addressing each plaintiff, the court noted that the underlying offenses did not involve improper internet use. *Id.* at 11-12. Under the circumstances, the court reasoned that, perhaps "less restrictive alternatives" to monitor the plaintiff's internet use was available and concluded that the imposition of a "blanket ban" was "incompatible with the First Amendment." *Id.* at 12-14. The *Jones* case is presently pending in the Eastern District.

The Court agrees with the reasoning set forth in *Eaglin, Yunus*, and *Jones* and finds that the Special Conditions related to social networking websites, the internet, and Peoples' ability to own or possess a computer are overlapping and may infringe upon Peoples' First Amendment rights. While the Court does not dispute that a legitimate penological interest exists in monitoring Peoples' activities, Defendants have not offered any evidence or explanation regarding why such restrictive conditions are necessary or whether any other less restrictive means of monitoring Peoples were considered. *See*

*U.S. v. Bolin*, 976 F.3d 202, 213-14 (2d Cir. 2020) (citing to *Packingham, Eaglin*, and *Savastio* and concluding that "[i]nternet monitoring, as opposed to a blanket ban, [...], remained to all outward appearances a viable option as it would adequately protect the public from [the releasee's] potential misuse of the Internet while imposing a more reasonable burden on [his] First Amendment interest in accessing the Internet."); *see Eaglin*, 913. F.3d at 98 (holding that an earlier Internet restriction under which his Internet use was monitored by the Probation Office, appeared to be a "viable option").

Most importantly, an issue that was somewhat ignored by Defendants on the motion, the record is devoid of any evidence establishing that the internet, social media, pornography, and children factored into any of Peoples' crimes or criminal history. Defendants have not proven, with competent admissible evidence, that the conditions are "narrowly tailored" so as not to burden Peoples' First Amendment rights more than necessary. *See Scott*, 2020 WL 4274226, at *9 (holding that because the plaintiff's underlying crime did not involve computers or the internet, the restrictions on all computer or internet use without permission were not reasonably related to the plaintiff's conduct); *Yunus*, 2018 WL 3455408 at *32 (holding that parole conditions restricting access to computers and social media were not "narrowly tailored" as required by the Constitution because the plaintiff had never been charged with any internet-related criminal conduct). To be entitled to summary judgment on the issue of the constitutionality of the social media, internet, and computer restrictions, Defendants must prove that the conditions do not violate Peoples' constitutional rights and, on the record, the Court finds that Defendants have not met that burden. Accordingly, it is for the factfinder to conclude whether the special conditions involving technology infringe upon Peoples' First Amendment rights and the Court recommends that this portion of Defendants' motion for summary judgment be denied.

### g. Financial Documentation

**\*21**  23. I will provide copies of financial documents to my parole officer upon request. These documents may include, but are not

limited to, all credit card bills, bank statements, and income tax returns.

Peoples argues that this condition is over-broad and unconstitutional. [14] Dkt. No. 1-1 at 13. Defendants argue that this condition is reasonably related to Peoples' criminal history, past conduct, and to deter recidivism and protect the public. Dkt. No. 71-2 at ¶ 49(K); Dkt. No. 71-29 at 15.

[14]    Plaintiff also argues that the condition violates the settlement agreement in *Peoples v. Annucci*, No. 11-CV-2694 (S.D.N.Y. Mar. 16, 2016). Dkt. No. 82-1 at 11. The Court is familiar with the settlement agreement in *Peoples v. Annucci* and finds that it is not relevant or binding upon the Court as it relates to the issues presented herein.

"[F]inancial conditions may make it easier for the Probation Department to track [a parolee] in order to ensure his compliance with his registration obligation and with the conditions of his supervised release." *U.S. v. Bradshaw*, 653 Fed. App'x 325, 328 (5th Cir. 2016). However, where the conditions are "vague and overbroad" or imposed without context, the condition may impact liberties. *U.S. v. Sterling*, 959 F.3d 855, 863 (8th Cir. 2020) (reasoning that "broad financial disclosure conditions" are needed in cases involving convictions related to child support, debt, money, or greed).

Here, Peoples' conviction did not involve any monetary crimes and he is not required to make restitution payments. *Cf. U.S. v. Jeremiah*, 493 F.3d 1042, 1046 (9th Cir. 2007) (upholding restrictions on bank accounts, credit cards, and taxes because the conditions were reasonably related to supervising the defendant's ability to make restitution payments). While Peoples has a history of failing to comply with travel and geographical restrictions, the condition, as presently written, is overreaching as it does not include any language related to the purpose of the condition or language that would prevent the parole officer from demanding information arbitrarily. *But cf. U.S. v. Scaife*, No. 12 CR 519, 2015 WL 3775352, at *10 (N.D. Ill. May 20, 2015) (upholding condition that required the defendant to "provide the Probation Officer with access to requested financial information 'necessary to monitor compliance with the conditions of supervised release.' ").

Accordingly, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

### h. Photo Imaging

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

Peoples argues that there is no evidence that he has ever altered his image or attempted to alter his image and therefore, the condition is over broad and arbitrary. Dkt. No. 82-1 at 12; Dkt. No. 1-1 at 13. Defendants contend that the condition is mandated by statute and reasonably related to Peoples' criminal history, needed to protect the public, and necessary to prevent future offenses. Dkt. No. 71-29 at 18.

Pursuant to SORA and N.Y. Corr. Law § 168-f(3):

... [a] sex offender designated as a sexual predator or having been given a level three designation must personally verify his or her address with the local law enforcement agency every ninety calendar days after the date of release or commencement of parole or post-release supervision, or probation, or release on payment of a fine, conditional discharge or unconditional discharge. At such time the law enforcement agency having jurisdiction may take a new photograph of such sex offender if it appears that the offender has had a change in appearance since the most recent photograph taken pursuant to paragraph (b-2) of subdivision two of this section. If such photograph is taken, the law enforcement agency shall promptly forward a copy of such photograph to the division. The duty to personally verify shall be temporarily suspended during any period in which the sex offender is confined to any state

or local correctional facility, hospital or institution and shall immediately recommence on the date of the sex offender's release.

**\*22** A Level Three sex offender must register in person with the local police department every ninety (90) days and their registration obligations continue annually for life. *Rodriguez v. Attorney Gen.*, No. 10 CIV. 3868, 2011 WL 519591, at \*5 (S.D.N.Y. Feb. 15, 2011); *People v. Barber*, 27 Misc. 3d 1234(A), 911 N.Y.S.2d 694 (Sup. Ct. 2010) (citations omitted).

As discussed *supra*, Peoples was designated a Level Three sex offender. Peoples has not stated how this condition deprives him of a fundamental liberty interest in violation of the Constitution. Moreover, the government has a legitimate interest in SORA and protecting the community from sex offenders. *People v. Knox*, 12 N.Y.3d 60, 68 (2009).

Accordingly, the Court recommends that Defendants' motion for summary judgment, with respect to this condition, be granted.

### i. Requirement to Comply with Conditions Imposed by Parole Officer

11. I will comply with all case specific sex offender conditions to be imposed by the P.O.

Peoples argues that this condition is "overly-broad and unconstitutional" as it constitutes a "blanket-condition meant to whimsically abuse discretion by overreaching and infringing on constitutional rights." Dkt. No. 1-1 at 11.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *Yunus*, 2018 WL 3455408, at \*25 (quoting *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999)). While Alexander claims that the condition is "specifically tailored" and "enables the calibration of his conditions according to his particular risk factors and criminogenic needs," *see* Dkt. No. 71-2, Defendants did not

present any legal argument or caselaw in support of the motion for summary judgment with respect to this condition. As presently constituted, the condition does not "sufficiently inform" defendant of "what conduct will result in his being returned to prison. *See Yunus*, 2018 WL 3455408, at *25." As to this condition, there are genuine issues of material fact for a factfinder to resolve. Therefore, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

### C. Personal Involvement

Defendants move for summary judgment and dismissal of all claims against Stanford, the Chairwoman of the Board, arguing that Stanford was not personally involved in the October 2018 determination imposing the Special Conditions at issue herein. *See* Dkt. No. 71-29 at 21-25. Peoples argues that Stanford was personally involved in the constitutional violations because she permitted a policy or custom to continue to deny registered sex offenders access to the internet and social media in violation of *Packingham*. *Id.* at 14-15.

As discussed *supra*, Peoples sued Defendants for declaratory relief, injunctive relief, and compensatory damages. Although Peoples does not specifically state that he is suing Defendants in their individual capacity, *see* Compl. at 1; Dkt. No. 1-1 at 1, 9-20, courts in this district assume that pro se prisoners intend to sue pursuant to § 1983 in both capacities. *See Zaire v. Doe*, No. 9:03-CV-629 (FJS/RFT), 2006 WL 1994848, at *10 (N.D.N.Y. July 13, 2006). The arguments presented by Defendants in support of dismissal of the claims against Stanford, and Plaintiff's opposition, implies that the parties believe that the defendants have been sued in their individual capacities. *See Davis v. Cty. of Nassau*, 355 F.Supp.2d 668, 675-76 (E.D.N.Y. 2005) (citing *Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988)) (reasoning that the plaintiff's for damages, "coupled with the defendants' summary judgment motion [...], suggests that the parties believed that this action is a personal capacity suit.").

### 1. Claims Against Stanford in her Individual Capacity

**\*23** "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section

1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In a recent case, *Tangreti v. Bachmann*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *Id.*, 2020 WL 7687688 (2d Cir. 2020). In *Tangreti*, the plaintiff was sexually abused by correctional officers at York Correctional Institute in 2014 and argued that the defendant, a counselor supervisor, violated the Eighth Amendment by exhibiting deliberate indifference to the risk of sexual abuse by the officers. *Id.* at *2, 3. Consistent with other circuits, the court concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Id.* at *6. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could

not "rely on a separate test of liability specific to supervisors." *Id.*

In support of the motion, Stanford provided a Declaration and avers that she does not have authority to unilaterally establish a process for administratively appealing the imposition of special conditions by a Parole Board panel. Dkt. No. 71-24 at ¶ 7. Stanford was not present at Peoples' parole interview, she did not review the Board's conclusions and, in fact, was not aware of the Board's decision until she was served with the summons and Complaint in this lawsuit. *Id.* at ¶ 13. Stanford had no contact with Peoples, prior to being served with the Complaint. *Id.* at ¶ 15.

**\*24** Based upon the holding in *Tangreti*, summary judgment should be entered in favor of Stanford. The record lacks any evidence that Stanford violated Plaintiff's First and/or Fourteenth Amendment rights through her own individual actions or conduct.

Even if the Court considers the *Colon* factors, summary judgment is still warranted. The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873. "A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the 'violative practice is persistent and widespread,' and if the acts of subordinate employees 'imply the constructive acquiescence of senior policy-making officials.' " *Lipton v. Cty. of Orange*, 315 F.Supp.2d 434, 453 (S.D.N.Y. 2004). To establish personal involvement pursuant to the third *Colon* factor, a plaintiff must produce evidence that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm. *See Pusepa v. Annucci*, No. 17-CV-7954, 2019 WL 720699, at *4 (S.D.N.Y. Feb. 19, 2019) (citation omitted).

Even assuming that Stanford was responsible for creating policy, Peoples has not presented evidence establishing that Stanford was on notice that an unconstitutional policy existed and failed to take action. The record lacks facts related to other instances of similar unconstitutional practices involving registered sex offenders and their access to the internet and social media in violation of *Packingham*, or evidence of Stanford's knowledge of the instances to permit a jury to find that Stanford was personally involved pursuant to the third *Colon* factor. *See Pusepa*, 2019 WL 720699, at *7 (accepting

allegations of frequent sexual abuse at facility to suggest that the supervisory defendants were aware that their policies permitted the abuse to continue); *see also Casey v. Brockley*, No. 9:13-CV-01271 (DNH/TWD), 2018 WL 1399244, at *9 (N.D.N.Y. Feb. 16, 2018) (awarding summary judgment in favor of the superintendent because the plaintiff failed to provide evidence of similar events and "sheds no light on [the Superintendent's] actions or conduct in creating or permitting a policy or custom"). [15]

[15]    With respect to the remaining *Colon* factors, the record evidence does not suggest that Stanford was aware of Peoples' claims or that she acted, or failed to act, once placed on notice of the allegations.

Thus, the Court recommends granting Defendants' motion summary judgment and dismissing Peoples' claims against Stanford, in her individual capacity.

### 2. Claims Against Stanford in her Official Capacity

Although it is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983 for monetary damages, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation, *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013), "district courts in this Circuit have held 'that the personal involvement requirement does not apply to bar actions ... pursuant to § 1983 for injunctive relief against a state official.' " *Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F.Supp.3d 50, 68 (E.D.N.Y. 2018) (quoting *Marinaccio v. Boardman*, No. 1:02-CV-00831, 2005 WL 928631, at *9 (N.D.N.Y. Apr. 19, 2005)); *McLaurin v. Paterson*, No. 07 CIV 3482, 2008 WL 3402304, at *11 (S.D.N.Y. Aug. 11, 2008) (denying motion to dismiss the claims against the Governor and the Chairman of the Division of Parole in their official capacities based upon the lack of personal involvement in parole hearings). However, "[u]nder *Ex parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law." *Daily Mart Convenience Stores, Inc. v. Nickel (In re Dairy Mart Convenience Stores, Inc.)*, 411 F.3d 367, 372–73 (2d Cir. 2005) (quoting *Ex Parte Young*, 209 U.S. at 154, 157). "So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." *Id.*; *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F.Supp.2d 78, 102–03 (N.D.N.Y. 2013) (reasoning that "[a]ll that a Plaintiff

must show is that the official had: (1) 'a direct connection to, or responsibility for, the alleged illegal action[s]'; and (2) 'the authority to perform the required act.' ") (citation omitted).

**\*25** Defendants' arguments in support of summary judgment are limited to an analysis of the *Colon* factors and personal involvement as it relates to claims for damages against Stanford, in her individual capacity. Defendants offer no argument or evidence establishing that Stanford is not "connected" with the decisions to impose special conditions of parole.

The evidence before the Court does not demonstrate an absence of an issue of fact regarding whether Peoples is prevented from asserting a claim for injunctive relief against Stanford. Thus, the Court recommends denying Defendants' motion summary judgment and dismissal of Peoples' claims against Stanford, in her official capacity.

### D. Judicial Immunity

Defendants argue that Peoples' claims against Alexander are barred by absolute immunity. Dkt. No. 71-29 at 19-20. Peoples did not respond to this argument.

It is well established that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (citation omitted). This immunity extends to claims for injunctive relief unless a declaratory decree was violated or declaratory relief is unavailable. *Id.* at 761; *Davis v. Travis*, No. 07 CIV. 3047, 2008 WL 5191074, at \*3 (S.D.N.Y. Dec. 3, 2008) (holding that absolute immunity barred claims for damages and injunctive relief against parole board officials). "[A]bsolute immunity protects officials in their adjudicative or prosecutorial functions[,]" but "does not extend to the performance of administrative or investigative functions." *Farrell v. Burke*, No. 97 Civ. 5708, 1998 WL 751695, at \*4 (S.D.N.Y. Oct. 28, 1998) (citing *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998)).

"[P]arole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole" because these tasks are "functionally comparable to that of a judge." *Montero,* 171 F.3d at 761; *Scotto,* 143 F.3d at 111. While some courts have held that the

imposition of special parole conditions can be an adjudicative act that merits absolute immunity, courts in this circuit have also recognized that the decision to impose special conditions may be administrative in nature and "void of any discretion on the parole official's part." *Hartwick*, 2020 WL 6781562, at \*8 (citations omitted); *Doe v. Annucci*, No. 14 CIV. 2953, 2015 WL 4393012, at \*8 (S.D.N.Y. July 15, 2015); *Farrell*, 1998 WL 751695, at \*4 (citing *inter alia, Morrissey v. Brewer*, 408 U.S. 471, 478 (1972) (stating that parole officers perform largely administrative functions)). To resolve the issue of whether the imposition of special conditions of parole is an adjudicative or administrative act, a factual inquiry is necessary. *Farrell*, 1998 WL 751695, at \*4.

Although Defendants move for summary judgment on this issue, the motion lacks any argument or analysis of Alexander's role or facts establishing that she performed solely adjudicative functions, rather than administrative or investigative. Conversely, the record before the Court indicates that some of the special conditions imposed were the "product of an adjudicative process" while others were administered pursuant to statutory authority; "as administrative." *See Hartwick*, 2020 WL 6781562, at \*8 (declining to apply absolute immunity where the Board allegedly imposed statutory unconstitutional parole conditions related to the internet).

**\*26** Based upon the record, the Court finds issues of fact for a jury to resolve related to the issue of immunity. Accordingly, the undersigned recommends denying the Defendants' motion for summary judgment on this ground. *See Farrell*, 1998 WL 751695, at \*4 (refusing to dismiss on the grounds of absolute immunity where the facts did not permit the Court to determine whether the parole officers acted adjudicatively or administratively in imposing special conditions). [16]

[16]     Defendants cite to *Stewart v. Smallwood*, No. 92 Civ. 4043, 1993 WL 77381 (S.D.N.Y. Mar. 15, 1993), in support of the argument that officials who imposed parole conditions are absolutely immune from civil damages. In *Hartwick,* Judge Hurd deviates from the decision in *Stewart* noting that the court found "parole board officials absolutely immune without further inquiry." *Hartwick*, 2020 WL 6781562, at \*8.

### E. Qualified Immunity

In the alternative, Defendants argue that they are shielded from liability based on the doctrine of qualified immunity because Peoples had no clearly established right to be free from the special conditions he challenges. [17] Dkt. No. 71-29 at 26-27.

[17]   To the extent that Defendants move for summary judgment and dismissal of all claims based on the doctrine of qualified immunity, I do not consider these arguments in the context of claims for which I have already recommend dismissal in this Report-Recommendation. *See Armand v. Simonson,* 12-CV-7709, 2016 WL 1257972, at *15 (S.D.N.Y. Mar. 30, 2016) ("[b]ecause the Court dismisses Plaintiff's claim against Peterson, there is no need to consider whether she may also be entitled to qualified immunity."); *see also Posr v. City of New York,* 10-CV-2551, 2013 WL 2419142, at *10, n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher,* 569 Fed. App'x 32 (2d Cir. 2014).

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso,* 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York,* 492 Fed. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " *Phillips v. Wright,* 553 Fed. App'x 16, 17 (2d Cir. 2014) (quoting *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir. 2013)). "Even

if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Doe v. Lima,* 270 F.Supp.3d 684, 710 (S.D.N.Y. 2017) (citations omitted), *aff'd sub nom. Doe v. Cappiello,* 758 Fed. App'x 181 (2d Cir. 2019).

**\*27**   Qualified immunity only bars monetary damages - it does not bar declaratory and injunctive relief. *Robinson v. New York,* 486 Fed. App'x 905, 907 (2d Cir. 2012); *Singleton v. Doe,* 210 F.Supp.3d 359, 371 (E.D.N.Y. 2016) (citing *Allen v. Coughlin,* 64 F.3d 77, 81 (2d Cir. 1995)). Thus, Defendants' motion for summary judgment and dismissal of the claims for declaratory relief and injunctive relief prohibiting the enforcement of the special conditions of parole is denied.

With respect to Peoples' claim for monetary damages, the record contains genuine issues of material fact as to the constitutionality of certain Special Conditions of parole. As such, the first prong of the qualified immunity analysis has been met.

With respect to the second prong, in support of the motion for summary judgment, Defendants summarize the legal standards related to qualified immunity and state, in a cursory manner, that Peoples had no clearly established right to be free from any of the special conditions of confinement. Dkt. No. 71-29 at 27. While Defendants are correct, it is also well established that parole conditions may not be applied in an arbitrary and capricious manner and must be reasonably related to the parolee's underlying offense. *Yunus,* 2019 WL 168544, at *19 (S.D.N.Y. Jan. 11, 2019) (citation omitted); *Scott,* 2020 WL 4274226, at *13. As discussed *supra,* there are genuine issues of material fact as to whether Defendants acted arbitrarily and capriciously in imposing Special Conditions 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33. Further, as previously noted, cases in this Circuit have held that special conditions on internet and computer access may infringe upon a parolee's First Amendment rights if the restrictions are overly-broad and not reasonably related to a parolee's past conduct. Defendants' brief lacks any argument suggesting that Peoples' right to be free from some or all of these conditions was not clearly established. On the basis of the record before it, the Court cannot find that Defendants are entitled to the protections of qualified immunity.

2021 WL 1582173

Therefore, the Court recommends denying Defendants' motion for summary judgment and dismissal based upon qualified immunity.

### F. Declaratory and Injunctive Relief Against Leon

Leon avers, and Peoples does not dispute, that she retired from DOCCS in January 2020 and is no longer employed by DOCCS. Dkt. No. 71-23 at ¶1. Therefore, because Leon does not have the authority to remedy any ongoing constitutional violations, Peoples cannot seek injunctive or declaratory relief against her. *Marshall v. Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *8 (S.D.N.Y. Mar. 22, 2018). Accordingly, Peoples' claims for injunctive and declaratory relief against Leon are dismissed, sua sponte, as moot. *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 CIV. 3826, 2012 WL 2367033, at *2 (S.D.N.Y. June 21, 2012) (finding that retiree has no ability to provide injunctive relief) (citing *Corr. Officers Benevolent Assoc. v. Kralik*, No. 04–CV–2199, 2009 WL 856395, at *8 (S.D.N.Y. Mar. 26, 2009)) ("[B]ecause a defendant no longer occupied the position which he occupied at the time of the underlying events, and therefore did 'not have the official capacity necessary to enable him to comply with the injunctive relief sought,' he had to be dismissed from the case").

### G. Doe Defendants

**\*28**  As discussed *supra*, Peoples asserted claims against two unnamed defendants identified as Commissioner Jane Doe and Commissioner John Doe. Compl. at 1, 2. In a Memorandum-Decision and Order issued on February 19, 2019 (the "February Order"), the Court directed Plaintiff to "take reasonable steps to ascertain their identities through discovery[.]" Dkt. No. 8 at 10. Peoples was advised to amend the operative pleading to properly name the individuals as parties and was advised that if he failed to ascertain the identify of the Doe defendants to permit timely service of process, all claims against the individuals were subject to dismissal. *Id.*

Peoples did not comply with the February Order and, further, his opposition to Defendants' motion is devoid of any reference to the Doe Defendants. Therefore, as to the still unidentified John Doe and Jane Doe Defendants, I recommend these Defendants be dismissed based upon: (1) Fed. R. Civ. P. 16(f) for failure to comply with a court

order pursuant to; (2) Fed. R. Civ. P. 41(b) and N.D.N.Y.L.R. 41.2(a) for failure to prosecute under; and (3) Fed. R. Civ. P. 4(m) for failure to serve within 90 days.

### IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment and dismissal (Dkt. No. 71) be **GRANTED** as to:

a. Plaintiff's claims for monetary damages against Defendants in their official capacities;

b. Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 3, 4, 8, 10, 14, 15, 16, 32, 34, 35, and 36;

c. Plaintiff's claims for monetary damages against Stanford in her individual capacity; and it is further

**RECOMMENDED**, that Defendants' motion (Dkt. No. 71) be **DENIED** as to:

 a. Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33; and

 b. Plaintiff's claims for injunctive relief against Stanford in her official capacity; and

 c. the issue of judicial immunity; and

 d. the issue of qualified immunity; and it is further

**RECOMMENDED**, that Plaintiff's claims against Jane Doe and John Doe be **DISMISSED**, *sua sponte;* and it is further

**RECOMMENDED**, that Plaintiff's claims for injunctive and declaratory relief against Leon be **DISMISSED**, sua sponte; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules; and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [18] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk

**Peoples v. Leon, Slip Copy (2021)**

2021 WL 1582173

of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

18    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have

seventeen days from the date the order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(c).

**All Citations**

Slip Copy, 2021 WL 1582173

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Fox v. Harris, Not Reported in Fed. Supp. (2017)
2017 WL 1319835

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 107 of 115

2017 WL 1319835
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javell FOX, Plaintiff,
v.
Sgt. HARRIS, Defendant.

6:15-CV-0616 (LEK/ATB)
|
Signed 04/07/2017

**Attorneys and Law Firms**

Javell Fox, Attica, NY, pro se.

David A. Bagley, Kernan Professional Group, LLP, Oriskany, NY, for Defendant.

## MEMORANDUM-DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

### I. INTRODUCTION

*1 Pro se plaintiff Javell Fox commenced the present action in Oneida County Supreme Court under 42 U.S.C. § 1983, alleging violations of his right of access to the courts. Dkt. No. 2 ("Complaint"). The case was removed to the Northern District of New York on May 20, 2015. Dkt. No. 1 ("Notice of Removal"). Presently before the Court is defendant Sergeant Deborah Harris's motion for summary judgment. Dkt. No. 29 ("Motion"); see also Dkt. Nos. 29-27 ("Memorandum"), 29-26 ("Harris Statement of Material Facts"). Fox filed a response, Dkt. No. 34-1 ("Response"); see also Dkt. No. 34-2 ("Fox Statement of Material Facts"), and Harris filed a reply, Dkt. No. 37 ("Reply"). For the following reasons, the Motion is granted.

### II. BACKGROUND

#### A. Factual Background
On October 27, 2011, Fox was charged in the County Court of Oneida County, New York, with third- and fourth-degree criminal possession of a controlled substance, resisting arrest, and second-degree harassment. Dkt. No. 29-16 ("Zennamo Declaration") ¶ 3. One day earlier, Cory Zennamo, an assistant public defender in Oneida County, had been assigned to represent Fox in the case. Id. ¶¶ 1–2. Zennamo represented

Fox throughout the criminal proceedings, "including at trial and sentencing." Id. ¶ 4. Zennamo also filed pretrial motions, including a motion to suppress, and participated in Huntley and Mapp hearings. Dkt. Nos. 29-17 ("Exhibit A"), 29-18 ("Exhibit B"), 29-19 ("Exhibit C"), 29-20 ("Exhibit D"). [1] Without the assistance of Zennamo, Fox filed his own motions in the case. Dkt. No. 29-24 ("Exhibit 5"). On April 5, 2012, after a two-day bench trial, Fox was found guilty on all counts. Dkt. No. 29-22 ("Exhibit E") at 145:13–25. On May 21, 2012, Fox received a ten-year sentence for his crimes, Dkt. No. 29-23 ("Exhibit F") at 5:3–14, and the Appellate Division of the New York Supreme Court, Fourth Department, affirmed Fox's conviction on January 2, 2015, People v. Fox, 999 N.Y.S.2d 293, 295 (App. Div. 2015).

[1]  A hearing under People v. Huntley, 204 N.E.2d 179 (N.Y. 1965), "is held to determine the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers," Torres v. Ercole, No. 06-CV-674, 2009 WL 4067281, at *1 n.2 (S.D.N.Y. Nov. 24, 2009). A hearing under Mapp v. Ohio, 367 U.S. 643 (1961), is held "when the defendant alleges that physical evidence sought to be used against him or her was obtained illegally by law enforcement officers and is inadmissible at trial," Cardova v. Lavalley, 123 F. Supp. 3d 387, 392 n.2 (E.D.N.Y. 2015) (quoting Montgomery v. Wood, 727 F. Supp. 2d 171, 186 (W.D.N.Y. 2010)).

Fox was not pleased with Zennamo's performance. Fox SMF ¶ 11. Specifically, Fox alleges that Zennamo "failed to call [Fox's] alibi witness to go to the Grand Jury" or the trial, id. ¶¶ 5, 8, "refused to allow [Fox] to review pretrial motions before he submitted them," id. ¶ 6, and "failed to preserve [d]iscovery in the form of dashcam footage that would have gotten the narcotics [Fox] was charged with suppressed and the case dismissed," id. ¶ 8. Fox has been pursuing an ineffective assistance of counsel claim stemming from Zennamo's representation; the Appellate Division, in affirming Fox's conviction, rejected that claim. Fox, 999 N.Y.S.2d at 294–95. Fox also sued Zennamo in the Northern District for depriving him of his constitutional rights and committing attorney malpractice, and this Court dismissed his complaint with prejudice on March 18, 2016. Fox v. Zennamo, No. 15-CV-587, 2016 WL 1090583, at *3 (N.D.N.Y. Mar. 18, 2016) (Kahn, J.).

*2 Fox was incarcerated at the Oneida County Correctional Facility (the "Jail") from August 20, 2010, to March 1, 2011,

**Fox v. Harris, Not Reported in Fed. Supp. (2017)**

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 108 of 115

2017 WL 1319835

and then from October 4, 2011, to June 1, 2012. Dkt. Nos. 29-4 ("Zurek Affidavit") ¶ 2, 29-15 ("Harris Affidavit") ¶ 3. Thus, Fox was incarcerated in the Jail from charging to sentencing for the crimes discussed above. The Jail usually "houses over 500 inmates and has one Corrections Service Aide assigned to its law library." Zurek Aff. ¶ 6; Harris Aff. ¶ 6. The Jail maintains a policy of both allowing inmates to "consult with counsel and making available legal reference materials." Zurek Aff. ¶ 5; Harris Aff. ¶ 5. Fox took advantage of the policy; he testified to having made requests for 300 to 400 cases during his time at the Jail. Dkt. No. 29-3 ("Fox Deposition") at 46:23–47:5. That is unsurprising, for Fox is a prolific litigant, having filed fourteen lawsuits in state court in 2011 and 2012 alone. Dkt. No. 29-25 ("Exhibit 6") at 1.

Sometime in late October or early November 2010, the law librarian at the Jail told Harris, one of the Jail's supervisors of inmate programs, Harris Aff. ¶ 2, that Fox was making "a large number of requests for [legal] materials," id. ¶ 9; Zurek Aff. ¶ 10. Harris informed Captain Liddy of Fox's behavior, and Liddy referred the matter to Lisa Zurek, another supervisor of inmate programs at the Jail. Zurek Aff. ¶¶ 1, 10; Harris Aff. ¶ 9. Zurek then asked Harris to tell her how many requests Fox had made, and on November 2, 2010, Harris told Zurek that Fox "had made over 100 requests, all of which had been honored." Zurek Aff. ¶ 10; Harris Aff. ¶ 9. After receiving this information, Zurek informed Liddy that Fox's requests "contained at least 5 items per request." Zurek Aff. ¶ 10. On November 4, 2010, Liddy responded to Zurek by directing that Fox "be limited to one item per day with a maximum of 20 pages, 5 days per week." Id.; Harris Aff. ¶ 9. [2] The same day, Harris informed Fox of the new restrictions. Zurek Aff. ¶ 10. Harris says she was "involved subsequently from time to time in regard to ... Fox's law library usage," but stresses that she "never personally imposed restrictions" on Fox's access to legal materials. Harris Aff. ¶ 10.

[2]       Fox now says he was limited to "1 case law every 10 days," Fox SMF ¶ 18, but in his deposition he testified that he was restricted to one case per day, Fox Dep. at 44:20–45:5, 46:3–16. Fox cannot escape summary judgment via "self-serving statements ... made in his opposition that contradict his sworn deposition testimony." Brown v. Russo, No. 15-CV-6215, 2016 WL 7410659, at *1 n.1 (E.D.N.Y. Dec. 22, 2016) (collecting cases).

Fox filed grievances about the restrictions on his access to legal materials. Zurek Aff. ¶¶ 11, 14. He now claims that

but for these restrictions, he would have been able, during pretrial proceedings and the trial itself, to perform the research necessary to correct the deficiencies he saw in Zennamo's representation, namely, Zennamo's failure to make use of the alibi witness and obtain the dashcam footage. Resp. at 8–9. That, according to him, shows that he was denied access to the courts. Id.

### B. Procedural History

Fox brought this case against defendants Edna P. Hobbie, Anne Lamont, Harris, Zurek, Liddy, and the Jail. Compl. at 3. [3] On May 25, 2015, Defendants filed an unopposed motion to dismiss, Dkt. No. 5 ("Motion to Dismiss"), which the Court granted in part and denied in part on March 18, 2016, Fox v. Hobbie, No. 15-CV-616, 2016 WL 1090585, at *4 (N.D.N.Y. Mar. 18, 2016) (Kahn, J.). The Court dismissed all claims against Hobbie, Lamont, Zurek, Liddy, and the Jail. Id. On November 29, 2016, Harris, the sole remaining defendant, moved for summary judgment. Mot. She argues that Fox's access-to-the-courts claim fails because he has not demonstrated actual injury from the restrictions on his access to legal materials, and because his right of access to the courts during pretrial proceedings and the trial itself was satisfied by Zennamo's representation. Mem. at 4–7. Harris also argues that she is entitled to qualified immunity. Id. at 7–8. [4]

[3]       The page numbers for this document refer to those generated by the Court's electronic filing system ("ECF").

[4]       Fox continues to assert that Harris's Motion is untimely and should therefore be denied. Dkt. Nos. 38, 39. Yet as Judge Baxter noted on December 6, 2016, Harris's Motion was "timely filed before the extended deadline of 1/6/2017." Dkt. No. 31.

### III. LEGAL STANDARD

**\*3** Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable

Fox v. Harris, Not Reported in Fed. Supp. (2017)

2017 WL 1319835

trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

Prisoners "have a constitutional right of access to the courts." Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (quoting Bounds v. Smith, 430 U.S. 817, 821 (1977)). This right, however, is not "an abstract, freestanding right to a law library or legal assistance." Lewis v. Casey, 518 U.S. 343, 351 (1996). "The point is to provide prisoners with the tools" to present their claims to the courts. Bourdon, 386 F.3d at 93. Thus, "appointment of counsel can be a valid means of satisfying a prisoner's right of access to the courts." Id.; see also Perez v. Metro. Corr. Ctr. Warden, 5 F. Supp. 2d 208, 211 (S.D.N.Y. 1998) ("If an inmate is provided with legal counsel, the inmate is given a 'reasonably adequate opportunity' to present his claim and there is no violation of constitutional ... magnitude."), aff'd sub nom. Perez v. Metro. Corr. Ctr.'s Warden 181 F.3d 83 (2d Cir. 1999). Since Fox was represented by counsel during his criminal case, he cannot succeed on his access-to-the-courts claim unless he shows that "the provision of counsel did not furnish him with the *capability* of bringing his challenges before the courts,

not that he was denied effective representation in the court." Bourdon, 386 F.3d at 98 (emphasis added); see also Hayes v. County of Sullivan, 853 F. Supp. 2d 400, 437 (S.D.N.Y. 2012) ("The Bourdon court explicitly declined to import the Sixth Amendment standard for ineffective assistance of counsel into its analysis.").

**\*4** There is no evidence in the record that Fox lacked the ability to bring his challenges before the state trial court. Zennamo filed an omnibus pretrial motion and a motion to suppress in addition to participating in Mapp and Huntley hearings. Zennamo Decl. ¶ 5. The court in Hayes confronted a similar situation: the plaintiff's attorney had filed "a lengthy omnibus pre-trial motion, conducted two days of suppression hearings, and filed a supplemental affirmation in support of [his] suppression motion." 853 F. Supp. 2d at 437. Yet the Hayes court found it "abundantly clear" from the attorney's conduct that the plaintiff was not denied his right of access to the courts. Id. The Court sees no reason to depart from that conclusion here.

Fox was deeply dissatisfied with his lawyer's performance, but that is irrelevant to his access-to-the-courts claim given his inability to show that Zennamo was *incapable* of pursuing arguments Fox thought meritorious. See Bourdon, 386 F.3d at 99 ("[N]otwithstanding [the plaintiff's] allegation that his attorney was ineffective, the fact that [he] was represented by counsel—professional legal assistance provided at the government's expense—and that [he] has not demonstrated that he was hindered from pursuing a particular legal claim, established constitutionally acceptable access to the courts."). Fox's main problem with Zennamo is that Zennamo failed to call an alibi witness and was unable to obtain crucial dashcam footage. Fox SMF ¶¶ 5–6, 8. In effect, Fox asserts that Zennamo "ineffectively represented" him. Id. ¶ 11. But Fox's "redress for his alleged ineffective assistance of counsel is through an ineffective assistance of counsel claim, not through an access to courts claim against [Harris,] who do[es] not have any [control over] legal counsel's performance." Bovarie v. Tilton, No. 06-CV-687, 2010 WL 743741, at \*5 (S.D. Cal. Mar. 1, 2010); see also Johnson v. Doe, No. 12-CV-10918, 2016 WL 3997026, at \*6 (E.D. Mich. July 26, 2016) (rejecting an access-to-the-courts claim because "[t]he basic cause of the plaintiff's failure to raise [certain] issues in state court was his attorney's election to omit them from counsel's brief; but for that choice, the issues certainly could have been raised in that filing, which was timely submitted in the state court"); Garrett v. Picknell, No. 09-CV-13958, 2010 WL 2805107, at \*4 (E.D. Mich. May 6, 2010) (rejecting the

Case 9:20-cv-00242-MAD-TWD   Document 70   Filed 06/03/22   Page 110 of 115
Fox v. Harris, Not Reported in Fed. Supp. (2017)
2017 WL 1319835

plaintiff's argument that "the mere appointment of an attorney is not enough and that his constitutional right to access the court was not satisfied by the appointment of counsel in his criminal case because the counsel in that case failed to render effective legal assistance"), adopted by 2010 WL 2804929 (E.D. Mich. July 15, 2010). [5]

[5]   To the extent that Fox asserts that Harris violated his right of access to the courts by denying him the ability to file his own motions concurrently with Zennamo's representation, that claim fails because Fox "has no federal constitutional right to represent himself and concurrently be represented by counsel." Foss v. Racette, No. 12-CV-59, 2012 WL 5949463, at *4 (W.D.N.Y. Nov. 28, 2012) (citing United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996)).

As noted above, Fox appears to be pursuing his ineffective assistance claim before other courts, and he should continue to do so if he remains dissatisfied with Zennamo's representation. But, to repeat, the ineffectiveness of a state-appointed attorney is not enough to raise a genuine issue of material fact as to an access-to-the-courts claim. Further, while Fox appears to assert that the Jail denied him access to his attorney "by not providing free legal calls and 5 free legal postage as required by New York State Commission of Corrections," Fox SMF ¶ 14, he has not provided any evidence of Harris's personal involvement in this alleged failure, a prerequisite for establishing her individual liability

under § 1983, see Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994))). Accordingly, summary judgment is appropriate with respect to Fox's access-to-the-courts claim. [6]

[6]   Because the Court disposes of Fox's claim on the ground that he was represented by counsel during the criminal proceedings, it need not reach Harris's arguments about actual injury and qualified immunity.

## V. CONCLUSION

**\*5**  Accordingly, it is hereby:

**ORDERED**, that Harris's Motion for Summary Judgment (Dkt. No. 29) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2017 WL 1319835

End of Document                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 977222
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leroy PEOPLES, Plaintiff,
v.
Gina R. LEON, et al., Defendants.

9:18-CV-1349 (LEK/ML)
|
Signed 03/16/2021

**Attorneys and Law Firms**

Leroy Peoples, Binghamton, NY, pro se.

Keith J. Starlin, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1 Pro se plaintiff Leroy Peoples, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow C.F."), brings this action against Defendants Offender Rehabilitation Coordinator ("ORC") Gina R. Leon, New York State Board of Parole ("Board") Commissioner Ellen E. Alexander, Board Chairwoman Tina M. Stanford, Board Commissioner Jane Doe, and Board Commissioner John Doe, in their individual and official capacities, asserting claims pursuant to 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment rights in connection with the imposition of certain special conditions of parole (the "Special Conditions"). Dkt. Nos. 1 ("Complaint"); 1-1 ("Peoples' Memorandum of Law"). On July 17, 2020, Defendants filed a motion for summary judgment. Dkt. Nos. 71 ("Motion"); 71-29 ("Defendants' Memorandum of Law"). In a Report-Recommendation issued on January 4, 2021, the Honorable Miroslav Lovric, United States Magistrate Judge, granted Defendants' Motion in part and denied it in part. Dkt. No. 89 ("Report-Recommendation"). For the reasons that follow, the Court adopts the Report-Recommendation in its entirety.

**II. BACKGROUND**

The facts are detailed in the Report-Recommendation, familiarity with which is assumed. For convenience, the Court outlines the facts here and discusses other factual details as necessary throughout this Memorandum-Decision and Order.

Peoples was sentenced in 2005 to a term of imprisonment based on convictions for two instances of rape. See R. & R. at 4. The sentences were to run concurrently, with the longer being sixteen years. See id. The sentencing court certified Peoples as a "Sex Offender" pursuant to New York Correction Law § 168-d (the "Sex Offender Registration Act" or "SORA") and advised him that he would be obligated to register as a sex offender in New York. See id.

At an October 17, 2018 hearing, the Board denied Peoples discretionary release to parole and mandated that he be held until June 7, 2019, his maximum expiration date. See id. at 5. The Board also imposed thirty-six Special Conditions. See id. at 6. In May 2019, pursuant to a recommendation by the Board of Examiners of Sex Offenders, the Honorable Ira H. Margulis of the Queens County Supreme Court determined that Peoples' risk level under SORA was three and designated him a "sexually violent offender." See id. at 10. Peoples was released in June 2019. See id. at 10. In August 2019, he was arrested for violating the conditions of his parole. See id. He ultimately pled guilty to tampering with his global positioning system monitoring device and removing it from his ankle and was ordered held for eighteen months. See id.

Peoples challenges twenty-six of his Special Conditions on constitutional grounds. See id. at 6–10. In their Motion, Defendants argued that: (1) Peoples' claims for monetary damages are barred by the Eleventh Amendment; (2) the First and Fourteenth Amendment claims related to the Special Conditions must be dismissed, because the conditions were reasonably related to Peoples' crimes and tailored to serve legitimate state interests; (3) judicial immunity bars Plaintiff's claims against Alexander; (4) Stanford was not liable in her individual capacity, because she was not personally involved in the October 2018 determination; and (5) all Defendants are entitled to qualified immunity with respect to Peoples' First and Fourteenth Amendment claims. See id. at 14.

*2 Magistrate Judge Lovric granted the Motion to the following extent: Peoples' claims for monetary damages against Defendants in their official capacities were dismissed; Peoples' constitutional claims were dismissed with respect to eleven of the challenged Special Conditions; and his claims for monetary damages against Stanford in her individual

2021 WL 977222

capacity were dismissed. Magistrate Judge Lovric also dismissed Peoples' claims against Jane Doe and John Doe, and Peoples' claims for injunctive and declaratory relief against Leon, sua sponte. See id. at 58.

The magistrate judge permitted Peoples' First and Fourteenth Amendment claims related to the fifteen remaining Special Conditions to proceed, as well as his claims for injunctive relief against Stanford in her official capacity. Further, Magistrate Judge Lovric denied Defendants' Motion with respect to the issues of judicial immunity and qualified immunity. See id. at 58–59.

Peoples and Defendants have each objected to portions of the Report-Recommendation. Dkt Nos. 90 ("Peoples' Objections"); 95 ("Defendants' Objections").

## III. STANDARDS OF REVIEW

### A. Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

### B. Summary Judgment

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. 2548.

## IV. DISCUSSION

**\*3** The Court addresses each side's objections, in turn. For the reasons that follow, the Report-Recommendation withstands all objections.

### A. Constitutional Claims Related to Special Conditions

Parolees are entitled to some form of due process in the imposition of special conditions of parole. Pollard v. U.S. Parole Comm'n, No. 15-CV-9131, 2016 WL 3167229, at *4 (S.D.N.Y. June 6, 2016) (citing U.S. v. Green, 618 F.3d 120, 122 (2d Cir. 2010)). This "limited due process right" entitles a parolee to conditions of parole that are reasonably related to his prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. See Singleton v. Doe, No. 14-CV-0303, 2014 WL 3110033 at *3 (E.D.N.Y. July 7, 2014); U.S. v Myers, 426 F.3d 117, 123–24 (2d Cir. 2005) (summary order); Robinson v. Pagan, No. 05-CV-1840, 2006 WL 3626930, at *6 (S.D.N.Y. Dec. 12, 2006); Yunus v. Robinson, No. 17-CV-5839, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019). "If a special condition implicates a fundamental liberty interest," the court "must carefully examine it to determine whether it is reasonably related to the pertinent factors, and involves no greater deprivation of liberty than is reasonably necessary[.]" Myers, 426 F.3d at 126 (internal quotation marks omitted). Courts "must use

common sense to guide [their] interpretation of supervised release conditions." U.S. v. Moritz, 651 Fed. App'x 807, 810 (10th Cir. 2016) (citations omitted).

### B. Peoples' Objections

Plaintiff's Objections pertain to three Special Conditions of parole that Magistrate Judge Lovric held were constitutional.

Special Condition 14 provides, "I will comply with geographical restrictions as directed by [the Parole Officer]." See R. & R. at 26. Peoples alleged in his Complaint that he had a constitutional right to travel within the state. See R. & R. at 27 (citing Peoples' Mem. of Law at 11). The magistrate judge noted that parole limitations on travel and association are generally constitutional, and that Special Condition 14 was justified under the circumstances, based on evidence that Peoples had a history of leaving the state without permission, failing to appear for court appearances, and tampering with his GPS monitoring device. See id.

Peoples objects that he is not an "offender subject to civil-management ... making the imposition of a 'GPS' ankle-monitor [as] a special condition of parole unconstitutional." Peoples' Objs. at 2. This argument is improperly raised for the first time in objections. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 5408163, at *2 (N.D.N.Y. Sept. 28, 2016) ("[A] district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance."). In any case, the argument lacks merit: regardless of whether Peoples is subject to civil management, see N.Y. Mental Hygiene Law Article 10, the Board can require GPS monitoring if the restriction is reasonably related to Peoples' prior conduct. Cf. Lando v. Annucci, No. 18-CV-1472, 2021 U.S. Dist. LEXIS 41935, at *15, 2021 WL 1131475 (N.D.N.Y. Mar. 4, 2021) (report-recommendation) (denying motion to dismiss due process challenge to GPS monitoring condition when the condition had no basis in past conduct).

**\*4** Special Condition 16 provides, "I will not us[e] or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor." See R. & R. at 31. Peoples argued that this condition violated his right to privacy by interfering with his marital relationship, and that the condition was analogous to "penile plethysmography testing." See id.; Peoples's Mem. of Law at 12–13. The magistrate judge found that this condition

was reasonably related to Peoples' criminal history as a sex offender and to the goal of ensuring public safety. See R. & R. at 31. In his objections, Peoples repeats the argument that Special Condition 16 is analogous to penile plethysmography testing and is thus unconstitutional. See Peoples' Objs. at 2; see also United States v. McLaurin, 731 F.3d 258 (2d Cir. 2013) (invalidating a special condition mandating penile plethysmography). Since the magistrate judge did not address this argument, the Court reviews it de novo. Having done so, the Court rejects Peoples' contention that restricting the use of drugs for improving sexual performance is analogous to requiring the invasive penile plethysmography procedure. [1]

[1]     "This examination involves the use of a device known as a plethysmograph which is attached to the subject's penis. In some situations, the subject apparently may be required, prior to the start of the test, to masturbate so that the machine can be 'properly' calibrated. The subject is then required to view pornographic images or videos while the device monitors blood flow to the penis and measures the extent of any erection that the subject has. The size of the erection is, we are told, of interest to government officials because it ostensibly correlates with the extent to which the subject continues to be aroused by the pornographic images." McLaurin, 731 F.3d at 259.

Special conditions 3, 4, and 8 require Peoples to participate in a substance abuse treatment program, an alcohol abuse treatment program, and, "anti-aggression/anti-violence counseling," respectively. See R. & R. at 22 (citing Peoples' Mem. of Law at 10). Peoples argued that the imposition of these conditions was arbitrary and capricious, because he had satisfactorily completed "Aggression Replacement Training" and "Alcohol and Substance Abuse Treatment" while in prison and has since been sober. See id. The magistrate judge found that these Special Conditions were reasonably related to legitimate penological objectives and to Peoples' history of violence and drug use. See id. at 22–25. In his objections, Peoples improperly raises new arguments. See Peoples' Objs. at 3; see Ross, 2016 WL 5408163, at *2. The Court finds no clear error in the magistrate judge's analysis.

Accordingly, having reviewed the portions of the magistrate judge's Report-Recommendation to which Peoples objected, the Court adopts them.

### C. Defendants' Objections

2021 WL 977222

Defendants object to the magistrate judge's findings with respect to the constitutionality of certain special conditions, his conclusion that Alexander is not entitled to judicial immunity, his conclusion that a claim for injunctive relief should proceed against Stanford, and his conclusion that Defendants are not entitled to qualified immunity. See generally Defs.' Objs.

Defendants dispute the magistrate judge's findings regarding Special Conditions 11, 18, 20–31, and 33. See Defs.' Obj. at 4–7. With respect to all but Special Condition 11, Defendants offer only a general objection that the Report-Recommendation is incorrect. Defendants ask this Court to review Alexander's declaration and Defendants' summary judgment brief in full, and assert that once the Court does so, it will realize the wisdom of Defendants' arguments:

> Due to the length of the analysis in question, and with the knowledge that this Court will be reviewing Defendants' motion papers in their entirety, for the sake of brevity, Defendants respectfully refer the Court to that extensive discussion for a more detailed discussion and analysis of special conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33, and the rationale for applying them to this particular Plaintiff in light of the relevant facts and circumstances, and incorporate that discussion herein.

 *5  Defs.' Objs. at 6. The Court reviews this objection under the same standard of review that would apply if Defendants had made no objection at all. See Barnes, 2013 WL 1121353, at *1. Having reviewed the relevant portions of the magistrate judge's detailed and thoughtful opinion, the Court finds no clear error.

With respect to Special Condition 11, Defendants offer a marginally more specific objection. Special Condition 11 provides, "I will comply with all case specific sex offender conditions to be imposed by the P.O." See R. & R. at 46. The magistrate judge found that this condition was unconstitutionally vague, as it does not provide Peoples with notice of what conduct will result in his being returned to prison. See id. at 46. Defendants direct the Court's

attention to Alexander's statement in her declaration that the condition "simply 'authorizes Plaintiff's parole officer to impose "case specific" sex offender conditions of release based on Plaintiff's individual case and circumstances,' and is thus, 'specifically tailored to Plaintiff as he is indeed a sex offender and it simply enables the calibration of his conditions according to his particular risk factors and criminogenic needs.' " See Defs.' Objs. at 7 (quoting Dkt. 71-2 ¶ 49 (D)). The magistrate judge already addressed this evidence. See R. & R. at 46. But as the Report-Recommendation notes, Defendants failed to offer any legal argument or case law in support of their Motion with respect to Special Condition 11. See id. They still do not. Defendants' mere reiteration of an initially perfunctory argument merits review for clear error. See Barnes, 2013 WL 1121353, at *1. The Court finds none.

Next, Defendants object to the magistrate judge's finding that Alexander is not entitled to judicial immunity. In their Motion, Defendants argued that Alexander was entitled to absolute immunity, because the Board, in imposing the Special Conditions, was serving a quasi-judicial function, and a parole board official is entitled to absolute immunity when she performs a quasi-adjudicative role. See Defs.' Mem. of Law at 17–18. The magistrate judge denied the Motion with respect to judicial immunity based on Defendants' failure to address nuances in the doctrine of judicial immunity as applied to parole board officials. See R. & R. at 53. Namely, while certain functions of a parole board, such as granting, denying, and revoking parole, are generally quasi-judicial, the imposition of special conditions is under some circumstances a merely administrative function. See id. (collecting cases). Defendants did not address the question of why the imposition of special conditions was in this case judicial. In other words, in neglecting to argue a complex, fact-intensive question by identifying the relevant legal principles and applying them to the evidence, Defendants failed to meet their burden of persuasion. See 11 MOORE'S FEDERAL PRACTICE - Civil § 56.40 (2021) ("[T]he moving party bears an ultimate burden of persuading the court that a trial is unnecessary."); id. at § 56.20 ("[T]he movant must identify and establish the legal principles that entitle it to judgment as a matter of law[.]"); Celotex Corp. v. Catrett, 477 U.S. 317, 330–331 & n.2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The burden of persuasion imposed on a moving party by Rule 56 is a stringent one. Summary judgment should not be granted unless it is clear that a trial is unnecessary.") (citations omitted). They now present five pages of new arguments and factual analysis in an attempt to meet this burden after the fact. See Defs.' Objs. at 9–13. The Court cannot

consider these arguments. See Ross, 2016 WL 5408163, at \*2. Having otherwise reviewed this portion of the Report-Recommendation for clear error, the Court finds none.

 **\*6** Further, Defendants object to the magistrate judge's denial of their Motion with respect to Peoples' claim for injunctive relief against Stanford. See Defs.' Objs. at 13–15. The magistrate judge correctly found that Defendants failed to address whether Stanford was properly named for purposes of injunctive relief, instead focusing exclusively on her personal involvement for purposes of monetary relief. See R. & R. at 52; Defs. Mem. of Law 18–23. A defendant need not have been personally involved in a constitutional violation to be properly named in her official capacity for purposes of injunctive relief. See Smith v. Perez, No. 19-CV-1758, 2020 WL 2307643, at \*6 (D. Conn. May 8, 2020) (noting that a claim for injunctive relief can only proceed against defendants who "plausibly have the authority to grant the prospective relief"); Vaughan v. Aldi, No. 19-CV-107, 2019 WL 1922295, at \*2 (D. Conn. Apr. 29, 2019) (prison warden was proper defendant for official capacity claim seeking injunctive relief even though he lacked personal involvement in alleged constitutional violation). In their objections, Defendants reiterate their initial irrelevant argument that Stanford was not personally involved in any alleged constitutional violation. See Defs.' Objs. at 13–15. This reiteration warrants review for clear error. See Barnes, 2013 WL 1121353, at \*1. There is none.

Defendants additionally object to the magistrate's finding that they are not entitled to qualified immunity. In this portion of their objections, Defendants recount the nature of Peoples' crimes, and then appear to assert that due to the serious nature of his offenses, he does not have *any* "clearly established" constitutional rights pertaining to the imposition of special conditions. See Defs.' Objs. at 17. This perfunctory, legally unsupported argument merits clear error review. See Barnes, 2013 WL 1121353, at \*1. Aside from this objection, Defendants argue in general terms that the Special Conditions were sufficiently tailored. This also warrants clear error review. See id. The Court finds no clear error.

Finally, Defendants assert that they are entitled to Eleventh Amendment immunity, see Defs.' Objs. at 25, even though there are no remaining damages claims against Defendants in

their official capacities, see R. & R. at 58. Under any standard of review, the magistrate judge did not err.

Having reviewed the remaining portion of the Report-Recommendation, to which the parties have not objected, the Court finds no clear error.

**V. CONCLUSION**
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 89) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 71) is **GRANTED in part and DENIED in part.** The motion is **DENIED** as to Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33; Plaintiff's claims for injunctive relief against Stanford in her official capacity; the issue of judicial immunity; and the issue of qualified immunity. Plaintiff's claims against Jane Doe and John Doe, and Plaintiff's claims for injunctive and declaratory relief against Leon are **DISMISSED** sua sponte. Defendant's motion is **GRANTED** as to Plaintiff's claims for monetary damages against Defendants in their official capacities; Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 3, 4, 8, 10, 14, 15, 16, 32, 34, 35, and 36; and Plaintiff's claims for monetary damages against Stanford in her individual capacity; and it is further

**ORDERED**, that the Clerk **TERMINATE** John Doe and Jan Doe from the docket; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 977222

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.